## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DR. MAHENDRA AMIN, M.D.
*address will be filed separately under seal*

    Plaintiff,

v.

TAYLOR & FRANCIS GROUP, LLC,
JESSICA TILLIPMAN, GOVERNMENT
ACCOUNTABILITY PROJECT, INC., TOM
DEVINE, SAMANTHA FEINSTEIN, and
JOHN A. KOLAR,

    Defendants.

Case No. _____

## COMPLAINT FOR DEFAMATION AND DEMAND FOR JURY TRIAL

Plaintiff, Dr. Mahendra Amin, M.D., hereby states his complaint for defamation against

Defendants Taylor & Francis Group, LLC, the Government Accountability Project, Jessica

Tillipman, Tom Devine, Samantha Feinstein, and John A. Kolar (collectively "Defendants") as

follows:

## INTRODUCTION

1.    This Complaint arises from the Defendants' April 30, 2024 publication of a book,

*The Routledge Handbook of Public Procurement Corruption*, with a chapter containing multiple

false and defamatory statements of and concerning a private figure, Dr. Mahendra Amin, M.D.,

which accuse him of performing mass hysterectomies that were not medically necessary and

were conducted without consent on immigrant women detained by the United States Immigration

and Customs Enforcement ("ICE") at the Irwin County Detention Center ("ICDC") as alleged by

an ICDC nurse named Dawn Wooten who did not observe Dr. Amin's treatment and whose accusations of mass hysterectomies without consent or necessity, first made in September 2020, have been widely and definitively discredited.

2.      The chapter falsely portrays Dr. Amin as having committed "fraud and human rights abuses" and "malpractice."

3.      The false and defamatory statements in the chapter convey to the average reader that Dr. Amin was an evil doctor seeking to carry out a sterilization campaign on immigrant women detained at ICDC in order to defraud the government and enrich himself.

4.      The statements and insinuations leveled toward Dr. Amin were reckless, vile, and devoid of any decency or concern for Dr. Amin's reputation and livelihood.

5.      The statements are false and discredited.

6.      The statements have been false and discredited since Wooten's allegations were originally reported on, with multiple media outlets and investigations reporting that Wooten's allegations of mass hysterectomies were not accurate, years before the publication of the book.

7.      Dr. Amin performed only two hysterectomies on patients from ICDC.

8.      Both hysterectomies were medically necessary.

9.      In both instances, the patients were informed and consented to the procedures, as documented by witnesses and signed inform consent forms.

10.      In both instances, ICE conducted an independent review of the treatment plans and approved the procedures.

11.      Indeed, ***all*** procedures Dr. Amin performed for ICDC patients were medically necessary, done with patient knowledge and consent as demonstrated by signed forms indicating

informed consent, and approved by ICE's independent preapproval process that must be done before any medical procedure on a patient.

12.    The statements cite a lawsuit and "the sheer size of the legal team" therein as demonstrating "the amount of public attention and outrage" as to Dr. Amin's conduct without noting that Dr. Amin was dismissed as a defendant from that lawsuit before publication of the book.

13.    The statements cite a Congressional investigation by the U.S. Senate Permanent Subcommittee on Investigations, without noting that the Report of that Subcommittee **_contradicted_** Ms. Wooten's allegations in stating that Dr. Amin had committed two hysterectomies, both medically necessary, before publication of the book.

14.    The false and defamatory statements assassinated Dr. Amin's character and damaged his reputation as a physician.

15.    Book authors and publishers have an important role to play in our society.  But they do not have an unfettered right or privilege under the First Amendment to injure the reputations of private individuals by publishing and broadcasting false and defamatory statements against them.

16.    Instead of considering their important role in sharing news and truth, the Defendants chose to chase a false narrative that supported their thesis that alleged "whistleblowers" like Wooten are "essential for making the government aware of fraud and human rights abuses that occur," at the expense of Dr. Amin, a private individual, a good and trusted doctor—an immigrant himself—who has dedicated his life to providing quality healthcare services for marginalized and underserved communities.

17.     Defendants set forth those false statements well after it was clear that Wooten's allegations regarding Dr. Amin had been disproven, which all of the Defendants knew or should have known.  Indeed, Defendant Government Accountability Project, which is the place of employment for the chapter authors, *represents* Wooten in various matters as attorney, advocate, and even press agent.

