## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DR. MAHENDRA AMIN, M.D.**,

Plaintiff,

v.                                                    Civil Action No. 1:25-cv-01313

**TAYLOR & FRANCIS GROUP, LLC;**
**JESSICA TILLIPMAN;  GOVERNMENT**
**ACCOUNTABILITY PROJECT, INC.;**
**TOM DEVINE;  SAMANTHA FEINSTEIN;**
and **JOHN A. KOLAR**,

   Defendants.

_____

## GOVERNMENT ACCOUNTABILITY PROJECT DEFENDANTS' MOTION TO DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM FOR RELIEF PURSUANT TO FED. R. CIV. P. 12(b)(6)

I. INTRODUCTION ........................................................................................................ 2

II. EXCERPTS OF MATERIAL ALLEGATIONS FROM COMPLAINT ................................... 3

III. REQUEST FOR JUDICIAL NOTICE OF EXHIBITS 1, 2 AND 3 ....................................... 5

IV. ALLEGATIONS AND MATERIAL ATTACHED TO THE DEMAND FOR RETRACTION (MTD EXHIBIT 2) ......................................................................................................... 6

V. EXCERPTS OF CHAPTER 15 OF THE ROUTLEDGE HANDBOOK AND AMIN CASE STUDY (MTD EXHIBIT1) .............................................................................................. 7

VI. EXCERPTS FROM ORDER DENYING DISMISSAL OF STATE CLAIMS WITH PREJUDICE, DETAINEE CLASS ACTION AGAINST AMIN IN *OLDAKER v. GILES* (MTD 3)        10

VII. THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE FALSITY AS REQUIRED BY DISTRICT OF COLUMBIA LAW ................................................................................. 17

   A. Chapter 15 Contains Only Attributed Reporting of What Public Sources Said .............. 17

   B. Scholarly Authors Are Not Liable for the Truth of Allegations They Accurately Attribute to Public Materials ............................................................................................................. 17

   C. Plaintiff's Assertion of Falsity Is Conclusory and Insufficient Under Controlling Law .. 18

VIII. SCHOLARLY AND ACADEMIC PUBLICATIONS RECEIVE HEIGHTENED FIRST AMENDMENT PROTECTION AND MUST BE DISMISSED AT THE PLEADING STAGE 19

IX. CONCLUSION .......................................................................................................... 20

1

## I.  INTRODUCTION

Defendants Government Accountability Project, Inc., Tom Devine, Samantha Feinstein, and John A. Kolar (the "GAP Defendants") respectfully move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal is not merely appropriate—it is required. Plaintiff's lawsuit targets a scholarly chapter in an academic publication that accurately and transparently reports the existence of allegations, public proceedings, and government investigations concerning matters of profound public concern. Chapter 15 does not assert independent facts, adopt any allegation as true, or state anything beyond what public sources themselves reported. Under bedrock principles of District of Columbia defamation law and controlling First Amendment doctrine, accurately attributed summaries of publicly known allegations cannot, as a matter of law, give rise to defamation liability.

Plaintiff attempts to transform a documented case study on whistleblower disclosures into a vehicle for relitigating complaints about media reporting, congressional oversight, and federal investigative processes. But the GAP Defendants did not create those allegations. They cited them. The Complaint fails to allege that any challenged statement was false, fails to identify any inaccurate description of any source, and fails to plead actual malice with the factual specificity required by *Ashcroft v. Iqbal* and *Bell Atlantic Corp. v. Twombly*. The GAP Defendants' chapter is a quintessential example of protected academic analysis of public information. Allowing litigation of this nature to proceed past the pleadings would impermissibly chill scholarly commentary, advocacy-based research, and the public's ability to scrutinize the whistleblowing process.

For each of these independently sufficient reasons—and consistent with the numerous authorities requiring early dismissal of defamation suits that threaten First Amendment freedoms—the Complaint should be dismissed in its entirety.

## PART A. DETAILED RENDITION OF THE FACTUAL MATERIALS

## II. EXCERPTS OF MATERIAL ALLEGATIONS FROM COMPLAINT

The following are verbatim quoted excerpts from the Complaint in this action:

151. On February 25, 2025, Dr. Amin sent via overnight delivery and email a letter to the Author Defendants informing them of the falsity of her statements on the chapter, which they already knew, and demanding that they retract the statements and cease and desist publication.

**Taylor & Francis**

66. Taylor & Francis is an international academic publishing company that focuses on books and journals.

67. Taylor & Francis has published tens of thousands of books and thousands of academic journals.

69. Routledge publishes an ongoing, internal series of academic books called the Routledge Handbooks, which includes hundreds of volumes on a wide range of topics and issues.

70. On April 30, 2024, Taylor & Francis released the book underlying this suit, The Routledge Handbook on Public Procurement Corruption.

**Jesssica Tillipman**

72. Tillipman is a licensed attorney and is the Associate Dean for Government Procurement Law Studies and Government Contracts Advisory Council Distinguished Professorial Lecturer in Government Contracts Law, Practice & Policy at the George Washington University College of Law located in Washington, D.C.

