# 15

# WHISTLEBLOWERS AND WINNING THE BATTLE AGAINST GOVERNMENT CONTRACT FRAUD

## You can't have one without the other

*Tom Devine, Samantha Feinstein and Jack Kolar*

### Introduction

The U.S. federal government's work is largely carried out by third parties, ranging from contractors and grantees for services in general to procurement for resources in particular. In FY 2021 the U.S. government spent $637 billion on contracts (U.S. Government Accountability Office, 2022) out of $1.6 trillion in total discretionary spending. Even more significant, contractor employees as deputies vastly outnumber government workers who carry out public service responsibilities. An analysis of the federal government's blended workforce traced that between 1984 and 2015 the number of civil service employees hovered around two million. By contrast, the number of federally funded contractor and grant employees ranged from 4.4 to 7.6 million workers, "dwarfing" the civil service workforce (Senate Committee on Homeland Security and Governmental Affairs ("HSGAC"), 2016; The Volcker Alliance, 2017; Project on Government Oversight, 2017). That disparity surely will grow with the enactment of multi-trillion-dollar legislation for COVID-19 relief, infrastructure, and climate change.

Unfortunately, government procurement has always been a magnet for pork-barrel corruption. To illustrate, Department of Justice Inspector General Michael Horowitz, who chaired the government's Pandemic Response Accountability Committee, estimated that fraud in COVID-19 relief spending has been greater than $100 billion (Kelper, 2022). Procurement corruption is a global phenomenon, not just a U.S. malady. For example, European Commission (EC) auditor Paul Van Buitenen's whistleblowing about systematic bribery as a prerequisite for EC procurement contracts forced the resignation of all Commission members, including President Edith Cresson (Senior, 2006, pp. 44–45).

In this context it is no surprise that the free flow of evidence from eyewitnesses is the lifeblood for law enforcement and essential for public scrutiny. The Government Accountability Project views whistleblowers as those who use free speech rights to challenge misspending or abuses of power that betray public trust. There are many different legal definitions, but the U.S. Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8) reflects a consensus, defining whistleblowers as applicants, current or former employees who disclose information that they reasonably believe is

AuQ296

AuQ297

evidence of any illegality, abuse of authority, gross waste, gross mismanagement, or a substantial and specific danger to public health or safety. If the information is classified or its release is specifically prohibited by statute, whistleblowers can only share it through secure channels, rather than with the public, in order to be eligible for legal protections.

There is little doubt about their impact. Numerous studies have confirmed that whistleblowers and tipsters are more effective at detecting fraud within private companies where they work than auditors, compliance officers, and law enforcement combined (PwC, n.d., pp. 8–10). U.S. Inspectors General credited best practice whistleblower controls in the 2009 stimulus for surprisingly low levels of fraud and waste (HSGAC, 2011, p. 6). In 2020, Congress declined to strengthen depleted whistleblower rights in COVID-19 relief, and massive fraud followed.  AuQ299

The False Claims Act, 31 U.S.C. § 3729 *et. seq.*, which deputizes whistleblowers to go beyond making a report by filing lawsuits to challenge contract or grant fraud, is arguably America's most effective anti-corruption law. According to Justice Department figures, those *qui tam*[1] lawsuits have increased the prior average $10 million annual recovery to $70 billion (Department of Justice, 2022b) or some $2 billion annually (King, 2022) since the law's 1986 resurrection. In FY 2021, the recovery totaled $5.6 billion, and $2.2 billion in FY 2022 (Department of Justice, 2022b).  AuQ300 AuQ301

Though most resolutions are for repayment, the Act's scope goes far beyond merely returning money to the Treasury. False statements in connection with legal responsibilities that are prerequisites for government funding can spark liability for any serious misconduct about which a vendor conceals in connection with government funding. *Qui tam* suits have sparked corrective action in contexts ranging from unnecessary, dangerous surgeries to environmental hazards such as toxic dumping. The Justice Department's 2020 opioid settlement with Purdue Pharma illustrates the law's double-barreled scope. The company had to pay the Treasury $2.8 billion, and the settlement also required a corporate restructuring and the free or discounted provision of medical care services (Department of Justice, 2020).  AuQ302

### Rights against retaliation

In this context, it is not surprising that there is a wide-ranging menu of legal rights for whistleblowers to defend themselves against retaliation. The point of whistleblower laws is the safe, free flow of information for responsible exercises of authority. As seen above, they work.

There are currently 26 private sector whistleblower laws administered by the U.S. Department of Labor that apply to contractors. These laws cover nearly the entire range of commerce in the United States, protecting those whose challenges range from antitrust, money laundering, tax, environmental, consumer protection, food safety, energy, transportation, to any significant misconduct by publicly traded corporations (U.S. Department of Labor, n.d.). For instance, the Dodd-Frank law established a rewards program and anti-retaliation rights for whistleblowing to the Securities and Exchange Commission, 15 U.S.C. § 78u-6, and the Commodities Future Trading Commission, 7 U.S.C. § 26, both of which are available to contractor employees.

The other imperative for these laws is that whistleblowing is extremely dangerous. Without strong legal rights, it is professional suicide. Retaliation is like the organizational equivalent of the animal instinct to destroy whatever is an immediate threat. Retaliation ranges from harassment, a hostile workplace, termination, and blacklisting to civil and even criminal action. The goal is not just to discredit and harass whistleblowers but to destroy them so that other potential witnesses will be scared into silence[2] (Devine and Maassarani, 2011). This reaction is ironic because in

reality it is bad business to kill the messenger.³ Further, according to a global study that surveyed firms in Europe and Latin America, most whistleblowers intend to defend the organization when they speak out. Ninety-six percent do not break ranks and disclose misconduct to third parties (Ethics Resource Center, 2010, p. 15).    AuQ303

The foundation for contractor-specific anti-retaliation rights, however, always has been the partnership between whistleblowers and Offices of Inspector General ("OIG"). Initially, rights against retaliation were largely symbolic because they were unenforceable. Section seven of the Inspector General Act of 1978, 5 U.S.C. App., bans discrimination against OIG witnesses, but there is no remedy beyond the Inspector General transmitting findings and recommendations to the agency head. The protections under this law have been incrementally increased. In 1994, Congress added some teeth, giving the secretary of every department authority to order corrective action and seek enforcement in court. However, there was no provision for compensatory damages for consequences such as emotional distress, pain or suffering, loss of reputation, or similar effects. Most significantly, there was no due process for whistleblowers, who only could petition the relevant court of appeals to challenge the agency chief's decision.