18.     As a result of the conduct described herein, the Defendants crossed the threshold from speech protected by the First Amendment to enter the arena of actionable defamation, for which they must be held legally accountable.

## PARTIES

19.     Dr. Amin is an individual who resides in Douglas, Georgia, Coffee County, and is a citizen of the State of Georgia.

20.     Taylor & Francis Group, LLC ("Taylor & Francis") is a Delaware limited liability company registered to do business in the District of Columbia.  Taylor & Francis may be served through its registered agent, Corporation Service Company, 1156 15th Street NW, Suite 605, Washington, District of Columbia, 20005.

21.     Jessica Tillipman ("Tillipman") is an individual who resides in Herndon, Virgina, 20170.  Tillipman may be served at her home address or wherever else she may be found.

22.     The Government Accountability Project, Inc. ("GAP") is a 501(c)(3) tax exempt entity with its principal place of business at 1612 K St. NW, Suite #1100 Washington, District of Columbia, 20006.  GAP may be served through its registered agent, Louis Clark, at 1612 K St. NW, Suite #1100 Washington, District of Columbia, 20006.

4

23.     Tom Devine ("Devine") is an individual who resides in Silver Spring, Maryland, 20902.  Devine may be served at his home address or wherever else he may be found.

24.     Samantha Feinstein ("Feinstein") is an individual who resides in Hillsboro, Virginia, 20131.  Feinstein may be served at her home address or wherever else she may be found.

25.     John A. Kolar ("Kolar") is an individual who resides in Adelphi, Maryland, 20783.  Kolar may be served at his home address or wherever else he may be found.

26.     Defendants, as those responsible for the publication of the book and the false and defamatory statements therein, are liable.

**JURISDICTION AND VENUE**

27.     Plaintiff Dr. Amin is a citizen of the State of Georgia for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

28.     Defendant Taylor & Francis is a citizen of Delaware or Florida for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

29.     Defendant Tillipman is a citizen of Virginia for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

30.     Defendant GAP is a citizen of the District of Columbia for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

31.     Defendant Devine is a citizen of Maryland for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

32.     Defendant Feinstein is a citizen of Virginia for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

33.     Defendant Kolar is a citizen of Maryland for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

34.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between Dr. Amin and the Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

35.     Taylor & Francis is subject to the personal jurisdiction of this Court because it transacts and has transacted business in this state.

36.     For instance, Taylor & Francis publishes hundreds of academic journals and textbooks that it sells and distributes to schools in the District of Columbia.

37.     Taylor & Francis also transacted business in the District of Columbia by contracting with the DC-based Tillipman as one of the Book's editors.

38.      Taylor & Francis also transacted business in the District of Columbia by contracting with Washington, D.C.-based Defendants GAP, Devine, Feinstein, and/or Kolar, directly or indirectly, to write the chapter of the Book containing defamatory content about Dr. Amin.

39.     Dr. Amin's claims arise from those transactions because they arise from the defamatory content of the Book, which is one of Taylor & Francis's numerous publications sold to DC-based customers, and which was written and edited by DC-based Tillipman, GAP, Devine, Feinstein, and Kolar, who were hired by Taylor & Francis.

40.     Tillipman is subject to the jurisdiction of this Court because her domicile and/or principal place of business are located in the District of Columbia.

6

41.     GAP is subject to the jurisdiction of this Court because its principal place of business is located in the District of Columbia.

42.     Devine is subject to the jurisdiction of this Court because his domicile and/or principal place of business are located in the District of Columbia.

43.     Feinstein is subject to the jurisdiction of this Court because her domicile and/or principal place of business are located in the District of Columbia.

44.     Kolar is subject to the jurisdiction of this Court because his domicile and/or principal place of business are located in the District of Columbia.

45.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Dr. Amin's claim occurred in this district.

46.     In the alternative, venue is proper in this Court under 28 U.S.C. § 1391(b)(3) because at least one defendant is subject to its personal jurisdiction.

## FACTUAL BACKGROUND

### Dr. Amin

47.     Dr. Amin was born, raised, and completed medical school in India.

48.     Dr. Amin grew up very poor, living in homes with dirt floors.  But his parents sacrificed to help him through medical school.  His parents sold the only land they owned and borrowed money to make sure he could finish his education.