73. Tillipman teaches and has authored numerous articles on anti-corruption, ethics and compliance, government procurement, and white-collar crime.GAP75. GAP is a non-profit organization located in Washington, D.C. and founded in 1977 that describes itself as a tireless defendant and advocate of "those who speak up in the face of injustice."

76. GAP also described itself as "dedicat[ed] to ensuring that the public is protected from waste, fraud, and abuse at the highest echelons of power."

81. Devine is currently GAP's legal director.

83. Feinstein is the Director of GAP's Interna[tional] Program.

86. Kolar is GAP's Director of Litigation.

**Wooten's Media Campaign and Her Actual Complaint; Two Different Things**

88. On September 14, 2020, Project South, an organization that portrays its mission as "eliminating poverty and genocide" and "cultivating strong social movements," sent a letter to the media which purported to be addressed to the Department of Homeland Security, the ICE Atlanta Field Office, and the ICDC ("letter").

94. The letter was not part of a complaint filed in any court or submitted as part of any administrative proceeding.

95. Wooten did not file the letter in the Department of Homeland Security Office of Inspector General's whistleblower web portal.

96. Wooten filed an actual, but separate complaint in which she alleged she had been retaliated against by her employer as a consequence for sharing concerns about the ICDC's failure to adhere to COVID-19 protocols and protections.

**Wooten's Allegations Discredited**

108. It is beyond reasonable belief that detainees in an ICE facility, such as ICDC, could undergo surprise hysterectomies without consultation and consent.

127. An investigation of a Senate subcommittee confirmed that only two hysterectomies were performed, both approved by ICE as medically necessary.

**Count 1: Defamation Against the Author Defendants (Jessica Tillipman, the Government Accountability Project, Tom Devine, Samantha Feinstein, and John A. Kolar)**

138. The Defendants are responsible for the words that they write and edit, including the communication of defamatory matter they published in the chapter of and concerning Dr. Amin as set forth more fully in paragraph 133 herein and including the following:

   a) Ms. Wooten's other disclosures concerned a doctor who allegedly performed hysterectomies and other gynecological procedures on immigrant women detained at the ICDC with dubious consent and necessity (Project South et al., 2020).

   b) On September 15, 2020, a Prism article by Tina Vasquez reported that the doctor responsible for the alleged abuse of these migrant women was identified by the press as Dr. Mahendra Amin (Vasquez, 2020).

4

c) By December 21, 2020, 13 women previously detained at ICDC and allegedly victimized by Dr. Amin joined a class action lawsuit filed by attorneys from Dreyer Sterling LLC and eight immigration advocacy organizations (Dreyer et al., 2020).

d) Although the class action lawsuit is ongoing as of December 11, 2022, the sheer size of the legal team representing the survivors of Dr. Amin's alleged malpractice signifies that the amount of public attention and outrage spurred by Ms. Wooten's whistleblower complaint is significant.

e) According to a U.S. Government Accountability Office (GAO) investigation, ICDC is merely one of several facilities where patients in ICE's custody lacked informed consent.

f) Whistleblowers, therefore, continue to be essential for making the government aware of fraud and human rights abuses that occur.

139. Those statements are false.

## III.   REQUEST FOR JUDICIAL NOTICE OF EXHIBITS 1, 2 AND 3

The Complaint references the retraction demand (MTD Exhibit 2), which incorporates by attachment both the Senate Report of 2022, *Amin v. NBCUniversal* Summary Judgment Order denying almost all of Amin's partial motion for summary judgment and finding the case must go to trial on credibility issues.  The Complaint quotes extensively from Chapter 15 of the Ruteledge Handbook (MTD Exhibit 1), which itself references the Senate Report and *Oldaker v. Giles* (MTD Exhibit 3).  Where a complaint refers to a document and relies on its contents, the Court may consider the full document. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133–34 (D.C. Cir. 2015); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). Plaintiff quotes and characterizes Chapter 15 throughout his Complaint; Exhibit 1 is therefore properly before the Court. Courts may notice the existence and content of public records, including congressional reports and administrative filings, for the fact of their publication. *Fridman v. Bean LLC*, No. 17-2041, 2019 WL 231751, at *5 n.1 (D.D.C. Jan. 15, 2019); *Shive-Ayala v. Pacelle*, No. 21-704, 2022 WL 782412, at *2 n.1 (D.D.C. Mar. 15, 2022); *Hourani v. Psybersolutions LLC*, 164 F.

Supp. 3d 128, 132 n.1 (D.D.C. 2016). Exhibit 2 contains such materials and is therefore properly noticed. Courts routinely notice federal judicial decisions for their existence. *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002); *Jones v. Auto. Ins. Co. of Hartford*, 917 F.2d 1528, 1532 (11th Cir. 1990). Exhibit 3, the *Oldaker v. Giles* order, is therefore properly considered for the fact of its issuance and procedural posture.

## IV. ALLEGATIONS AND MATERIAL ATTACHED TO THE DEMAND FOR RETRACTION (MTD EXHIBIT 2)

The following are verbatim quoted excerpts from the Retraction Demand, MTD Exhibit 2:

[Retraction Demand, p. 2 and n.3] "[I]n November 2022, the United States Senate Permanent Subcommittee on Homeland Security and Government Affairs issued a report 3 …". The Senate report is attached as Exhibit 2.