It took over a decade, until 2007, for the next significant advance. Spurred by corruption and human rights abuses in the Iraq conflict, Section 861 of the National Defense Authorization Act provided credible due process rights for defense contractors. Their cases would be governed by the pro-employee legal burden of proof under the U.S. Whistleblower Protection Act, 10 U.S.C. § 4701. Most significantly, defense whistleblowers received due process, and if the agency head providing funds ruled against them or 15 months passed without a decision, they could start from a blank slate, or *de novo*, for a jury trial in district court to seek reinstatement, back pay, compensatory damages, and litigation costs. Curiously, however, the rights did not extend to abuses of authority, which are protected for civil service workers under the Whistleblower Protection Act. Nor did it include language that overrode non-disclosure agreements (NDA) that gagged employees from any communications without prior approval as a job prerequisite.

The landscape was quickly changing. Partisan fears of potential pork barrel abuses in the 2009 stimulus law sparked best practice rights for all contract and grant employees who disclosed misconduct in the use of those funds. Section 1553 of the American Recovery and Reinvestment Act (ARRA) established the strongest whistleblower protection rights in the book and built on the 2007 law by protecting disclosures to all who could make a difference, including Congress. It explicitly protected "duty speech," in which employees disclose protected information not as allegations but as part of their professional responsibilities in conducting audits, inspections, investigations, or other duties. It protected disclosures evidencing abuse of authority. For the first time, whistleblowers challenging retaliation had strict confidentiality protection for their work with OIGs and even obtained access to the investigative file of their retaliation complaint. This time the law also had an anti-gag provision invalidating restrictive NDA job prerequisites and shortened the time lag for court access from 15 to seven months if the whistleblower did not receive relief at the administrative level.

The stimulus law only applied to that specific spending, and the rights ended with the spending. However, Congress was impressed and in 2012 upgraded the 2007 defense contractor law permanently for Pentagon and National Aeronautics and Space Administration (NASA) contractor employees (10 U.S.C. § 4701). It also enacted identical rights for the rest of executive branch contractors, but only as a four-year pilot program since they had not been tested with defense. In 2016, Congress made the rights permanent for all executive branch agencies (41 U.S.C. § 4712, 2016).    AuQ304
The new law mirrored the stimulus rights but was diluted in some significant respects. Whistleblowers lost their right to the investigative file for their complaints, and there was an exception for the intelligence community.

Following the Senate Governmental Affairs subcommittee hearings chaired by Senators Claire McCaskill (D.-Mo.) and Robert Portman (R.-Oh) (HSGAC, 2016), Congress made the pilot program permanent. It also acted on lessons learned, and protection was explicitly added for "personal services contractors," those individuals who work directly for the federal government as their employer (10 U.S.C. 4701(a)(1); 41 U.S.C. § 4712(a)(1)). AuQ305

Currently, the due process dimension of the statute is under significant attack, which threatens to roll back the rights for 28 years by limiting them to administrative investigations under the 1994 law. In a precedent-setting decision, *Robertson v. Intratek Computer* 976 F.3d 575 (Fifth Cir. 2020), *pet. cert. denied*, 142 S.Ct. 2708, 212 L.Ed.2d 777 (2022) the Fifth Circuit Court of Appeals held that the law's anti-gag provision protecting rights and remedies did not apply to court access, reasoning that due process is just the channel to seek remedies rather than an intrinsic right. That means that an employer could make it a job prerequisite to waive court access if the whistleblower does not obtain relief from the administrative remedy. The only other recourse left would be employer-controlled arbitration, with the employer setting the rules and paying the arbitrator. Because the Supreme Court declined to review the issue, the due process loophole is liable to spread. AuQ306

## Case study

LaSalle Corrections (herein "LaSalle") is a private, for-profit company that operated the Irwin County Detention Center ("ICDC") in Ocilla, Georgia, and owns and/or operates 19 correctional centers in Georgia, Louisiana, and Texas. LaSalle operated ICDC under a federal government contract with the U.S. Department of Homeland Security's (DHS) Immigration and Customs Enforcement (ICE) to house immigrant detainees (United States Senate Permanent Subcommittee on Investigations, 2022). AuQ307

Dawn Wooten is a licensed practical nurse employed as a nurse at ICDC. Although she had alternative periods of employment, she worked at ICDC on and off from 2010 until July 2020, when ICDC retaliated against her for blowing the whistle and stopped giving her shifts (Project South et al., 2020). Although LaSalle gave no formal notice of termination, by December 31, 2020, LaSalle had not given her any shifts, and Wooten considered herself to be constructively discharged by this date (*Dawn Wooten v. LaSalle Corrections et al.*, 2022). During the COVID-19 pandemic, she witnessed numerous alleged violations of rule, law, and regulation, gross waste of federal funds, fraud, gross mismanagement of a federal contract, abuse of authority, and substantial dangers to public health and safety. Like most employees, she first raised concerns internally with her supervisors, but her reports were ignored, and the misconduct continued. In September 2020, Ms. Wooten obtained *pro bono* legal counsel and on September 14, 2020, Government Accountability Project and Project South submitted her whistleblower disclosure to the DHS Office of Inspector General (Government Accountability Project, 2020).

Under 41 U.S.C. § 4712, an employee of a contractor, subcontractor, grantee, or subgrantee, or personal services contractor, is protected from retaliation for making disclosures to Congress; an Inspector General; the Government Accountability Office; a federal employee responsible for overseeing the contract or grant at the relevant agency; authorized officials at the U.S. Department of Justice or other law enforcement agencies; a court or

grand jury; or a management official or other employee of the contractor responsible for investigating, discovering, or addressing the misconduct.

Ms. Wooten's case illustrates both how whistleblowers can make a difference through reporting and how the system for obtaining relief for retaliation is slow and ineffectual. Her disclosures revealed significant dangers to the health and safety of the ICDC detainees, nurses, other staff, and the public. She claimed, *inter alia*, that LaSalle under-reported COVID-19 cases, placing staff and detainees at risk of contracting the virus, neglected medical complaints, and refused to test symptomatic detainees (Government Accountability Project, 2020). Her disclosures and the pressure that resulted from the media's widespread coverage were significant in catalyzing accountability at a facility that managed to otherwise avoid it despite advocates' documentation of human rights abuses years prior (PennState Law Center for Immigrants' Rights Clinic et al., 2017).

In fact, during the pandemic, whistleblowers from Richwood Corrections Center in Louisiana, another ICE detention facility operated by LaSalle, reported many similar concerns that did not result in meaningful accountability (Government Accountability Project, 2020).