49.     Dr. Amin lived up to his parents' sacrifice, becoming one of only eight out of 300 medical student hopefuls who could ultimately enroll in medical school from his district in India.

50.     When Dr. Amin first came to the United States, he worked in a New York City subway store and sold newspapers in Brooklyn, working 12 hours a day, six days a week, all while studying for additional medical exams required of foreign students.

51.     Dr. Amin completed his Residency in Gynecology in the United States and has been licensed to practice medicine in Georgia for nearly 40 years.

52.     Dr. Amin remembers his humble beginnings and the power of someone sacrificing so that others can have a better future.  That is why he has practiced in underserved areas nearly his entire medical career.

53.     Over the course of his medical career, on a regular basis, he has worked 36-hour shifts, seen over 60 patients in a day, and delivered over 400 babies in a year.

54.     He has often worked for free and for many years, he kept regular daily office hours and performed hospital surgeries at night, all to ensure that—as much as he could prevent it—no one who needed care would go without.

55.     Dr. Amin regularly treats uninsured patients (some who drive over 100 miles to see him) and accepts whatever patients can pay in return.

56.     He never turns away a patient for inability to pay.

57.     He regularly treated patients in area jails because he knows that if he does not provide treatment, it is likely the patients will go without.

58.     Until recently, Dr. Amin was the sole OB/GYN physician in Irwin County, Georgia.  At the present time, Dr. Amin is one of only two OB/GYN physicians in Irwin County, Georgia.

59.     Many of Dr. Amin's patients fall below the poverty line and are on Medicaid.

60.     Dr. Amin provides medical care to patients at a local health clinic at least once per week on a voluntary basis.

61.     Before Wooten first made false allegations that he was conducting mass hysterectomies and sterilizations without consent, Dr. Amin provided gynecological medical services to patients detained at ICDC.

62.     In the early to mid-1990s, Irwin County Hospital was on the brink of closing its doors.  Dr. Amin put up his own money, hired a management team, and kept the hospital alive. Indeed, the hospital improved with Dr. Amin's leadership—adding more patient rooms and several other upgrades.

63.     On his rare weekends away, Dr. Amin remains "on call" and instructs his nursing staff to call him if any of his patients go into labor so that he can return and deliver the babies and care for their mothers.

64.     Dr. Amin loves this country and all it has afforded him, and he is determined to give back.

65.     He is devoted to medicine and to providing care to underserved communities.

**Taylor & Francis**

66.     Taylor & Francis is an international academic publishing company that focuses on books and journals.

67.     Taylor & Francis has published tens of thousands of books and thousands of academic journals.

68.    Taylor & Francis has multiple divisions or imprints, one of which is Routledge. Routledge is a leading publisher of academic works in the humanities and social sciences, publishing thousands of titles each year.

69.    Routledge publishes an ongoing, internal series of academic books called the Routledge Handbooks, which includes hundreds of volumes on a wide range of topics and issues.

70.    On April 30, 2024, Taylor & Francis released the book underlying this suit, *The Routledge Handbook on Public Procurement Corruption*.

71.    Shockingly, this book is not the only Taylor & Francis publication containing false and defamatory statements about Dr. Amin.  Instead, Taylor & Francis has published multiple books that repeat Nurse Wooten's false allegations.

**Jesssica Tillipman**

72.    Tillipman is a licensed attorney and is the Associate Dean for Government Procurement Law Studies and Government Contracts Advisory Council Distinguished Professorial Lecturer in Government Contracts Law, Practice & Policy at the George Washington University College of Law located in Washington, D.C.

73.    Tillipman teaches and has authored numerous articles on anti-corruption, ethics and compliance, government procurement, and white-collar crime.

74.    Tillipman is one of two editors (and the only United States-based editor) of the defamatory book underlying this suit.

## GAP

75.     GAP is a non-profit organization located in Washington, D.C. and founded in 1977 that describes itself as a tireless defendant and advocate of "those who speak up in the face of injustice."

76.     GAP also described itself as "dedicat[ed] to ensuring that the public is protected from waste, fraud, and abuse at the highest echelons of power."

77.     Relevant to this suit, GAP has represented and acted as attorney, press agent, and spokesperson for Dawn Wooten, a purported "whistleblower" whose outrageous, false, and defamatory statements about Dr. Amin are repeated and furthered in the book underlying this suit.