[Retraction Demand, p. 5 and n.7] GAP's representation includes serving as her legal counsel in various matters, such as the defamation suit Dr. Amin is pursuing against Nurse Wooten. N. 7 Amin v. Sinclair, Inc. d/b/a Sinclair Broadcast Group, Superior Court of Tift County, Georgia Case No.2024CV0085.

[Retraction Demand, Exhibit 1] Wooten OIG Complaint Form[Retraction Demand, Exhibit 2] United States Senate PERMANENT SUBCOMMITTEE ON INVESTIGATIONS Committee on Homeland Security and Governmental Affairs/ MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION STAFF REPORT PERMANENT SUBCOM:MITTEE ON INVESTIGATIONS UNITED STATES SENATE.

[Retraction Demand, Ex. 3, Senate Report p. 3 at n. 3] In December 2020, former ICDC detainees filed a class action lawsuit ("December 2020lawsuit") against ICDC, ICE, Dr. Amin, Irwin County Hospital ("ICH"), and other federal and nonfederal parties alleging that the detainees had undergone nonconsensual and unnecessary gynecological procedures n. 3 citing Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), Oldaker v. Giles, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

(The Senate Report cites the *Oldaker* litigation 13 times.)

[Retraction Demand, Exhibit 3] Amin v. NBCU Order on Summary Judgment Case 5:21-cv-00056-LGW-BWC Document 209 Filed 06/26/24 Page 1 of 108.

## V.  EXCERPTS OF CHAPTER 15 OF THE ROUTLEDGE HANDBOOK AND AMIN CASE STUDY (MTD EXHIBIT 1)

The following are verbatim quoted excerpts from the Chapter 15 of the Routledge

Handbook, MTD Exhibit 2:

### A.  Case Study Text

[1]  LaSalle Corrections (herein "LaSalle") is a private, for-profit company that operated the Irwin County Detention Center ("ICDC") in Ocilla, Georgia, and owns and/or operates 19 correctional centers in Georgia, Louisiana, and Texas. LaSalle operated ICDC under a federal government contract with the U.S. Department of Homeland Security's (DHS) Immigration and Customs Enforcement (ICE) to house immigrant detainees (United States Senate Permanent Subcommittee on Investigations, 2022).

[2] Dawn Wooten is a licensed practical nurse employed as a nurse at ICDC. Although she had alternative periods of employment, she worked at ICDC on and off from 2010 until July 2020, when ICDC retaliated against her for blowing the whistle and stopped giving her shifts (Project South et al., 2020).

[3] Although LaSalle gave no formal notice of termination, by December 31, 2020, LaSalle had not given her any shifts, and Wooten considered herself to be constructively discharged by this date (Dawn Wooten v. LaSalle Corrections et al., 2022).

[4] In September 2020, Ms. Wooten obtained pro bono legal counsel and on September 14, 2020, Government Accountability Project and Project South submitted her whistleblower disclosure to the DHS Office of Inspector General (Government Accountability Project, 2020).

[5]  Under 41 U.S.C. § 4712, an employee of a contractor, subcontractor, grantee, or subgrantee, or personal services contractor, is protected from retaliation for making disclosures to Congress; an Inspector General; the Government Accountability Office; a federal employee responsible for overseeing the contract or grant at the relevant agency; authorized officials at the U.S. Department of Justice or other law enforcement agencies; a court or grand jury; or a management official or other employee of the contractor responsible for investigating, discovering, or addressing the misconduct.

[6] Her disclosures and the pressure that resulted from the media's widespread coverage were significant in catalyzing accountability at a facility that managed to otherwise avoid it despite advocates' documentation of human rights abuses years prior (Penn State Law Center for Immigrants' Rights Clinic et al., 2017).

[7] Ms. Wooten's other disclosures concerned a doctor who allegedly performed hysterectomies and other gynecological procedures on immigrant women detained at the ICDC with dubious consent and necessity (Project South et al., 2020).

[8] On September 15, 2020, a Prism article by Tina Vásquez reported that the doctor responsible for the alleged abuse of these migrant women was identified by the press as Dr. Mahendra Amin (Vásquez, 2020).

[9] By December 21, 2020, 13 women previously detained at ICDC and allegedly victimized by Dr. Amin joined a class action lawsuit filed by attorneys from Dreyer Sterling LLC and eight immigration advocacy organizations (Dreyer et al., 2020).

[10] Although the class action lawsuit is ongoing as of December 11, 2022, the sheer size of the legal team representing the survivors of Dr. Amin's alleged malpractice signifies that the amount of public attention and outrage spurred by Ms. Wooten's whistleblower complaint is significant.

[11] There have been other positive developments as well. Within a week of Ms. Wooten's public disclosures, women stopped being referred to Dr. Amin, and by May 3, 2021, ICE confirmed that all women were transferred out of ICDC (Davis, 2021; Merchant, 2021).

[12] On May 20, 2021, although federal and Congressional investigations were still ongoing, DHS Secretary Mayorkas announced his plans to shut down ICDC as an immigrant detention facility based on the findings of ongoing investigations spurred by Ms. Wooten and the women survivors who came forward (Olivares and Washington, 2021).