Ms Wooten's other disclosures concerned a doctor who allegedly performed hysterectomies and other gynecological procedures on immigrant women detained at the ICDC with dubious consent and necessity (Project South et al., 2020). On September 15, 2020, a *Prism* article by Tina Vásquez reported that the doctor responsible for the alleged abuse of these migrant women was identified by the press as Dr. Mahendra Amin (Vásquez, 2020). By December 21, 2020, 13 women previously detained at ICDC and allegedly victimized by Dr. Amin joined a class action lawsuit filed by attorneys from Dreyer Sterling LLC and eight immigration advocacy organizations (Dreyer et al., 2020). Although the class action lawsuit is ongoing as of December 11, 2022, the sheer size of the legal team representing the survivors of Dr. Amin's alleged malpractice signifies that the amount of public attention and outrage spurred by Ms. Wooten's whistleblower complaint is significant. There have been other positive developments as well. Within a week of Ms. Wooten's public disclosures, women stopped being referred to Dr. Amin, and by May 3, 2021, ICE confirmed that all women were transferred out of ICDC (Davis, 2021; Merchant, 2021). On May 20, 2021, although federal and Congressional investigations were still ongoing, DHS Secretary Mayorkas announced his plans to shut down ICDC as an immigrant detention facility based on the findings of ongoing investigations spurred by Ms. Wooten and the women survivors who came forward (Olivares and Washington, 2021). By October 7, 2021, ICE ended its contract with ICDC, but as of September 3, 2021, the facility already had stopped housing ICE detainees (Cuffari, 2022).

There is a deeper problem across U.S. immigration detention centers. According to a U.S. Government Accountability Office (GAO) investigation, ICDC is merely one of several facilities where patients in ICE's custody lacked informed consent. GAO's investigation found that 25 out of 128 facilities inspected in fiscal year 2021 lacked informed consent (U.S. Government Accounability Office, 2022). Although ICE promised the U.S. Senate Permanent Subcommittee on Investigations that it intends to change its procedures to identify trends in off-site medical treatment, ICE's commitments do not go far enough to prevent similar problems from occurring in the future. There also seems to be a problem of consistency across government agencies in their positions on contractors. The U.S. Marshals Service, for instance, still utilizes ICDC to detain individuals in their custody, and DHS still contracts with

LaSalle to operate other detention facilities (United States Senate Permanent Subcommittee on Investigations, 2022). Whistleblowers, therefore, continue to be essential for making the government aware of fraud and human rights abuses that occur. But at what cost?

There are weaknesses in 41 USC § 4712 that contribute to long delays and insufficient relief for whistleblowers, especially in emergencies. Under the law, the Inspector General has 180 days to investigate whistleblowers' disclosures and submit a report, and extensions of time up to an additional 180 days are permitted if the complainant consents to the extension, and the law does not limit the number of times extension requests may be made. Furthermore, Inspectors General may only submit a report of their findings to the head of the executive agency concerned, and the agency head is responsible for determining if there is a sufficient basis to conclude the contractor subjected the complainant to illegal retaliation and if so, what remedies are appropriate, including make-whole relief, attorney fees, and costs. If the executive agency issues an order denying relief or has not issued an order within 210 days after the complaint was submitted, then the whistleblower may bring a *de novo* action at law or equity against the contractor in an appropriate U.S. district court. There is no process for whistleblowers to seek temporary relief while an Inspector General's investigation is ongoing, which means that whistleblowers cannot get reinstatement or other temporary relief unless or until the agency head issues a favorable finding of illegal retaliation and seeks injunctive relief in court or the whistleblower takes the matter to court themselves, which can be expensive and time-consuming.

Ms. Wooten paid a great cost for blowing whistle. The inadequacies of the Inspector General System failed to protect Ms. Wooten from long-term financial hardship and vulnerability. Ms. Wooten is a single mother supporting five children and is in a high-risk health category due to being immunocompromised. She lost her nursing job during the pandemic, became a public figure because of the media coverage of her story, and found herself unable to get a job in her field despite submitting hundreds of applications on a regular basis (Lewis, 2022). This resulted in immediate and sustained housing and financial insecurity (Bryant, 2022). Furthermore, many of the workers who lost their jobs at ICDC because of the DHS Secretary's decision to end ICE's contract with the facility misplace the blame on Ms. Wooten for their hardship, and her personal security continues to be a serious concern (Herel, 2022). As of December 11, 2022, the DHS Inspector General investigation into whistleblower retaliation against Ms. Wooten is still ongoing, and although she has received multiple awards for her bravery and cooperated with several federal and Congressional investigations, she has not received any relief (Government Accountability Project, 2022).

AuQ308
AuQ309
AuQ310
AuQ311

### The False Claims Act

As discussed above, the most effective law empowering whistleblowers to make a difference has been the False Claims Act. Consistent with its deep *qui tam* roots, the law has a long history in the United States. It came from a proposal by President Abraham Lincoln to deputize citizens because the far smaller federal government then could not maintain effective oversight of massive corruption during the Civil War. As the Supreme Court summarized in a 1968 decision, *United States v. McNinch*, soldiers were getting killed by their own backfiring weapons; ammunition was loaded with sand instead of gunpowder; and feet were freezing from cardboard shoes, as well

as analogous frauds. Lincoln and Congress responded to a "series of sensational congressional investigations into the sale of provisions and munitions to the War Department." Those investigations showed that the government "had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war."

The statute remained stable until World War II, when there was a political backlash against the fraud equivalent of ambulance-chasing lawyers. Prosecutors had brought numerous indictments against war profiteers who committed fraud. Private attorneys waited in courthouses where the indictments were handed down and then copied the allegations in the form of a civil False Claims complaint. They waited for the criminal trial and conviction, and then reaped a civil recovery. So, in 1943, Congress amended the statute to impose a complete bar on *qui tam* actions if the United States already possessed information about the fraud. This virtually choked off the filing of *qui tam* cases, and the statute became dormant. The Act was reborn in 1986 through a political partnership between conservative Iowa Senator Charles Grassley (R.-Iowa) and liberal Beverley Hills Representative Howard Berman (D.-Cal.) (Grassley, n.d.).   AuQ312

Controversies about Pentagon misspending sparked a public spotlight on the scope of fraud, and the results were alarming, with estimates of over $50 billion annually from the General Accounting Office (Senate Report, 1986, p. 3). The sponsors of the 1986 amendments convinced Congress that again the scope of fraud was too much for the federal government to challenge alone (Grassley, 1986). The modern law's provisions are summarized below.[4]   AuQ313

### *Liability provisions, § 3729*

The False Claims Act has two primary targets – knowingly false claims for payment, such as double-billing or for work not performed; and knowing false statements that are material to a claim for payment, such as lying about compliance with relevant environmental, public health, or other legal prerequisites for payment. While each false claim only triggers a penalty of $13,508 to $27,018, the real liability is three times the damages to the government, or at least triple the impact of the fraud (31 U.S.C. § 3729(a)).