78.     GAP and its officers and agents have personally participated in spreading and furthering Wooten's false and defamatory statements about Dr. Amin.

79.     For instance, as more fully described below, three GAP employees authored the specific chapter of the book at issue in this lawsuit which contains the defamatory statements about Dr. Amin.

### Tom Devine

80.     Devine has worked at GAP in Washington, D.C. since 1979.

81.     Devine is currently GAP's legal director.

82.     Devine is one of the authors of the book chapter which defames Dr. Amin.

### Samantha Feinstein

83.     Feinstein is the Director of GAP's Internal Program.

84.     Feinstein is also a staff attorney in GAP's Washington, D.C. office.

11

85.     Feinstein is one of the authors of the book chapter that defames Dr. Amin.

### John A. Kolar

86.     Kolar is GAP's Director of Litigation.

87.     Kolar is one of the authors of the book chapter that defames Dr. Amin.

### Wooten's Media Campaign and Her Actual Complaint; Two Different Things

88.     On September 14, 2020, Project South, an organization that portrays its mission as "eliminating poverty and genocide" and "cultivating strong social movements," sent a letter to the media which purported to be addressed to the Department of Homeland Security, the ICE Atlanta Field Office, and the ICDC ("letter").

89.     Wooten was the letter's main source.  With its release, Wooten went on a media campaign as the face of the letter.

90.     GAP actively assisted Wooten in this campaign.  For instance, a GAP employee appeared on camera with Wooten for an interview with MSNBC about the allegations.

91.     With GAP's assistance, Wooten sought the limelight, going so far as to solicit funds through GoFundMe campaigns which have generated over $100,000 in donations to date.

92.     The letter contained allegations regarding conditions at the ICDC, mostly relating to COVID-19.  The letter also contained allegations of high rates of hysterectomies at ICDC.

93.     Wooten, the alleged source of the information contained in the letter, did not seek to be anonymous and did not seek any other protections that could be afforded to true whistleblowers who file formal complaints.

94.     The letter was not part of a complaint filed in any court or submitted as part of any administrative proceeding.

95.    Wooten did not file the letter in the Department of Homeland Security Office of Inspector General's whistleblower web portal.

96.    Wooten filed an actual, but *separate* complaint in which she alleged she had been retaliated against by her employer as a consequence for sharing concerns about the ICDC's failure to adhere to COVID-19 protocols and protections.

97.    GAP was a signatory to one of the filings submitted with this complaint.

98.    This *actual* "whistleblower complaint," which was filed through the whistleblower web portal system, contained zero allegations about hysterectomies and not a word about care from any gynecologist.

99.    The truth is that medical records that Wooten had access to did not show mass hysterectomies were performed on women detained at ICDC.

100.    There are no medical records showing a lack of consent for any hysterectomy performed by Dr. Amin on any woman detained at ICDC.

101.    Medical records show that Dr. Amin only performed two hysterectomies on women detained at ICDC.

102.    Further, Wooten never accompanied any women detained at ICDC to medical appointments with Dr. Amin or any other physician outside the ICDC.

103.    Wooten has never identified any women who she claimed received an unconsented-to hysterectomy.

**Wooten's Allegations Discredited**

104.    Although the letter did not identify Dr. Amin by name, as the only doctor providing gynecological treatment on ICDC patients outside of ICDC, his identify was discernible.

105.    A few outlets, including MSNBC and Prism, identified Dr. Amin by name and reported on the accusations in the letter.  Many other outlets, however, noted that the allegations had not been corroborated and identified reasons to doubt the allegations.

106.    Only one day after the letter was sent, it was confirmed that Dr. Amin had performed only two hysterectomies on ICDC patients.

107.    ICE also confirmed that patient consent and independent preapproval are secured before all procedures on women detained by ICE, including the ICDC patients.

108.    It is beyond reasonable belief that detainees in an ICE facility, such as ICDC, could undergo surprise hysterectomies without consultation and consent.

109.    Indeed, an ICDC patient would not even be referred to a health care provider outside of ICDC such as Dr. Amin without requesting treatment, ICDC staff referring the patient to the outside provider, and the patient voluntarily undertaking the treatment.

110.    ICE performs an independent review for all surgical procedures and issues its approval or denial for such procedures.

111.    This review process requires ICDC to review a patient's medical records and determine if the requested procedure is medically necessary.  The process typically takes around two weeks.