[13] By October 7, 2021, ICE ended its contract with ICDC, but as of September 3, 2021, the facility already had stopped housing ICE detainees (Cuffari, 2022).

[14] There is a deeper problem across U.S. immigration detention centers. According to a U.S. Government Accountability Office (GAO) investigation, ICDC is merely one of several facilities where patients in ICE's custody lacked informed consent. GAO's investigation found that 25 out of 128 facilities inspected in fiscal year 2021 lacked informed consent (U.S. Government Accountability Office, 2022).

[15] Whistleblowers, therefore, continue to be essential for making the government aware of fraud and human rights abuses that occur. But at what cost?

[16] As of December 11, 2022, the DHS Inspector General investigation into whistleblower retaliation against Ms. Wooten is still ongoing, and although she has received multiple awards for her bravery and cooperated with several federal and Congressional investigations, she has not received any relief (Government Accountability Project, 2022).

## B.  <u>Sources Cited</u>

Cuffari, D.J.V. (2022) Testimony of Inspector General, Dr. Joseph V. Cuffari [online]. Available at: www.hsgac.senate.gov/imo/media/doc/Cuffari%20Testimony.pdf [https://perma.cc/8CPD-NZ6L] (Accessed:11 December 2022).

Davis, C.R. (2021) ICE Transfers Women Out of Detention Center That Became Infamous over Allegations of Forced Sterilization [online]. Available at: www.businessinsider.com/ices-irwin-county-detention-centertransfers-remaining-women-lawyer-says-2021-4 [https://perma.cc/QW6U-V2DN] (Accessed: 14 March2023).

Dawn Wooten v. LaSalle Corrections et al. (2022) United States District Court Middle District of Georgia Valdosta Division [online]. Available at: https://whistleblower.org/wp-content/uploads/2023/01/Wootenv-Lassale-Complaint-12-29-2022-ECF.pdf [https://perma.cc/6RUF-N3CN] (Accessed: 6 March 2023).

Dreyer, D.N. et al. (2020) Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages Submitted to the United States District Court for the Middle District of Georgia, s.l.: NIPNLG.

Merchant, N. (2021) 'Houston: AP news', Migrant Women to No Longer See Doctor Accused of Misconduct [online]. Available at: https://apnews.com/article/georgia-archive-immigration-f3b1007a9d2ef3cb6d2bd410673eae83[https://perma.cc/WC83-CAG4] (Accessed: 14 March 2023).

Olivares, J. and Washington, J. (2021) 'The intercept', ICE Detention Center Shuttered Following Repeated Allegations of Medical Misconduct [online]. Available at: https://theintercept.com/2021/05/20/ice-irwinhysterectomies-medical/ [https://perma.cc/PW5S-FGBS] (Accessed: 14 March 2023).

Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights, and South Georgia Immigrant Support Network (2020) Complaint Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center. Atlanta: Project South [online]. Available at: https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf [https://perma.cc/J5RL-7N4C] (Accessed: 14March 2023).

U.S. Government Accountability Office (2022) Immigration Detention: ICE Needs to Strengthen Oversight of Informed Consent for Medical Care [online]. Available at: www.gao.gov/products/gao-23-105196[https://perma.cc/2ZSS-KQXQ] (Accessed: 14 March 2023).

Vásquez, T. (2020) Exclusive: Georgia Doctor Who Forcibly Sterilized Detained Women Has Been Identified [online]. Available at: https://prismreports.org/2020/09/15/exclusive-georgia-doctor-who-forcibly-sterilized-detained-women-has-been-identified/ [https://perma.cc/GC6Q-X5TQ] (Accessed: 14 March2023).

U.S. Senate Committee on Homeland Security and Governmental Affairs (n.d.) Senate Report 114–270 – To Enhance Whistleblower Protection for Contractor and Grantee Employees [online]. Available at: www.govinfo.gov/content/pkg/CRPT-

114srpt270/html/CRPT-114srpt270.htm    [https://perma.cc/KUN5-PDJK](Accessed:    14 December 2022).

## VI.  EXCERPTS FROM ORDER DENYING DISMISSAL OF STATE CLAIMS WITH PREJUDICE, DETAINEE CLASS ACTION AGAINST AMIN IN *OLDAKER V. GILES* (MTD EXHIBIT 3)

The following are verbatim quoted excerpts from the *Oldaker* Order denying Amin's

dismissal with prejudiced of the allegations made against him in the detainee class action, MTD

Exhibit 3:

*FACTUAL BACKGROUND*

[Doc. 363, p. 3] The 196-page SAC names sixteen women who claim that, while in civil immigration detention at ICDC, they were subjected to medical and other abuse, most notably, unnecessary gynecological procedures that were performed without their consent by or at the direction of Defendant Dr. Amin. (See generally Doc. 210).3 The procedures caused Plaintiffs significant pain and left some Plaintiffs infertile. (Id.)

[Doc. 363, p. 3] Then, the Court will describe the three classes of Defendants, and, generally, what Plaintiffs allege their involvement was in the medical abuses perpetrated by Defendant Dr. Amin.[Doc. 363, p. 3] When Plaintiff Oldaker saw Defendant Dr. Amin in February 2020, she requested an estrogen patch, instead, he had her undress for a transvaginal ultrasound. (Doc. 210 ¶¶ 144–45). Plaintiff Oldaker explained that she had undergone a hysterectomy, but Defendant Dr. Amin explained that he did ultrasounds on all of his patients. (Id. ¶ 145).