Definitions always are key. "Knowing" means actual knowledge of the information, or acting with deliberate ignorance or reckless disregard for its truth or falsity. A "claim" is any demand or request for money, whether for a contract, grant, or otherwise (30 U.S.C. § U.S.C. 3729(b)). To summarize, there are four legal elements to establish liability:

1) a claim or statement in connection with the claim;
2) that is false or fraudulent, whether to induce award of a contract such as understating the costs of a cost-plus contract or misstating how the money was spent;
3) scienter, i.e., actual knowledge the information is false or fraudulent or deliberate ignorance or reckless disregard of the truth; and
4) materiality for the decision, whether to award a contract or make a payment. For example, The Supreme Court's *Escobar* decision held that failure to disclose noncompliance with regulatory requirements is a false "implied certification" that violates the Act.

(*Escobar*, 2016)

While that holding was a victory for whistleblowers, at the same time, the Court imposed a new, "demanding" and "rigorous" test for materiality. Traditionally, the government would argue that, if a recipient of payment was not eligible to participate in a program, any payment to it was

by definition a false claim. However, the Supreme Court ruled that a plaintiff must prove that the requirement the defendant violated was a condition of payment. The Court explained that the government's decision to expressly identify a provision as a condition of payment is relevant but not automatically dispositive. Likewise, proof of materiality can include, but is not limited to, evidence the defendant knows that the government consistently refuses to pay claims in other cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the government pays a particular claim despite its actual knowledge that certain requirements were violated, that is strong, but not necessarily dispositive, evidence that those requirements are not material (*Escobar*, 2016, pp. 191–196).

### *Qui tam provisions, § 3730*

The Act permits anyone, whether an employee, citizen, or non-governmental organization, to be a "relator" and file a whistleblower lawsuit to expose and challenge fraudulent payments. The first step is to file the complaint under seal, or in secret, with the district court and to file a "written disclosure statement" with the Department of Justice. 31 U.S.C. 3730(b)(2). The disclosure must allege the material facts of the fraud. The government then has at least 60 days to review and further investigate the disclosure, often in conjunction with an Office of Inspector General or other enforcement unit of the concerned agency. After that the Justice Department may intervene and essentially take charge of the litigation. If it decides to intervene, the relator still can participate in the case as a party with limited rights. If the government declines to intervene, the relator can continue with the case independently. After the government decides, the seal is lifted, and the defendant has an opportunity to respond.[5] The government may seek lengthy extensions to decide on intervention, which are routinely sought and granted.[6] The statute of limitations to file a civil action is six years after the violation of § 3729, or three years after the facts were known or reasonably should have been known, but not later than ten years (31 U.S.C. § 3731(b)).

    The seal has been the source of some controversy. The Justice Department aggressively enforces it, even threatening criminal prosecution for leaks about a case to the media. The justification is that secrecy is necessary to preserve the integrity of any law enforcement investigation. An advance warning of liability could put a potential defendant on guard, enabling the destruction of evidence and putting pressure on potential witnesses. However, this inherently means the FCA process is sustaining the cover-up of what may be dangerous threats to public health and safety for years, making it functionally a temporary gag statute. In *ACLU v. Holder*, a district court resolved the issue and held that whistleblowers are not gagged from disclosing the facts of fraudulent misconduct. The seal applies to the release of any information that could provide notice of the *qui tam* litigation's existence.

    Since the Attorney General has prosecutorial discretion, in practice the whistleblower must make a successful sales pitch. The complaint, evidentiary record, and any briefings possible are the foundation to convince the Justice Department to take the case – that it will be successful and return significant sums to the Treasury. In practice, many Justice Department Civil Division attorneys, who handle False Claims Act litigation, leave for private practice as *qui tam* attorneys, capitalizing on their knowledge of the system, relationships, and credibility.

    Although a relator can pursue the case independently, the Justice Department has significant authority to limit its role. It can seek dismissal of the case over the relator's objection; settle the dispute over the relator's objection; restrict the relator's participation in portions of

the litigation, such as actions that interfere with pending investigations and examining witnesses; restrict the relator's ability to gain information through pre-trial discovery; seek relief for the same misconduct through alternate remedies whose procedures exclude relators; and even intervene to take over a case it earlier had rejected before the relator's further progress (31 U.S.C. § 3730(c)).

A January 10, 2018, memorandum by Michael Granston, Director of the DOJ Commercial Litigation Branch, Fraud Section, describes the seven key factors the Justice Department reviews for decisions whether to seek restriction or dismissal of a relator's claim. They include:

- *Meritless Qui Tams* – failure of the relator to allege actionable obligation; in other words, a complaint that even if verified wouldn't prove a violation.
- *Parasitic or Opportunistic Qui Tam Actions* -filing an action that duplicates pre-existing government investigations and adds no useful data.
- *Interference with Agency Policies and Programs* – dismissal of *Qui Tam* actions that could delay governmental plans already in progress dealing with the alleged violation.
- *Controlling the Litigation brought on Behalf of the United States* – different relators bringing separate parallel actions in different district courts, which could bog down the government's own litigations on the same matter.
- *Safeguarding Classified information and National Security* – Safeguarding when qui tam actions threaten exposure of classified information for intelligence agencies or military procurement contracts.
- *Preserving Government Resources* – Cost-benefit analysis of pursuing actions, where the statutory penalties and damage multipliers are less than the expected cost of monitoring and answering discovery requests.
- *Accountability for Egregious Procedural Errors* – such as in response to relators who continually ignore the government's requests to properly disclose facts.

(Granston, 2018).

Although relators can challenge any exercise of this authority, they clearly are subsidiary partners in cases in which the government keeps on a tight leash to prevent obstructing its own parallel law enforcement efforts.

*Awards*

The whistleblowers are subsidiary but potentially lucrative partners in the recovery of treble damages due to their entitlement to a portion of any recovery from a successful decision or settlement. If the government intervenes, relators are entitled to a share of proceeds ranging from 15 percent to 25 percent, depending on the significance of their contribution. If their primary contribution was an analysis of information already on the public record, the minimum can shrink to 10 percent. If the relator prevails without government intervention, the award range raises from a 25 percent minimum to 30 percent maximum. These boundaries can be lowered if the relator participated in the fraud. If there is a criminal conviction for the relator's associated misconduct, the *qui tam* case will be dismissed (31 U.S.C. § 3730(d)(1–3)).