112.    Dr. Amin has never performed a procedure on an ICDC patient without going through this process.

113.    ICE provided such review and approval for both hysterectomies that Dr. Amin performed on ICDC patients.

114.    Several independent physician reviews of those procedures confirms that the procedures were medically necessary.

115.    Signed medical consent forms, for the hysterectomies as well as all of the procedures Dr. Amin performed on ICDC patients, confirm that all procedures were discussed and consented to by ICDC patients.

116.    Dr. Amin always obtains informed consent from his patients.

117.    Dr. Amin utilizes interpreters when treating patients who do not speak or understand English.

118.    When Dr. Amin treated ICDC patients, he was supervised by at least one other person.  This was a matter of protocol.

119.    Dr. Amin has never abused any patient.

120.    After an initial wave of media coverage, the news cycle moved on to other stories, as journalists were unable to substantiate Wooten's allegations and/or found evidence to contradict them.

121.    Of the outlets that continued to publish about Wooten's allegations, many published information tending to contradict the hysterectomy allegations.

122.    For example, on September 17, 2020, two days after publishing the article identifying Dr. Amin that is cited in the chapter of the book published by the Defendants, Prism

published an article in which it relayed that many Douglas residents viewed Dr. Amin as a "pillar in the community;" that Wooten was "complicit" in the mistreatment immigrants suffered at ICDC, with which Dr. Amin had no involvement; that one patient in the community asked Dr. Amin to perform a hysterectomy on her but he declined to do so and that the same patient said Dr. Amin provided her free care when her insurance lapsed and otherwise worked with her to provide care; that "an associate in the medical field" said that "[t]here is no way this was being done under the radar and without a paper trail;" and that likewise the deputy secretary of the Department of Homeland Security said that "his agency has not seen any payments or requests for payment for the hysterectomies Amin allegedly performed, and that it is 'virtually inconceivable that any of this could have been going on without multiple sets of records.'"

### Investigations Confirm No Mass Hysterectomies or Sterilization

123.    Following Wooten's jaw-dropping allegations and the ensuing media coverage, multiple government bodies investigated.

124.    No investigation corroborated Wooten's allegations of mass hysterectomies.

125.    No investigation resulted in any penalty against Dr. Amin.

126.    The Georgia Composite Medical Board cleared Dr. Amin of wrongdoing and allowed him to continue practicing medicine, as he still does.

127.    An investigation of a Senate subcommittee confirmed that only two hysterectomies were performed, both approved by ICE as medically necessary.

### The Routledge Handbook of Public Procurement Corruption

128.    On April 30, 2024, well after Wooten's claims were discredited, the Defendants published *The Routledge Handbook of Public Procurement Corruption*.

129.    Defendants Devine, Feinstein, Kolar, and GAP wrote Chapter 15 of the book. The chapter includes a purported "Case Study" based on Wooten's discredited accusations of mass hysterectomies and sterilization without consent or knowledge.  The chapter was subsequently edited by Tillipman and published by Defendant Taylor & Francis.

130.    The chapter conveys a grossly inaccurate and false impression of Dr. Amin.

131.    Accusations stated in the chapter that Dr. Amin performed hysterectomies and sterilized patients without their knowledge or consent are false and defamatory *per se*.

132.    Nothing in the chapter changes the understanding an ordinary viewer would have of the accusations.

133.    Indeed, by using Wooten's accusations to support its argument that whistleblowers are "essential for making the government aware of fraud and human rights abuses," the Defendants emphasized the false and defamatory nature of the accusations.

134.    The Defendants published at least the following false and defamatory statements of and concerning Dr. Amin:

> Ms. Wooten's other disclosures concerned a doctor who allegedly performed hysterectomies and other gynecological procedures on immigrant women detained at the ICDC with dubious consent and necessity (Project South et al., 2020). On September 15, 2020, a *Prism* article by Tina Vasquez reported that the doctor responsible for the alleged abuse of these migrant women was identified by the press as Dr. Mahendra Amin (Vasquez, 2020). By December 21, 2020, 13 women previously detained at ICDC and allegedly victimized by Dr. Amin joined a class action lawsuit filed by attorneys from Dreyer Sterling LLC and eight immigration advocacy organizations (Dreyer et al., 2020). Although the class action lawsuit is ongoing as of December 11, 2022, the sheer size of the legal team representing the survivors of Dr. Amin's alleged malpractice signifies that the amount of public attention and outrage spurred by Ms. Wooten's whistleblower complaint is significant . . . .