[Doc. 363, pp. 3-4]. During the procedure, Defendant Dr. Amin "violently jammed a transvaginal ultrasound monitor inside her and, after removing it, pushed several fingers into her vagina causing her excruciating pain." (Id.) Plaintiff Oldaker "squirmed and told him 'no,' but he kept going." (Id.)

[Doc. 363, p. 3 n. 3] The facts contained herein, consistent with the standard of review for motions to dismiss, are derived from the SAC, accepted as true, and construed in the light most favorable to Plaintiffs. See Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003).

[Doc. 363, p. 5] Plaintiffs Oldaker, Tatyana Solodkova, Luz Adriana Walker, Lourdes Silas, Jaromy Navarro, Ndonga Mbeti, Keynin Ramirez, Ana Adan-Cajigal,5 Pauline Binam,6 and Jane Doe Nos. 5, 6, 8 15, 22, and 25 allege that Defendant Dr. Amin performed gynecological procedures on them "without prior disclosure of their nature, purpose, risks, or alternatives" while they were in the custody of ICDC and ICE. (Doc. 210 ¶ 641).

[Doc. 363, p. 5] Specifically, when Plaintiffs saw Defendant Dr. Amin, there was frequently no translator present, even when those Plaintiffs spoke little to no English. (Id. ¶¶ 265, 268, 270, 302, 309, 497).

[Doc. 363, p. 6] For example, Plaintiff Binam, was told she would be receiving a "simple" Dilation and Curettage surgery to drain ovarian cysts. (Doc. 210 ¶¶ 434, 435). However, when she awoke from general anesthesia, she discovered that Defendant Dr. Amin had performed a partial salpingectomy, or partial removal of her right fallopian tube. (Id. ¶¶ 440–41). As a result, Defendant Dr. Amin informed her that she would no longer be able to conceive without fertility assistance. (Id. ¶ 445).

[Doc. 363, p. 6] Plaintiffs Oldaker, Solodkova, Walker, Silas, Navarro, Ndonga, Ramirez, Adan-Cajigal, Binam, and Jane Doe Nos. 5, 6, 8, 15, 22, and 25 allege that many procedures performed by Defendant Dr. Amin on them were medically unnecessary. (Doc. 210 ¶¶ 176, 225, 257, 301, 356, 642). For example, Plaintiff Ndonga was treated by Defendant Dr. Amin on a number of occasions, and he performed a dilation and curettage, a paropscopy, and an ovarian cystectomy on her. (Id. ¶¶ 355, 356).

[Doc. 363, p. 6] Similarly, Plaintiff Jane Doe No. 5 was told by Defendant Dr. Amin that he would perform a surgical procedure to treat an ovarian cyst. (Id. ¶ 248) However, when another physician examined her after the procedure, she told Plaintiff Jane Doe No. 5 that Defendant Dr. Amin had "'cut or burned part of her uterus.'" (Id. ¶ 253) A specialist who reviewed Plaintiff Jane Doe No. 5's medical records found that she may never be able to conceive. (Id. ¶ 256). Plaintiffs allege that this procedure was not medically necessary.

[Doc. 363, p. 6] A specialist who reviewed Plaintiff Jane Doe No. 5's medical records found that she may never be able to conceive. (Id. ¶ 256). Plaintiffs allege that this procedure was not medically necessary. (Id. ¶ 257).

[Doc. 363, pp. 8-7] Plaintiffs Oldaker, Solodkova, Walker, Silas, Navarro, Ndonga, Ramirez, Adan-Cajigal, Binam, and Jane Doe Nos. 5, 6, 8, 15, and 22 allege that "after speaking out about, protesting, making known they were willing to speak out about" Defendant Dr. Amin's improper medical treatment, they were subjected to retaliation by ICDC staff and ICE. (Doc. 210 ¶¶ 162, 170, 201, 259, 260, 325, 347, 363, 387).

[Doc. 363, p. 7] For instance, on October 27, 2020, Plaintiff Ndonga completed an interview with federal investigators related to Defendant Dr. Amin's treatment of her and other female detainees at ICDC. (Id. ¶¶ 359–60). A few hours after the interview, ICE informed Plaintiff Ndonga that the stay on her deportation would be lifted, and that she would be deported immediately. (Id. ¶¶ 360–61).

[Doc. 363, p, 13] Although Plaintiffs' FTCA claims against the United States depend on Defendant Dr. Amin's actions, the alleged misconduct encompasses a number of improper actions, only one of which Plaintiffs characterize as "Medical Battery."10 Defendant Dr. Amin may have committed a battery on some or all of Plaintiffs, but Plaintiffs' FTCA claims in no way depend on such a finding.

*DEFENDANT DR. AMIN'S MOTION TO DISMISS*

[Doc. 363, p. 37] Then, as now, the Court declines to address the adequacy of Plaintiffs' class definitions before discovery has begun, because such discovery may yield facts which are critical to that issue, preventing a full review of the class certification issues on the merits at this stage. Here, Defendant Dr. Amin does not seek early determination by way of a motion to do so on the merits, but by motion to dismiss. Accordingly, Defendant Dr. Amin's Motion to Dismiss Plaintiffs' class allegations against him is DENIED-WITHOUT PREJUDICE.