This structure has combined the concepts of doing good and doing well. *Qui tam* litigation can be extremely lucrative. Fifteen percent of a successful challenge to billion-dollar fraud is like winning the lottery. From FY 2017 to FY2021, total annual awards to whistleblowers ranged from

AuQ314

$237 to $392 million (Department of Justice, 2022b). To illustrate the potential, in the Biogen case involving kickbacks for multiple sclerosis drugs, the government received $900 million, of which $266 million went to the whistleblower (U.S. Department of Justice, 2022a).

There are serious statutory entry barriers for eligibility, however. As a matter of law under the statute, claims will be dismissed if – they concern information gained during military service; filed against Members of Congress, the judiciary, or senior executive officials and the government was aware of the information; or if the government is already in litigation over the same issues (31 U.S.C. § 3730(e)(1–3)). Relators can build on the public record, but if the lawsuit is substantially the same as publicly available information, the case will be dismissed under the public disclosure bar unless the relator was the original source. An original source is a relator who previously had disclosed to the government what later appeared on the public record or whose independent knowledge materially adds to publicly available information (31 U.S.C. § 3730(d)(4)).

### *Anti-retaliation provision, § 3730(h)*

The 1986 amendments also included another anti-retaliation right, two decades ahead of general contractor whistleblower protection in terms of due process, which did not start providing court access to seek relief until 2007 for defense contractor employees. The law provides court access for suits against retaliation caused by protected activity challenging violations listed in section 3729. 31 U.S.C. § 3730 (h). Generally, retaliation claims are joined with the *qui tam* action, but they can be pursued independently without one.

False Claims Act retaliation claims involve three elements:

(1) that the plaintiff engaged in protected conduct,
(2) that the employer knew of plaintiff's protected conduct, and
(3) that the employer took adverse action against the plaintiff because of the protected conduct.

(*Lord v. Univ of Miami*, 2021)    AuQ315

An employee engages in "protected activity" for purposes of establishing a False Claims Act (FCA) retaliation claim where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.

The context for protected speech has been interpreted broadly. The rights do not require communications with the government as a prerequisite. If an employee protests at the workplace but does not break ranks, it still is illegal to retaliate. Internal complaints that concern false or fraudulent claims for payment submitted to the government are "protected activity" for purposes of a claim for retaliatory discharge, but complaints must raise concerns about fraud. It is not necessary to use words like "fraud" or "illegal." As one court explained, if the employee puts the organization on notice that there is a "reasonable possibility" of litigation it is protected speech. "[N]o magic words – such as illegal or unlawful – are necessary to place the employer on notice of protected activity" (*Jamison v. Fluor Fed. Sols.*, 2017).

While § 3730(h) created pioneering anti-retaliation rights, it was relatively crude compared to current best practices. For example, it does not specify burdens of proof, a jury trial in court, or any damages beyond reinstatement and double back pay. As a result, its primary significance has been creating leverage for more lucrative settlements when combined with a *qui tam* suit.

### Case study

American Grocers, Inc. (AGI) was a Texas-based exporter of food and non-food products to countries in the Middle East. AGI was owned and controlled by Samir Mahmoud Itani along with his wife, Suzanne Itani, and a close cadre of family members and business associates. (*United States ex rel. Delma Pallares v. Samir Itani, et al.*, [2009]).

In May 2003 the Defense Supply Center Philadelphia (DSCP), a component of DoD, awarded a multi-million-dollar contract to Public Warehousing Company (a/k/a PWC Logistics, a/k/a Agility Logistics) ("PWC"), based in Kuwait, to act as its prime vendor in providing, among other things, food products to the U.S. military. AGI sold food products to PWC that PWC, in turn, supplied to the U.S. military (*United States v. Samir Mahmoud Itani*, [2007]).

Delma Pallares began working at AGI in 1995 as a logistics manager. Samir Itani's sister-in-law taught Ms. Pallares how to create invoices, code orders, and file. Mr. Itani promoted Ms. Pallares to general merchandise manager. In this capacity, Pallares gained personal knowledge of all of the daily operations of the company (*United States ex rel. Delma Pallares v. Samir Itani, et al.*, [2009]).

The offices of AGI were located in a warehouse where all of the food items were received prior to shipment overseas. As the containers of grocery items were unloaded at Itani's warehouse, Pallares gained personal knowledge of how the food was invoiced, valued, and weighed prior to shipping. Pallares also gained personal knowledge of Itani's alleged scheme to defraud the government (*United States ex rel. Delma Pallares v. Samir Itani, et al.*, [2009]).

When food products arrived at AGI's warehouse, Samir Itani instructed his employees to alter the expiration or "sell by" dates, placed on the products. The employees would erase the manufacturers' dates with acetone, spray paint, or a "Dremel" tool. Itani, or his brother, Ziad Itani, would then make up a new date and instruct employees to imprint it on the product with a special dating machine (*United States ex rel. Delma Pallares v. Samir Itani, et al.*, [2009]). Suppliers would contact Itani and ask if he wanted to buy cheap products that would soon expire. Itani would usually take the product if the seller assured him that the product date was easy to manipulate. Itani would sell the food to PWC or others at full price, from which it would be supplied to the military (*United States ex rel. Delma Pallares v. Samir Itani, et al.*, [2009]). In addition to the date fraud, AGI added bogus trucking charges to its invoices to PWC, which PWC then passed along to DoD (*United States v. Samir Mahmoud Itani*, [2007]).

There were aspects of the fraud that victimized others besides the DoD. Itani regularly created two sets of invoices. The "real" invoice, which included correct product descriptions for the shipped goods, such as number of containers, quantities, weights, and values, would be sent to the bank to secure payment for the transaction, while the second "fake" invoice, which significantly lowered the amounts stated for the products and costs, was sent to the customer for presentation to customs officials in order to fraudulently lower the amount of tariffs, customs and duties owed (*United States ex rel. Delma Pallares v. Samir Itani*, et al., [2009]).

Most of the destinations in the Middle East to which Itani shipped products require an Islamic Slaughter Certification (Halal). This is to certify that the products intended for importation into Muslim countries meet appropriate requirements for religious slaughter.