> There is a deeper problem across U.S. immigration detention centers. According to a U.S. Government Accountability Office (GAO) investigation, ICDC is merely one of several facilities where patients in ICE's custody lacked informed consent . . . . Whistleblowers, therefore, continue to be essential for making the government aware of fraud and human rights abuses that occur. But at what cost?

135.    The statements are false.  As discussed above, Dr. Amin only conducted two hysterectomies, both of which were necessary and done with the patient's knowledge and consent, as were all of the procedures Dr. Amin performed on ICDC patients.  Dr. Amin was dismissed as a defendant from the class action lawsuit discussed therein, Prism had published reasons to doubt the veracity of Wooten's claims on September 17, 2020, and the United States Senate Permanent Subcommittee on Investigations had definitively stated that only two hysterectomies had been performed by Dr. Amin on ICDC patients and that ICE had approved both as medically necessary.

**CAUSES OF ACTION AGAINST THE DEFENDANTS FOR DEFAMATION**

**Count 1: Defamation Against the Author Defendants (Jessica Tillipman, the Government Accountability Project, Tom Devine, Samantha Feinstein, and John A. Kolar)**

136.    Dr. Amin incorporates by reference paragraphs 1-134 of this Complaint as if fully restated herein.

137.    Georgia law applies to Dr. Amin's defamation claims, as Georgia is the place where the plaintiff suffered injury by reason of his loss of reputation.

138.    The Defendants are responsible for the words that they write and edit, including the communication of defamatory matter they published in the chapter of and concerning Dr. Amin as set forth more fully in paragraph 133 herein and including the following:

(a)    Ms. Wooten's other disclosures concerned a doctor who allegedly performed hysterectomies and other gynecological procedures on immigrant women detained at the ICDC with dubious consent and necessity (Project South et al., 2020). On September 15, 2020, a *Prism* article by Tina Vasquez reported that the doctor responsible for the alleged abuse of these migrant women was identified by the press as Dr. Mahendra Amin (Vasquez, 2020).

(b)    By December 21, 2020, 13 women previously detained at ICDC and allegedly victimized by Dr. Amin joined a class action lawsuit filed by attorneys from Dreyer Sterling LLC and eight immigration advocacy organizations (Dreyer et al., 2020). Although the class action lawsuit is ongoing as of December 11, 2022, the sheer size of the legal team representing the survivors of Dr. Amin's alleged malpractice signifies that the amount of public attention and outrage spurred by Ms. Wooten's whistleblower complaint is significant.

(c)    According to a U.S. Government Accountability Office (GAO) investigation, ICDC is merely one of several facilities where patients in ICE's custody lacked informed consent.

(d)    Whistleblowers, therefore, continue to be essential for making the government aware of fraud and human rights abuses that occur.

139.    Those statements are false.

140.    The statements are defamatory.

141.    The statements are not privileged.

142.    The statements specifically name and identify Dr. Amin.

143.    Accordingly, persons who know or know of Dr. Amin would reasonably understand the episode to be talking about Dr. Amin, and the statements are of and concerning Dr. Amin.

144.    The statements constitute defamation *per se* in that they directly and/or implicitly impute actions to Dr. Amin that injure his professional reputation.

145.    The statements constitute defamation *per se* in that they directly and/or implicitly impute actions to Dr. Amin that are crimes punishable by law.

146.    The statements constitute defamation in that they directly and/or implicitly impute actions to Dr. Amin that are defamatory and injurious to his reputation on their face and can be so understood without reference to any additional or extrinsic facts.

147.    The Author Defendants negligently and maliciously published the statements, which have been discredited.

148.    The Author Defendants had actual knowledge that the accusations against Dr. Amin were false prior to publication, as was reported by widespread media coverage and the United States Senate Permanent Subcommittee on Investigations which is cited in the chapter, and as the Author Defendants knew through their representation as advocate and press agent of Dawn Wooten.

149.    The Defendants published the statements with actual malice.

150.    The Defendants financially benefited from their allegations against Dr. Amin, by purportedly supporting their argument and making the book more salacious.