[Doc. 363, p. 39] Defendant Dr. Amin contends that the availability of alternative state law remedies counsels hesitation here. The Court agrees. There are alternative state law remedies which Plaintiffs could use to pursue relief for the alleged unconstitutional conduct by Defendant Dr. Amin, as evidenced by the many state law claims Plaintiffs assert against Defendant Dr. Amin, Irwin County Hospital, and the ICDC Defendants. (See Doc. 210 ¶¶ 12–17).

[Doc. 363, p. 39, n. 25] The Court notes that it cannot allow the seriousness of Plaintiffs' allegations against Defendant Dr. Amin, which are grave indeed, to distract it, in the Court's view, from the clear instruction of the Supreme Court that it would be inappropriate to extend Bivens to Plaintiff's claim against Defendant Dr. Amin.

[Doc. 363, p. 40] Both comity and judicial economy are served when state courts are given the opportunity to resolve issues of state law. Rowe, 279 F.3d at 1288. And this argument to decline jurisdiction is particularly strong when federal law claims have been dismissed prior to trial. Id.

[Doc. 363, p. 40] Here, the Court has granted Defendant Dr. Amin's Motion to Dismiss all federal claims against him. Considering judicial economy, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims against Defendant Dr. Amin. As such, the Court makes no determination as to the merits of those state law claims.

## PART B.  GAP'S FACTUAL ARGUMENT

Dr. Mahendra Amin is an OB/GYN in rural Georgia who provided medical services to detainees housed at the Irwin County Detention Center ("ICDC"), a facility operated under a federal contract. In September 2020, a coalition of advocacy organizations publicly released a Office of Inspection General disclosure and a separate letter based on information provided by ICDC nurse Dawn Wooten. The letter raised concerns regarding COVID-19 protocols at ICDC and also referenced concerns about gynecological procedures performed on detainees. Media

outlets quickly identified Dr. Amin as the physician providing gynecological care to female detainees, and these media reports led to widespread public attention.

The allegations contained in the Project South letter triggered multiple investigations by federal agencies, congressional committees, and public-interest organizations. These investigations, and the public reporting surrounding them, were widely available, extensively covered, and frequently updated. Reporting from news organizations identified Dr. Amin by name based on publicly accessible information. Unknown publicly was that a group of women detainees had a large cadre of public interest lawyers, including university professors, and advocacy groups preparing to file a class action lawsuit on behalf of detainees in the Middle District of Georgia. The class action focused on scathing allegations by these women and their physicians allegations that Dr. Amin had performed improper gynecological procedures on detainees. The litigation record, including hundreds of pages of public pleadings, remains publicly available and has been widely referenced by news media, advocacy groups, and government investigators, including scholarly publications. The U.S. Senate Permanent Subcommittee on Investigations undertook a detailed inquiry into the allegations involving ICDC and published a staff report documenting its findings, including its determination that Dr. Amin had performed an unusually high number of gynecological interventions on the women.

Against this backdrop, Taylor & Francis published an academic volume titled the *Routledge Handbook of Public Procurement Corruption* in April 2024. Chapter 15, authored by the Government Accountability Project Defendants, addressed whistleblower protections for employees of federal contractors. The chapter used several public examples to illustrate challenges faced by whistleblowers navigating federal reporting systems. One of those examples was the publicly known dispute arising from the Wooten disclosures and subsequent

investigations relating to ICDC. The chapter's discussion of the ICDC matter relied entirely on published public records. No statement about Dr. Amin was not sourced in detailed fashion. The chapter did not purport to resolve factual disputes, reach medical conclusions, or provide independent investigative findings regarding Dr. Amin or any other individual.

Following the publication, Dr. Amin sent a written retraction demand to the authors and publisher in a single retraction demand, asserting that the publicly reported allegations were inaccurate and that the chapter should be changed. His correspondence attached public records and government investigative materials that he asserted contradicted the allegations referenced in the chapter.  Dr. Amin then initiated this lawsuit. The Complaint does not identify any statement in Chapter 15 that misrepresents a public source. It does not claim that the underlying sources did not make exactly the statements attributed to them. It does not identify any factual assertion by the GAP Defendants about who published what that can be shown to be a false attribution of the sources or their statements.

## PART C.  GAP'S LEGAL ARGUMENT

No court has ever found Dr. Amin to be credible or Ms. Wooten to not be credible. Dr. Amin has never had any court or jury adjudicate his many claims and grievances of defamation. Chapter 15 of the Ruteledge Handbook merely discusses in scholarly fashion in a scholarly publication edited by a George Washington University scholar the various allegations, conclusions and analysis of the courts, the Congress, the Department of Homeland Security, and the media as a "case study" to illustrate what anti-corporation whistleblowers face nationally and internationally.