> The certificate must be endorsed by an approved organization, such as the Arabian-American Chamber of Commerce. In order to avoid the approximate $500 expense of procuring this certification for every product that requires it, Itani had a fake certificate created by a sheik in California, although no inspection was performed as to the meat that was certified (*United States ex rel. Delma Pallares v. Samir Itani*, et al., [2009]).
>
> Health certificates also are required to accompany edible animal by-products upon export. Exports that contain meat or dairy products require certification from the United States Department of Agriculture (USDA) that they are free from certain diseases, such as rinderpest (cattle plague), foot-and-mouth disease, hog cholera, swine vesicular disease, African Swine fever, bovine fever, bovine spongiform encephalopathy, and contagious bovine pleuropneumonia. The certificate must be signed by an officer of the USDA Animal and Plant Health Inspection Service. Again, to avoid the cost and time associated with having products properly inspected, Itani forged these (*United States ex rel. Delma Pallares v. Samir Itani*, et al., [2009]).
>
> Ms. Pallares filed a *qui tam* action under seal pursuant to the False Claims Act on August 26, 2005, disclosing AGI's fraudulent activities (she amended her complaint, filing the First Amended Complaint on June 10, 2009). Government agents, after numerous interviews of her, established probable cause to obtain a search warrant from a federal district court. Investigators raided AGI's warehouse to carry out the warrant in 2006, where they witnessed employees eradicating expired dates in various ways and seized documents. With Pallares' continuing assistance, this led to a 2007 indictment of Samir Itani on a criminal False Claims Act charges under 18 U.S.C. § 286, for conspiring to submit falsely inflated trucking invoices for payment by the government (*United States ex rel. Delma Pallares v. Samir Itani, et al.*, Civil No. H-05–3018, [2010]).
>
> Samir Itani pleaded guilty to a criminal charge and was sentenced to 24 months in prison, followed by three years of supervised re-lease (*United States ex rel. Delma Pallares v. Samir Itani, et al.*, Civil No. H-05–3018 (S.D. Tex. Jun. 10, 2009), D-198, Judgment in a Criminal Case., [2009]). AGI and other defendants in Ms. Pallares' civil False Claims Act case settled the case in the amount of $13.2 million, with Ms. Pallares receiving a whistleblower share of 24 per cent (*United States ex rel. Delma Pallares v. Samir Itani, et al.*, Civil No. H-05–3018, [2010]).

AuQ316

## Conclusion

Private sector employees who challenge fraud or other misconduct in U.S. government contracts have an unsurpassed array of legal options to defend themselves. Those challenging fraud have the right to break the government's monopoly on law enforcement with *qui tam* whistleblower lawsuits. However, the procedures for whistleblower lawsuits are highly complex, and the anti-retaliation statutes are a jungle of inconsistent boundaries, responsibilities, and remedies. That challenge is combined with the near certainty of a retaliatory counterattack designed to scare other would-be whistleblowers into silent observers. This is dangerous territory. A navigator is essential – trustworthy, knowledgeable counsel who has experience and credibility bringing successful cases. Any employee considering this choice should know that it is a crossroad decision and do all possible advance homework before exposure as a possible threat to the organization and risk of retaliation.

*Tom Devine, Samantha Feinstein and Jack Kolar*

**Notes**

1. *Qui tam* comes from the Latin expression "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," meaning "[he] who sues in this matter for the king as well as for himself." This is an old common law device that goes back to 1318 or earlier. Indeed, according to Charles Doyle, a Senior Specialist in American Public Law for the Congressional Research Service, "[t]he earliest cited example of a *qui tam* provision is the 695 declaration of King Wihtred of Kent, which stated that 'If a freeman works during the forbidden time [i.e., the Sabbath], he shall forfeit his healsfang, and the man who informs against him shall have half the fine, and [the profits arising] from the labour.'" (Congressional Research Service, 2009, p. 2).
2. Common tactics include shifting the spotlight from the misconduct to the whistleblower through retaliatory investigations and smear campaigns; isolating the whistleblower; publicly humiliating the whistleblower; removing duties; ordering transfers that cannot be accepted; organizing other workers to "mob" the whistleblower as a threat to their jobs; disciplining or terminating the whistleblower on pretexts; appointments to positions without authority or resources followed by termination for the failure; blanket personal surveillance; physical violence; c suits and criminal prosecutions; and blacklisting, to identify illustrative examples. The harassment tactics are limited only by the imagination. For a fuller explanation of retaliatory consequences, see Devine and Maassarani, 2011, p. 7.
3. A study of over 1,000 publicly traded U.S. corporations demonstrated that companies with internal whistleblower policies faced fewer government enforcement actions with reduced penalties, and less litigation with reduced liability (Stubben and Welch, 2020).
4. Since passage of the 1986 amendments, 32 states and the District of Columbia also have adopted False Claims Acts, as well as New York city, Chicago, and Philadelphia (Pietragallo Gordon Alfano Bosick & Raspanti, LLP, n.d.).
5. Under 31 U.S.C. § 3730(a)(4)(B), if the government notifies the court that it declines, "the person bringing the action shall have the right to conduct the action." Intervention also means gaining the government's resources for the lawsuit. Since many relators are fighting resource David vs. Goliath battles, due to financial realities, government intervention often is essential for the claim to proceed.
6. 31 U.S.C. § 3730(b). In practice, the 60-day schedule is a fiction. Justice Department reviews frequently take two years or longer (U.S. Department of Justice, 2012).

**References**

*ACLU v. Holder*, 652 F. Supp. 2d 654, 658–9 (E.D. Va. 2009). AuQ317
*AmericanReinvestment and Recovery Act*, Pub. 111–5, 123 Stat. 115, § 1553. AuQ318
*Avco Corp. v. U.S. Dept. of Justice*, 884 F.2d 621, 622 (D.C. Cir. 1989). AuQ319
*Civil Actions for False Claims*, 31 U.S.C. § 3730. AuQ320
*Commodity Whistleblower Incentives and Protection*, 7 U.S.C. § 26. AuQ321
Congressional Research Service (2021) *Qui Tam: The False Claims Act and Related Federal Statutes* [online]. Available at: https://fas.org/sgp/crs/misc/R40785.pdf [https://perma.cc/P3CG-T4AQ] (Accessed: 14 December 2022). AuQ322
*Contractor Employees: Protection from Reprisal for Disclosure of Certain Information*, 10 U.S.C. § 4701. AuQ323
*Contractor Employees: Protection from Reprisal for Disclosure of Certain Information*, 41 U.S.C. § 265. AuQ324
Cuffari, D.J.V. (2022) *Testimony of Inspector General, Dr. Joseph V. Cuffari* [online]. Available at: www.hsgac.senate.gov/imo/media/doc/Cuffari%20Testimony.pdf [https://perma.cc/8CPD-NZ6L] (Accessed: 11 December 2022).
Davis, C.R. (2021) *ICE Transfers Women Out of Detention Center That Became Infamous over Allegations of Forced Sterilization* [online]. Available at: www.businessinsider.com/ices-irwin-county-detention-center-transfers-remaining-women-lawyer-says-2021-4 [https://perma.cc/QW6U-V2DN] (Accessed: 14 March 2023).
Dawn Wooten v. LaSalle Corrections et al. (2022) *United States District Court Middle District of Georgia Valdosta Division* [online]. Available at: https://whistleblower.org/wp-content/uploads/2023/01/Wooten-v-Lassale-Complaint-12-29-2022-ECF.pdf [https://perma.cc/6RUF-N3CN] (Accessed: 6 March 2023).
Devine, T. and Maassarani, T.F. (2011) *The Corporate Whistleblower's Survival Guide*. San Francisco: Berrett-Koehler Publishers.
Dreyer, D.N. et al. (2020) *Consolidated Amended Petition for Write of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages Submitted to the United States District Court for the Middle District of Georgia*, s.l.: NIPNLG.