151.    On February 25, 2025, Dr. Amin sent via overnight delivery and email a letter to the Author Defendants informing them of the falsity of her statements on the chapter, which they already knew, and demanding that they retract the statements and cease and desist publication.

152.    The Author Defendants did not retract the statements.   While GAP published a

statement on its web site about the allegations, this statement has no effect on the book's

circulation and does not (and cannot) reach everyone who has and will read the book.

153.    The Author Defendants are liable to Dr. Amin for the defamatory statements

published in the chapter of the book.

### Count 2: Defamation Against Publisher, Taylor & Francis

154.    Dr. Amin incorporates by reference paragraphs 1-151 of this Complaint as if fully

restated herein.

155.    Georgia law applies to Dr. Amin's defamation claims, as Georgia is the place

where the plaintiff suffered injury by reason of his loss of reputation.

156.    Defendant Taylor & Francis published the book and is responsible for its content,

including the communication of defamatory matter the Author Defendants wrote in the chapter

of and concerning Dr. Amin as set forth more fully in paragraph 133 herein and including the

following:

(a)    Ms. Wooten's other disclosures concerned a doctor who
allegedly performed hysterectomies and other
gynecological procedures on immigrant women detained at
the ICDC with dubious consent and necessity (Project
South et al., 2020). On September 15, 2020, a *Prism* article
by Tina Vasquez reported that the doctor responsible for
the alleged abuse of these migrant women was identified by
the press as Dr. Mahendra Amin (Vasquez, 2020).

(b)    By December 21, 2020, 13 women previously detained at
ICDC and allegedly victimized by Dr. Amin joined a class
action lawsuit filed by attorneys from Dreyer Sterling LLC
and eight immigration advocacy organizations (Dreyer et
al., 2020). Although the class action lawsuit is ongoing as
of December 11, 2022, the sheer size of the legal team
representing the survivors of Dr. Amin's alleged

21

malpractice signifies that the amount of public attention and outrage spurred by Ms. Wooten's whistleblower complaint is significant.

(c)    According to a U.S. Government Accountability Office (GAO) investigation, ICDC is merely one of several facilities where patients in ICE's custody lacked informed consent.

(d)    Whistleblowers, therefore, continue to be essential for making the government aware of fraud and human rights abuses that occur.

157.    Those statements are false.

158.    The statements are defamatory.

159.    The statements are not privileged.

160.    The statements specifically name and identify Dr. Amin.

161.    Accordingly, persons who know or know of Dr. Amin would reasonably understand the episode to be talking about Dr. Amin, and the statements are of and concerning Dr. Amin.

162.    The statements constitute defamation *per se* in that they directly and/or implicitly impute actions to Dr. Amin that injure his professional reputation.

163.    The statements constitute defamation *per se* in that they directly and/or implicitly impute actions to Dr. Amin that are crimes punishable by law.

164.    The statements constitute defamation in that they directly and/or implicitly impute actions to Dr. Amin that are defamatory and injurious to his reputation on their face and can be so understood without reference to any additional or extrinsic facts.

165.    Evidencing negligence and a reckless disregard for truth or falsity, Taylor & Francis published accusations against Dr. Amin that contradicted known facts.

22

166.    Evidencing negligence and a reckless disregard for truth or falsity, Taylor & Francis knowingly and purposely avoided the truth and ignored evidence establishing the falsity of their statements prior to their publication.

167.    Evidencing a reckless disregard for truth or falsity, Taylor & Francis published the accusations against Dr. Amin without conducting even a cursory investigation, which failure constitutes gross negligence in light of the accusations having been refuted.

168.    Evidencing negligence and a reckless disregard for truth or falsity, Taylor & Francis published accusations against Dr. Amin that were so inherently improbable on their face as to raise serious doubts about their truth.

169.    Evidencing negligence and a reckless disregard for truth or falsity, Taylor & Francis published accusations against Dr. Amin that were so outrageous on their face as to raise serious doubts about their truth.

170.    Evidencing negligence and a reckless disregard for truth or falsity, Taylor & Francis published broadcasted accusations against Dr. Amin without seeking his comment or participation, or the comment or participation of anyone other than the Author Defendants, who knew of the falsity of the statements yet published them anyway.