The argument below proceeds in four parts. First, the Complaint fails to plausibly allege falsity because Chapter 15 of the *Routledge Handbook* accurately attributes statements to public sources, including media reports, congressional materials, and litigation filings, and does not

14

assert independent facts about Plaintiff. Under controlling District of Columbia precedent, such accurately sourced reporting is not actionable. Second, under the pleading standards imposed by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Complaint's allegations of falsity and actual malice are conclusory and therefore insufficient. Third, longstanding First Amendment doctrine strongly protects academic and scholarly publications, particularly those addressing matters of public controversy, requiring early dismissal. Fourth, the Court may consider Exhibits 1–3 under incorporation-by-reference and judicial notice doctrines recognized in the District of Columbia and the federal courts. Collectively, these principles require dismissal.

The intended readers of Chapter 15 and the Handbook are lawyers, academics and activists, not the general public. Plaintiff's claims fail because the challenged statements are not false statements of fact by Defendants. District of Columbia law, including *Zimmerman v. Al Jazeera America, LLC*, 246 F. Supp. 3d 257 (D.D.C. 2017), *Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001), and *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990), requires a provably false assertion of fact made by the defendant.  For "a challenged statement to be actionable as defamation, 'it must at a minimum express or imply a verifiably false fact' " about the plaintiff. *Zimmerman* quoting *Weyrich.* This is because the First Amendment protects statements "that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" in an effort to ensure "that public debate [does] not suffer." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (first alteration in original) (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988)). For this reason, statements of opinion are generally not actionable because they often are "so imprecise or subjective that [they are] not capable of being proved true or false." *Farah*, 736 F.3d at 534-35.

Truthful statements, including ones that are "substantially true," are also not actionable. *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144, 1150 (D.C. Cir. 1994). And "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' " *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (quoting *Heuer v. Kee*, 59 P.2d 1063, 1064 (Cal. Ct. App. 1936)). In other words, a "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' " *Id.* (quoting Robert D. Sack, *Libel, Slander, and Related Problems* 138 (1980)).

The statements in Chapter 15 are sourced descriptions of public allegations, public litigation, and government reports. Under *Farah v. Esquire Magazine*, 736 F.3d 528, 535 (D.C. Cir. 2013), *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966), and *Mason v. American Prospect, Inc.*, No. 23-2238, 2024 WL 4345855, at *12 (D.D.C. Sept. 30, 2024), such attributed summaries are not actionable. As *Mason* explained:

> Assuming that Dr. Mason has properly pleaded an "overall narrative" theory, the argument fails. As previously mentioned, context is critical in defamation claims and the court must take the "publication ... as a whole[ ] and in the sense in which it would be understood by the readers to whom it was addressed." *Farah*, 736 F.3d at 535 (quoting *Afro-Am. Publ'g Co. v. Jaffe*, 366 F.3d 649, 655 (D.C. Cir. 1966)). Dr. Mason may believe that the article presents an overarching defamatory narrative. But when viewed holistically, it presents "an ongoing exchange of charge and countercharge" that provides readers with plenty of information from which they can make their own judgments. *Abbas*, 975 F. Supp. 2d at 19.

> The article sources each of its assertions, credits quoted sources and materials, and includes Dr. Mason's and IWPR's counterpoints when available. *** With very few exceptions, the article explains that it is recounting how former employees feel or what they believe about the organization, rather than presenting specific statements as objective truth. For these reasons, the court concludes that the article's overall narrative does not support a defamation-by-implication claim.

Plaintiff's dissatisfaction with the underlying allegations does not transform Defendants into their authors. The Complaint therefore fails as a matter of law.

VII. **THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE FALSITY AS REQUIRED BY DISTRICT OF COLUMBIA LAW**

A. <u>**Chapter 15 Contains Only Attributed Reporting of What Public Sources Said**</u>

District of Columbia law imposes a threshold requirement that the defendant make a false statement of fact. In cases such as *Zimmerman*, 246 F. Supp. 3d at 276, and *Weyrich*, 235 F.3d at 624–25, courts hold that statements are not actionable when they merely summarize, characterize, or report allegations from disclosed sources. *Farah*, 736 F.3d at 534–35, and *Afro-American Publishing*, 366 F.2d at 660, similarly explain that attributed reporting does not express independent factual assertions. Exhibit 1 shows that every challenged statement in Chapter 15 identifies the source for the information provided. The Complaint itself acknowledges that these sources exist and made the statements attributed to them. The Complaint does not allege that the Chapter misquoted or misrepresented any such source. Under *Mason*, 2024 WL 4345855, at *4–6, the failure to allege misrepresentation of sources is fatal to the falsity element.

District of Columbia precedent including *Nunes v. WP Co.*, No. 20-7121, 2022 WL 997826 at * 3 (D.C. Cir. Apr. 1, 2022), *Robertson v. District of Columbia*, 269 A.3d 1022, 1031 (D.C. 2022), and *BYD Co. Ltd. v. Alliance for American Manufacturing*, 554 F. Supp. 3d 1, 8-9 (D.D.C. 2021), aff'd, 2022 WL 1463866 (D.C. Cir. May 10, 2022), reinforces that a defamation plaintiff must allege that the publisher itself made a false assertion. Plaintiff does not do so.