| | |
|---|---|
| *Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information*, 41 U.S.C. § 4712. | AuQ325 |
| Ethics Resource Center (2010) *Reporting: Who's Telling You What You Need to Know, Who Isn't, and What You Can Do about It*. | AuQ326 |
| *False Claims Act*, 30 U.S.C. § 3729. | AuQ327 |
| Government Accountability Project (2020) *Press Release: Whistleblowing Nurse from Detention Center in Georgia Reports Unsafe Practices That Promote the Spread of COVID-19 in ICE Detention* [online]. Available at: https://whistleblower.org/press-release/press-release-whistleblowing-nurse-from-detention-center-in-georgia-reports-unsafe-practices-that-promote-the-spread-of-COVID-19-in-ice-detention/ [https://perma.cc/8MXR-KRTQ] (Accessed: 14 March 2023). | |
| Granston, M. (2018) *Factors for Evaluating Dismissal Pursuant to 31 U.S.C. 3730(c)(2)(A)* [online]. Available at: www.insidethefalseclaimsact.com [https://perma.cc/A4PK-36CZ] (Accessed: 15 December 2022). | |
| Grassley, C. (1986) *132 Cong. Rec*. S11, 243 (remarks of Sen. Grassley). | |
| Grassley, C. (2014) *Grassley Law Helps Justice Department Recover $3 Billion Taxpayer Money | U.S. Senator Chuck Grassley of Iowa* [online]. Available at: www.grassley.senate.gov/news/news-releases/grassley-law-helps-justice-department-recover-3-billion-taxpayer-money [https://perma.cc/DNJ8-JZDE] (Accessed: 18 March 2023). | AuQ328 |
| *Individual Right of Action in Certain Reprisal Cases*, 5 U.S.C. § 1221 (e). | AuQ329 |
| *Inspector General Act of 1978*, 5 U.S.C. App, Pub. L. 95–452, 92 Stat. 1101 (Oct. 12, 1978), as amended. | |
| *Jamison v. Fluor Fed. Sols., LLC, 2017* (2017) (United States District Court, Northern District of Texas Dallas Division) WL 3215289, at 9. | |
| JD Supra (2022) *False Claims Act Fundamentals: What Is a Relator?* [online]. Available at: www.jdsupra.com/legalnews/false-claims-act-fundamentals-what-is-a-3646643/ [https://perma.cc/W9YG-6MTS] (Accessed: 14 March 2023). | AuQ330 |
| Keiper, A. (2022) 'FOX business', *COVID-19 Relief Fraud Led to Billions in Taxpayer-Funded Paycheck Protection Program Loans Lost* [online]. Available at: www.foxbusiness.com/politics/COVID-relief-fraud-ppp-billions-taxpayer-funded-paycheck-protection-program-loans [https://perma.cc/8GA2-XHYP] (Accessed: 18 March 2023). | AuQ331 |
| King, J. (2022) 'Taxpayers against fraud', *Billions in False Claims Act Recoveries* [online]. Available at: www.taf.org/billions-in-false-claims-act-recoveries/ [https://perma.cc/BT5V-4D6A] (Accessed: 14 December 2022). | |
| *Lord v. Univ. of Miami* (2021) (United States District Court, Southern District of Florida), 571 F.Supp.3d 1299. | AuQ332 |
| Luiza (2021) 'Constantine canon', *The False Claims Act: It Benefits More Than Just the Government* [online]. Available at: https://constantinecannon.com/whistleblower/whistleblower-insider-blog/the-false-claims-act-benefits-more-than-the-government/ [https://perma.cc/4PZZ-82GP] (Accessed: 14 December 2022). | AuQ333 |
| Merchant, N. (2021) 'Houston: AP news', *Migrant Women to No Longer See Doctor Accused of Misconduct* [online]. Available at: https://apnews.com/article/georgia-archive-immigration-f3b1007a9d2ef3cb6d2b-d410673eae83 [https://perma.cc/WC83-CAG4] (Accessed: 14 March 2023). | |
| Office, U.S.G.A. (2022) *A Snapshot of Government-Wide Contracting for FY 2021 (Interactive Dashboard)* [online]. Available at: www.gao.gov/blog/snapshot-government-wide-contracting-fy-2021-interactive-dashboard [https://perma.cc/N7HT-J4A3] (Accessed: 14 March 2023). | |
| Olivares, J. and Washington, J. (2021) 'The intercept', *ICE Detention Center Shuttered Following Repeated Allegations of Medical Misconduct* [online]. Available at: https://theintercept.com/2021/05/20/ice-irwin-hysterectomies-medical/ [https://perma.cc/PW5S-FGBS] (Accessed: 14 March 2023). | |
| PennState Law Center for Immigrants' Rights Clinic, Project South, Alterna, Georgia DetentionWatch, Georgia Latino Alliance for Human Rights, Mercer University School of Law (2017) *Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers* [online]. Available at: https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf [https://perma.cc/YG6N-KYNA] (Accessed: 14 March 2023). | |
| Pietragallo Gordon Alfano Bosick & Raspanti, LLP. (n.d.) *States & Municipalities FCAs – False Claim Act Law Firm* [online]. Available at: www.falseclaimsact.com/states-municipalities-fcas/ [https://perma.cc/5QED-PSY8] (Accessed: 15 December 2022). | |
| *Prohibited Personnel Practices*, 5 U.S.C. § 2302. | AuQ334 |
| Project on Government Oversight (2017) *Contractors and the True Size of Government* [online]. Available at: www.pogo.org/analysis/2017/10/contractors-and-true-size-of-government [https://perma.cc/Z8JH-AQTC] (Accessed: 14 December 2022). | |

Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights, and South Georgia Immigrant Support Network (2020) *Complaint Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center*. Atlanta: Project South [online]. Available at: https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf [https://perma.cc/J5RL-7N4C] (Accessed: 14 March 2023).

PwC (n.d.). *Economic Crime: People, Culture & Controls the 4th Biennial Global Economic Crime Survey Engineering and Construction Industry Supplement* [online]. Available at: www.pwc.com/gx/en/economic-crime-survey/pdf/gecs_engineering_and_construction_supplement.pdf [https://perma.cc/V2FK-N49V] (Accessed: 14 March 2023).