171.    Taylor & Francis had actual knowledge that the accusations against Dr. Amin were false prior to publication.

172.    Taylor & Francis published the statements with actual malice.

173.    Taylor & Francis financially benefited from sales of the book.

174.    On February 25, 2025, Dr. Amin sent via overnight delivery and email a letter to Taylor & Francis informing it of the falsity of the statements on the episode and demanding that it retract the statements and cease and desist publication.

175.    Taylor & Francis did not retract the statements.  In fact, Taylor & Francis have claimed that the book's circulation is on hold while the parties discuss these issues, but the book is still currently for sale on Routledge's US-serving site, at the very least.

176.    Taylor & Francis, joined by the book's editors, have also claimed that they are "prepared to publish a Legal Notice" and to remove the defamatory content from future editions of the book, but have taken no concrete steps towards either.

177.    Taylor & Francis is liable to Dr. Amin for the defamatory statements it published during the episode.

## Damages

178.    The chapter was published to third parties, and the Defendant's statements therein were, in fact, viewed by third parties.

179.    As set forth above, the chapter is defamatory and libelous *per se*, entitling Dr. Amin to presumed damages.

180.    As a direct and proximate result of the false and defamatory statements about him in the book, Dr. Amin has suffered special damages, including but not limited to employment losses, medical treatment, and costs of reputational defense, which were the natural and proximate consequence of the language the Defendants used.

181.    As a direct and proximate result of the false and defamatory statements about him in the book, Dr. Amin's personal reputation and his reputation as a physician have been permanently damaged.

182.    As a direct and proximate result of the false and defamatory statements about him in the book, Dr. Amin has suffered stress, emotional distress, embarrassment, humiliation, anger, and other mental pain and suffering.

183.    As a direct and proximate result of the false and defamatory statements about him in the book, Dr. Amin has suffered public hatred, contempt, scorn, and ridicule.

184.    Dr. Amin continues to fear for his safety.  He fears that people are following him and talking about him in public.

185.    The conduct of the Defendants demonstrates willful misconduct and an entire want of care that raises to a conscious indifference to consequences, willful disregard of another's rights, and/or other circumstances tending to aggravate the injury.

186.    The false and defamatory accusations were published with constitutional actual malice thereby entitling Dr. Amin to an award of punitive damages.

187.    Dr. Amin is also entitled to an award of punitive damages to punish the Defendants for their unlawful conduct and to penalize and deter them from repeating such unlawful and egregious conduct.

WHEREFORE, Dr. Amin demands:

(a) Trial by jury pursuant to Federal Rule of Civil Procedure 38;

(b) That judgment be entered against the Defendants for compensatory damages in an amount not less than $2,000,000.00;

(c) That judgment be entered against the Defendants for punitive damages in an amount

   not less than $4,000,000.00 to punish and penalize them and deter them from

   repeating their unlawful conduct;

(d) That all costs of this action be assessed against the Defendants; and

(e) That this Court award such other relief as it deems equitable, just, and proper.


   Respectfully submitted this <u>29th</u> day of April, 2025.


   <u>***/s/ Sanjay S. Karnik***</u>
   Sanjay S. Karnik
   D.C. Bar No. 998684
   skarnik@cglawfirm.com
   CHILIVIS GRUBMAN LLP
   159 N. Sangamon St., Ste. 313A
   Chicago, IL 60607
   Tel: (872) 260-6679

   Scott R. Grubman
   *Pro hac vice application forthcoming*
   Georgia Bar No. 317011
   sgrubman@cglawfirm.com
   Joseph J. Siegelman
   D.C. Bar No. 1024736
   jsiegelman@cglawfirm.com
   CHILIVIS GRUBMAN LLP
   1834 Independence Square
   Atlanta, GA 30338
   Tel.: (404) 233-4171

   Stacey G. Evans
   *Pro hac vice application forthcoming*
   Georgia Bar No. 298555
   sevans@staceyevanslaw.com
   Ryan E. Harbin
   *Pro hac vice application forthcoming*
   Georgia Bar No. 370658

rharbin@staceyevanslaw.com
J. Amble Johnson
*Pro hac vice application forthcoming*
Georgia Bar No. 229112
ajohnson@staceyevanslaw.com
STACEY EVANS LAW
729 Piedmont Ave NE
Atlanta, GA 30308
Tel.: (404) 850-6750

*Attorneys for Plaintiff,*
*Dr. Mahendra Amin, M.D.*