B. <u>**Scholarly Authors Are Not Liable for the Truth of Allegations They Accurately Attribute to Public Materials**</u>

The Supreme Court has made clear that when a publication describes allegations while identifying the sources for those allegations, the publication is not asserting the underlying claims as true. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986). The D.C. Circuit's decisions in

*Montgomery v. Risen*, 875 F.3d 709, 713–14 (D.C. Cir. 2017), and *Moldea v. New York Times Co.*, 15 F.3d 1137, 1144, 1150 (D.C. Cir. 1994), likewise indicate that accurate summaries of public allegations or proceedings are not actionable. Chapter 15 is an academic case study written by public-interest attorneys analyzing whistleblower disclosures under 41 U.S.C. § 4712. It does not assert the truth of allegations; it recounts the existence of allegations and explains their relevance to whistleblower dynamics. District of Columbia law prohibits treating such commentary as defamation. The same outcome would be required under Georgia law, which applies a nearly identical falsity requirement.

### C.   Plaintiff's Assertion of Falsity Is Conclusory and Insufficient Under Controlling Law

*Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 555–56, require that factual allegations raise a claim above speculation. Courts applying those decisions in the defamation context—including *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 701–02 (11th Cir. 2016); *Biro v. Conde Nast*, 807 F.3d 541, 544–45 (2d Cir. 2015); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614–15 (7th Cir. 2013); *Mayfield v. NASCAR*, 674 F.3d 369, 377 (4th Cir. 2012); and *Schatz v. RSLC*, 669 F.3d 50, 55–58 (1st Cir. 2012)—hold collectively that conclusory assertions of falsity do not satisfy federal pleading standards. Plaintiff pleads no facts showing that Defendants misrepresented any source or that any statement in Chapter 15 was false at the time of publication. Under District of Columbia precedent, including *Dominion v. Byrne*, 600 F. Supp. 3d 24, 30 (D.D.C. 2022), this failure requires dismissal.

The Complaint must contain factual content that plausibly supports each required element. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678. The D.C. Circuit applies these standards in defamation cases, including those implicating the actual-malice requirement. See

*Kahl v. Bureau of National Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017). Other circuits such as those in *Michel*, *Biro*, *McDonald*, *Pippen*, *Mayfield*, and *Schatz*, *supra* are to the same effect.

## VIII.  SCHOLARLY AND ACADEMIC PUBLICATIONS RECEIVE HEIGHTENED FIRST AMENDMENT PROTECTION AND MUST BE DISMISSED AT THE PLEADING STAGE

Rule 12 plays an especially important role in claims involving defamation . "[T]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl* at 109. "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018) (internal quotations omitted) (quoting *Palin v. New York Times Co*., 264 F. Supp. 3d 527, 533 (S.D.N.Y. 2017)). See especially,  *Vindman v. Trump*, No. CV 22-257 (JEB), 2022 WL 16758575, at *4 (D.D.C. Nov. 8, 2022). Academic and scholarly works addressing government misconduct and whistleblowing occupy the highest rung of protected speech.

The authors of Chapter 15 are attorneys and public-interest advocates writing in an academic context. Courts recognize the special constitutional protection afforded to such commentary. See *White*, 909 F.2d at 518; *Guilford Transportation Industries, Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000); *Fells v. Service Employees International Union*, 281 A.3d 572, 586 (D.C. 2022).  "[I]t is not enough that a statement can 'be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses that that inference.' " *Id.* (quoting *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000)).

## IX. CONCLUSION

For all the reasons set forth in this Motion, the GAP Defendants respectfully submit that the Complaint fails to state a claim upon which relief can be granted. Plaintiff does not allege a single false statement of fact made by the GAP Defendants. He identifies no misquotation, no misrepresentation, no inaccurate description of any public source, and no factual basis for claiming that the GAP Defendants acted with constitutional actual malice. The allegations in the Complaint are conclusory, speculative, and legally insufficient under the standards mandated by the Supreme Court and the D.C. Circuit. Moreover, Plaintiff seeks to impose liability for protected academic expression—scholarly commentary that identifies its sources, discloses its basis, and contributes to public understanding of whistleblower disclosures and government oversight. Courts have repeatedly held that such speech lies at the heart of the First Amendment and must be shielded from defamation litigation designed to penalize authors, advocates, and researchers for analyzing matters of public controversy.

The GAP Defendants therefore respectfully request that the Court grant this Motion and dismiss the Complaint with prejudice. Any other result would undermine the constitutional protections afforded to academic discourse, impose unjustifiable burdens on public-interest advocacy, and contradict the well-established requirement that defamation plaintiffs plausibly plead falsity, fault, and causation before proceeding to discovery. The GAP Defendants further request such additional relief as the Court deems just and proper.

Respectfully submitted,

*/s/ F. Douglas Hartnett*

_____
F. Douglas Hartnett (DC Bar 466851)
Elitok & Hartnett at Law, PLLC
1101 - 30th Street, NW #500
Washington, DC 20007
(202) 965-0529/dhartnett@elitokandhartnett.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2025, a true and correct copy of the foregoing Government Accountability Project Defendants' Motion to Dismiss Complaint for Failure to State a Claim for Relief was electronically filed and served through this Court's electronic filing system (ECF) upon all counsel of record.

*/s/ F. Douglas Hartnett*
_____
Counsel for Government
Accountability Project Defendants