*Robertson v. Intratek Comput., Inc.*, 976 F.3d 575 (United States Court of Appeals for the Fifth Circuit) (2020) cert. denied 2022 U.S. LEXIS 2420.

*Securities Whistleblower Incentives and Protection*, 15 U.S.C. § 78u-6. <span style="float:right">AuQ335</span>

Senior, I. (2006) *Corruption – the World's Big C, Causes, Concerns, Consequences, Cures*. London: The Institute of Economic Affairs.

Stubben, S. and Welch, K.T. (2019) *Evidence on the Use and Efficacy of Internal Whistleblowing Systems* [online]. Available at: www.utah-wac.org/2019/Papers/stubben_UWAC.pdf (Accessed: 15 December 2022). <span style="float:right">AuQ336</span>

*United States Ex Rel. Delma Pallares v. Samir Itani, et al.*, Civil No. H-05–3018 (2010) Opinion and Order (United States District Court for the Southern District of Texas) [online]. Available at: www.govinfo.gov/content/pkg/USCOURTS-txsd-4_05-cv-03018/pdf/USCOURTS-txsd-4_05-cv-03018-0.pdf [https://perma.cc/A2Q6-XHQX] (Accessed: 18 March 2023).

*United States Ex Rel. Delma Pallares v. Samir Itani, et al.*, First Amended Complaint (United States District Court for the Southern District of Texas) (2009) [online]. Available at: https://ecf.txsd.uscourts.gov/cgi-bin/DktRpt.pl?574798572502861-L_1_0-1 (Accessed: 9 December 2022).

*United States v. McNinch*, 356 U.S. 595 (United States Supreme Court) (1958) at 599. <span style="float:right">AuQ337</span>

*United States v. Samir Mahmoud Itani*, Criminal No. H-07–310, Indictment (2007) (United States District Court for the Southern District of Texas) [online]. Available at: https://ecf.txsd.uscourts.gov/cgi-bin/DktRpt.pl?122400536360358-L_1_0-1 (Accessed: 9 December 2022).

*United States v. Samir Mahmoud Itani*, Criminal No. H-07–310, Judgment in a Criminal Case (2010) (United States District Court for the Southern District of Texas). Available at: https://ecf.txsd.uscourts.gov/cgi-bin/DktRpt.pl?122400536360358-L_1_0-1 (Accessed: 9 December 2022). <span style="float:right">AuQ338</span>

*Universal Health Servs. v. United States Ex Rel. Escobar*, 579 U.S. 176, 136 S. Ct. 1989 (2016) (United States Supreme Court) U.S. LEXIS 392.

U.S. Department of Justice (2012) *False Claims Act Cases: Government Intervention in Qui Tam (Whistleblower) Suits* [online]. Available at: www.justice.gov/sites/default/files/usao-edpa/legacy/2012/06/13/InternetWhistleblower%20update.pdf [https://perma.cc/3L6Z-TCVB] (Accessed: 15 December 2022).

U. S. Department of Justice (2020) *Justice Department Announces Global Resolution of Criminal and Civil Investigations with Opioid Manufacturer Purdue Pharma and Civil Settlement with Members of the Sackler Family* [online]. Available at: www.justice.gov/opa/pr/justice-department-announces-global-resolution-criminal-and-civil-investigations-opioid [https://perma.cc/672M-3H63] (Accessed: 14 March 2023). <span style="float:right">AuQ339</span>

U.S. Department of Justice (2022a) *Biogen Inc. Agrees to Pay $900 Million to Settle False Claims Act Allegations Related to Improper Physician Payment* [online]. Available at: www.justice.gov/usao-ma/pr/biogen-inc-agrees-pay-900-million-settle-false-claims-act-allegations-related-improper [https://perma.cc/8TMF-FXZN] (Accessed: 14 March 2023).

U.S. Department of Justice (2022b) *False Claims Act Recoveries Top $5.6 Billion in 2021*. Office of Public Affairs [online]. Available at: www.justice.gov/opa/pr/justice-department-s-false-claims-act-settlements-and-judgments-exceed-56-billion-fiscal-year [https://perma.cc/6Y6K-E5C6] (Accessed: 14 March 2023). <span style="float:right">AuQ340</span>

U.S. Department of Labor (n.d.) *Statutes | Whistleblower Protection Program* [online]. Available at: www.whistleblowers.gov/statutes [https://perma.cc/5GBS-B7LY] (Accessed: 14 March 2023).

U.S. Government Accountability Office (2022) *Immigration Detention: ICE Needs to Strengthen Oversight of Informed Consent for Medical Care* [online]. Available at: www.gao.gov/products/gao-23-105196 [https://perma.cc/2ZSS-KQXQ] (Accessed: 14 March 2023). <span style="float:right">AuQ341</span>

U.S. Senate Committee on Homeland Security and Governmental Affairs (n.d.) *Senate Report 114–270 – To Enhance Whistleblower Protection for Contractor and Grantee Employees* [online]. Available at: www.govinfo.gov/content/pkg/CRPT-114srpt270/html/CRPT-114srpt270.htm [https://perma.cc/KUN5-PDJK] (Accessed: 14 December 2022). AuQ342

U.S. Senate Committee on Homeland Security and Governmental Affairs (2011) *Whistleblower Protections for Government Contractors*. Hearing Before the S. Homeland Sec. & Governmental Affairs Subcomm. On Contracting Oversight 6, 112th Cong. (testimony of the Honorable Peggy Gustafson, Inspector General, U.S. Small Business Administration/Chair of the Legislation Committee of CIGIE) [online]. Available at: www.gpo.gov/fdsys/pkg/CHRG-112shrg72560/pdf/CHRG-112shrg72560.pdf [https://perma.cc/J72G-XGU2] (Accessed: 14 December 2022). AuQ343

U.S. Senate Committee on Judiciary (1986) S. Rep. No. 345, 99th Cong. 2d Sess. AuQ344

Vásquez, T. (2020) *Exclusive: Georgia Doctor Who Forcibly Sterilized Detained Women Has Been Identified* [online]. Available at: https://prismreports.org/2020/09/15/exclusive-georgia-doctor-who-forcibly-sterilized-detained-women-has-been-identified/ [https://perma.cc/GC6Q-X5TQ] (Accessed: 14 March 2023).

The Volcker Alliance (2017) *The True Size of Government* [online]. Available at: www.volckeralliance.org/resources/true-size-government-1 [https://perma.cc/PV4G-HQAE] (Accessed: 14 December 2022).

Taylor & Francis

Not for distribution