<span style="color:orange">MTD EXHIBIT 3</span>

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| YANIRA YESENIA OLDAKER et. al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CASE NO: 7:20-CV-224 (WLS) |
| | : | |
| THOMAS P. GILES, *et al.* | : | |
| | : | |
| Defendants. | : | |
| | : | |

**ORDER**

Before the Court are five Motions to Dismiss filed by (1) the Official Capacity Federal Defendants[1] (Doc. 242); (2) Defendants Thomas P. Giles, Cesar Ciprian, Ada Rivera, and Patrick Musante in their individual capacities (Doc. 234) ("Individual Capacity Federal Defendants"); Defendants Walkiria Mines ("Defendant Mines") and Djibril "William" Rabiou ("Defendant Rabiou") (Doc. 323); Defendant Dr. Mahendra Amin (Doc. 235) ("Defendant Dr. Amin"); and Defendant Hospital Authority of Irwin County (Doc. 165) ("Irwin County Hospital"). The Official Capacity Federal Defendants, Individual Capacity Federal Defendants, Defendants Mines and Rabiou, Defendant Dr. Amin, and Defendant Irwin County Hospital are referred to collectively herein as the "Present Defendants." For the reasons discussed below, the Present Defendants' Motions are **GRANTED-IN-PART**, **DENIED-IN-PART**, and **DENIED-AS-MOOT-IN-PART**. As a result, the only Defendant that remains in the action is the United States of America.[2]

---

[1] See discussion *infra* Section II.A. for identity of the Official Capacity Federal Defendants.

[2] An Order (Doc. 362) was entered earlier today, on March 22, 2024, resolving the Motions to Dismiss filed by the "ICDC Defendants": (1) Defendant LaSalle Southeast, LLC (Doc. 232), (2) Defendant Irwin County Detention Center (Doc. 227), (3) Defendant Warden David Paulk (Doc. 233) (4) Defendants Cheryl Slacks, Coretta Battle, Taura Amber Hughes, Latoshia Coney, and Janet Vaughn in their individual capacities (Doc. 349), and (5) Defendant Marteka George in her individual capacity (Doc. 252). As a result of that Order, all federal claims against the ICDC Defendants were dismissed and the Court declined to exercise supplemental jurisdiction over all state law claims asserted against the ICDC Defendants.

## I.    PROCEDURAL & FACTUAL BACKGROUND

### A.    Procedural Background

The above-captioned action, which was filed on November 9, 2020, began as a hybrid habeas/civil action brought by a number of immigrant women who were detained at Irwin County Detention Center ("ICDC"), while subject to removal proceedings or awaiting removal. (Doc. 1). The original petition for relief was filed by Yanira Yesenia Oldaker ("Plaintiff Oldaker"), asserting that Respondents had violated her First and Fifth Amendment rights as well as other statutory and regulatory rights enjoyed by witnesses in ongoing investigations. (Doc. 1). Plaintiff Oldaker sought release pending adjudication, a declaration by the Court that Respondents had violated her rights, and an injunction halting her removal. (*Id.*) Because Oldaker was scheduled for deportation the same morning, she filed her petition simultaneously with an Emergency Motion for a Temporary Restraining Order ("TRO") which sought an injunction preventing her removal. (Doc. 2).

On December 21, 2020, Plaintiffs filed a "Consolidated Amended Petition for Writ of Habeus Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages" ("Consolidated Petition"). (Doc. 54). The Consolidated Petition named thirteen Petitioner-Plaintiffs and added a number of Respondent-Defendants. (*Id.* ¶¶ 19–45). The Consolidated Petition brought, in total, twenty-one claims for relief. (*Id.* ¶¶ 524–78). The claims included a habeas claim seeking Plaintiffs' release from unlawful detention, and civil claims seeking monetary, declaratory, and injunctive relief from all Defendants. (*See id.*) Plaintiffs simultaneously filed a second Emergency Motion for TRO (Doc. 56) asking the Court for an injunction seeking, *inter alia*, release of Plaintiffs during the pendency of the action. (*Id.*) However, when the Court ruled on the second Emergency Motion for TRO on September 17, 2021, all Petitioner-Plaintiffs had already been released, with the exception of one Petitioner-Plaintiff who was deported. (Doc. 167). As a result, the Court denied the Emergency Motion for TRO as moot. (*Id.*)

Plaintiffs, with leave of the Court, filed a "Consolidated Second Amended Class Action Complaint for Declaratory and Injunctive Relief and for Damages" ("SAC") (Doc. 210) on December 1, 2022. The SAC alleges twenty-three counts against all Defendants. Plaintiffs

bring all claims against the Present Defendants on behalf of putative classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). (Doc. 210 ¶¶ 637–51).

### B. Factual Background

The 196-page SAC names sixteen women who claim that, while in civil immigration detention at ICDC, they were subjected to medical and other abuse, most notably, unnecessary gynecological procedures that were performed without their consent by or at the direction of Defendant Dr. Amin. (*See generally* Doc. 210).[3] The procedures caused Plaintiffs significant pain and left some Plaintiffs infertile. (*Id.*) The Court will not recite the allegations of each Plaintiff against the Defendants, because such a summary would be unnecessary for the purposes of the instant Motions. Instead, to provide context, the Court will first describe the types of claims asserted by Plaintiffs, with a particular focus on Plaintiff Oldaker's allegations to provide a typical narrative. Then, the Court will describe the three classes of Defendants, and, generally, what Plaintiffs allege their involvement was in the medical abuses perpetrated by Defendant Dr. Amin.

#### 1. Plaintiffs

#### a. Yanira Yesenia Oldaker

Plaintiff Oldaker is a woman who was held in ICDC from January 1, 2020, until December 30, 2020. (Doc. 210 ¶ 139). When she arrived at ICDC, she experienced symptoms related to a 2014 hysterectomy, which had previously been treated with an estrogen patch. (Doc. 210 ¶ 142). As a result, she requested another patch from ICDC medical staff, who referred her to Defendant Dr. Amin, (Doc. 210 ¶¶ 142–43), a physician affiliated with Defendant Irwin County Hospital. (Doc. 210 ¶¶ 49–50).

When Plaintiff Oldaker saw Defendant Dr. Amin in February 2020, she requested an estrogen patch, instead, he had her undress for a transvaginal ultrasound. (Doc. 210 ¶¶ 144–45). Plaintiff Oldaker explained that she had undergone a hysterectomy, but Defendant Dr. Amin explained that he did ultrasounds on all of his patients. (*Id.* ¶ 145). During the procedure, Defendant Dr. Amin "violently jammed a transvaginal ultrasound monitor inside her and, after

---

[3] The facts contained herein, consistent with the standard of review for motions to dismiss, are derived from the SAC, accepted as true, and construed in the light most favorable to Plaintiffs. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

removing it, pushed several fingers into her vagina causing her excruciating pain." (*Id.*) Plaintiff Oldaker "squirmed and told him 'no,' but he kept going." (*Id.*) After this examination, he prescribed her Estrace pills. (*Id.*) A female ICDC officer was present for the procedure. (*Id.* ¶ 146). After the ultrasound, Plaintiff Oldaker experienced significant pain, vaginal bleeding, and vaginal discharge for several days afterward. (*Id.* ¶ 147). After reviewing Plaintiff Oldaker's medical records, an outside medical expert opined "'[t]here was no medical indication to perform a transvaginal ultrasound' because, following [Plaintiff Oldaker's] hysterectomy, 'there are no reproductive organs to evaluate'." (*Id.* ¶ 171).

Plaintiff Oldaker next saw Defendant Dr. Amin on September 8, 2020. (Doc. 210 ¶ 148). During the visit she explained that she only wanted to refill a prescription, but a nurse told her that she had to have a pap smear. (*Id.* ¶ 149). Plaintiff Oldaker was unsure why she needed a pap smear, since she had, as noted, previously undergone a hysterectomy, "but the nurse gave her no choice." (*Id.*) When Defendant Dr. Amin performed the pap smear, he inserted the speculum without lubrication, which caused "agonizing pain" when it was removed. (*Id.* ¶ 150). Plaintiff Oldaker experienced lingering pain after the procedure, she had trouble sitting, and could not wipe herself for several days. (*Id.* ¶ 151).

On October 26, 2020, Plaintiff Oldaker submitted testimony to the Department of Justice ("DOJ") about her experiences with Defendant Dr. Amin. (Doc. 210 ¶ 152). On the evening of November 7, 2020, Plaintiff Oldaker became aware that her commissary account had been emptied, which commonly occurs within 24 to 48 hours of deportation. (*Id.* ¶ 155). Plaintiff Oldaker obtained counsel who was informed that she was scheduled to be deported on November 9, 2020. (*Id.* ¶ 157). Plaintiffs allege ICDC and/or other ICDC Defendants expedited Plaintiff Oldaker's deportation date in response to her submitting testimony to the DOJ. (*Id.* ¶ 158). Plaintiff Oldaker was transported to an airport in Columbus, Georgia, to be deported as scheduled, but following the filing of the instant action, she was informed that her deportation had been halted. (*Id.* ¶¶ 159–60).

After her deportation was halted, Plaintiff Oldaker was returned to ICDC the same day. (Doc. 210 ¶ 161). When she returned, ICDC staff allegedly retaliated against her. (*Id.* ¶ 162) For example, staff at ICDC failed to administer her Post Traumatic Stress Disorder medication, and refused to return her personal effects for more than a day after she returned.

(*Id.* ¶¶ 163–64). Plaintiff Oldaker called her counsel on the evening of November 10, 2020, to complain about ICDC staff withholding her medication and personal effects. (*Id.* ¶ 165) Almost immediately after the phone call, ICDC staff administered her medications and returned her belongings—suggesting that ICDC staff were eavesdropping on privileged and confidential communications between Plaintiff Oldaker and counsel. (*Id.*)

       **b.**    **Other Plaintiffs**

Plaintiffs' allegations of improper treatment at ICDC can be divided into three main sub-categories: (i) those who allege that procedures were performed on them without informed consent, (ii) those that allege that unnecessary procedures were performed on them, and (iii) those that allege that they were retaliated against for protected speech.[4]

       **i.**    **Lack of Informed Consent**

Plaintiffs Oldaker, Tatyana Solodkova, Luz Adriana Walker, Lourdes Silas, Jaromy Navarro, Ndonga Mbeti, Keynin Ramirez, Ana Adan-Cajigal,[5] Pauline Binam,[6] and Jane Doe Nos. 5, 6, 8 15, 22, and 25 allege that Defendant Dr. Amin performed gynecological procedures on them "without prior disclosure of their nature, purpose, risks, or alternatives" while they were in the custody of ICDC and ICE. (Doc. 210 ¶ 641). Specifically, when Plaintiffs saw Defendant Dr. Amin, there was frequently no translator present, even when those Plaintiffs spoke little to no English. (*Id.* ¶¶ 265, 268, 270, 302, 309, 497). Defendant Dr. Amin frequently performed painful and intrusive procedures (e.g., pap smears, transvaginal pelvic ultrasounds) on Plaintiffs with little to no warning before he began the procedure, or explanation as to the purpose of the procedure, and apparent disregard to the discomfort the procedures caused. (*Id.* ¶¶ 145, 184–87, 209–211, 228–29, 244, 265, 268, 270, 282, 302, 322, 335, 340, 355, 375, 392, 425). Defendant Dr. Amin also performed surgeries on Plaintiffs

---

[4] Although the subcategories the Court discusses here resemble Plaintiffs' proposed classes, the use of these classes does not express an opinion about the propriety of these classes for purposes of an action brought pursuant to Rule 23.

[5] The Court notes that Plaintiff "Ana Gabriela Adan Cajigal" is the named Plaintiff in the SAC's caption, and therefore, is the name the Court uses in this Order. However, Ms. Cajigal's name is sometimes spelled in the SAC as "Cagijal."

[6] Hereinafter, Plaintiffs are referred to individually as "Plaintiff [surname or family name]."

without informing them of the nature of the surgery, its risks, or any alternative options. (*Id.* ¶¶ 248, 285, 307–311, 356, 436).

For example, Plaintiff Binam, was told she would be receiving a "simple" Dilation and Curettage surgery to drain ovarian cysts. (Doc. 210 ¶¶ 434, 435). However, when she awoke from general anesthesia, she discovered that Defendant Dr. Amin had performed a partial salpingectomy, or partial removal of her right fallopian tube. (*Id.* ¶¶ 440–41). As a result, Defendant Dr. Amin informed her that she would no longer be able to conceive without fertility assistance. (*Id.* ¶ 445).

### ii.    Unnecessary Procedures

Plaintiffs Oldaker, Solodkova, Walker, Silas, Navarro, Ndonga, Ramirez, Adan-Cajigal, Binam, and Jane Doe Nos. 5, 6, 8, 15, 22, and 25 allege that many procedures performed by Defendant Dr. Amin on them were medically unnecessary. (Doc. 210 ¶¶ 176, 225, 257, 301, 356, 642). For example, Plaintiff Ndonga was treated by Defendant Dr. Amin on a number of occasions, and he performed a dilation and curettage, a paropscopy, and an ovarian cystectomy on her. (*Id.* ¶¶ 355, 356). When an expert examined Plaintiff Ndonga's medical record, that expert concluded that Plaintiff Ndonga "'underwent inappropriate, overly aggressive evaluation and care by [Defendant Dr.] Amin'; 'the operation that [Defendant Dr.] Amin performed on [Plaintiff] Ndonga did not meaningfully contribute to the evaluation or management of her gynecological condition'; and '[n]one of the care provided by [Defendant Dr.] Amin actually addressed [Plaintiff] Ndonga's underlying gynecological complaints.'" (*Id.* ¶ 367).

Similarly, Plaintiff Jane Doe No. 5 was told by Defendant Dr. Amin that he would perform a surgical procedure to treat an ovarian cyst. (*Id.* ¶ 248) However, when another physician examined her after the procedure, she told Plaintiff Jane Doe No. 5 that Defendant Dr. Amin had "'cut or burned part of her uterus.'" (*Id.* ¶ 253) A specialist who reviewed Plaintiff Jane Doe No. 5's medical records found that she may never be able to conceive. (*Id.* ¶ 256). Plaintiffs allege that this procedure was not medically necessary. (*Id.* ¶ 257).

### iii.    Retaliation Plaintiffs

Plaintiffs Oldaker, Solodkova, Walker, Silas, Navarro, Ndonga, Ramirez, Adan-Cajigal, Binam, and Jane Doe Nos. 5, 6, 8, 15, and 22 allege that "after speaking out about, protesting,

making known they were willing to speak out about" Defendant Dr. Amin's improper medical treatment, they were subjected to retaliation by ICDC staff and ICE. (Doc. 210 ¶¶ 162, 170, 201, 259, 260, 325, 347, 363, 387). For instance, on October 27, 2020, Plaintiff Ndonga completed an interview with federal investigators related to Defendant Dr. Amin's treatment of her and other female detainees at ICDC. (*Id.* ¶¶ 359–60). A few hours after the interview, ICE informed Plaintiff Ndonga that the stay on her deportation would be lifted, and that she would be deported immediately. (*Id.* ¶¶ 360–61). Plaintiff Ndonga alleges that the expedited deportation was retaliation for her participation in the investigation. (*Id.* ¶ 363).

In the same vein, Plaintiff Ramirez spoke with congressional representatives who visited ICDC in response to a whistleblower complaint and media reports about Defendant Dr. Amin's improper medical treatment. (Doc. 210 ¶ 380). Then, on November 5, 2020, her name was provided to federal investigators identifying her as a victim of Defendant Dr. Amin. (*Id.* ¶ 385). Plaintiffs allege that, as a result of Plaintiff Ramirez speaking out, ICE attempted to expedite her deportation twice in the next two weeks, although she was never actually deported. (*Id.* ¶¶ 381–87).

### 2. Defendants

Plaintiffs group Defendants into three main categories. First, the Irwin County Medical Defendants, which includes Defendants Irwin County Hospital and Dr. Amin. Second, the ICDC Defendants. And third, the Federal Defendants which includes officials who are affiliated with ICE, the Department of Homeland Security, and the Department of Justice.

### a. Irwin County Hospital

When detainees required gynecological care outside of ICDC, they were frequently referred to Defendant Irwin County Hospital, (*see generally* Doc. 210 ¶¶ 139–600), which is a general medical and surgical facility near ICDC. (*Id.* ¶ 49). Defendant Dr. Amin is a physician, affiliated with Defendant Irwin County Hospital, who provided medical services to detainees who were referred from ICDC. (*Id.* ¶ 50). As noted, the majority of Plaintiffs' allegations flow from alleged improper provision of medical treatment directly by Defendant Dr. Amin. (*See generally* Doc. 210 ¶¶ 139–600). Plaintiffs also allege that Defendant Irwin County Hospital allowed Defendant Dr. Amin to have a standing order in place requiring an ultrasound on

patients regardless of that patient's individual need, and that Defendant Irwin County Hospital "kn[ew] or should [have] know[n] [were] not medically necessary." (*Id.* ¶ 75).

### b.      Irwin County Detention Center Defendants

In 2007, Irwin County, Georgia, entered into an Intergovernmental Agreement ("IGA") with the United States Marshals Service ("USMS") allowing the USMS, the Federal Bureau of Prisons of the Department of Justice, and the United States Immigration and Customs Enforcement of the Department of Homeland Security, to house federal detainees at ICDC. (Doc. 210 ¶¶ 601–02). ICDC is a detention center located in Ocilla, Georgia. (Doc. 210 ¶ 33). Under the IGA, Irwin County would administer the daily operation of ICDC in exchange for a per-detainee daily payment. (Doc. 210 ¶ 602). Irwin County, in turn, contracted with Defendant LaSalle, a private for-profit company, to operate ICDC. (*Id.* ¶ 611).

Plaintiffs allege that ICDC and its employees were aware of Defendant Dr. Amin's improper treatment, yet, despite this knowledge, continued to send patients to him. (Doc. 210 ¶¶ 70–76). According to Plaintiffs, ICDC had knowledge of Defendant Dr. Amin's improper treatment from three sources. First, multiple women who were detained at ICDC complained, verbally and in writing, to ICDC officers about Defendant Dr. Amin's care. (*Id.* ¶ 71). Second, ICDC officers often accompanied Plaintiffs to their appointments with Defendant Dr. Amin and witnessed both that he did not obtain informed consent for the procedures, and that the women experienced severe pain. (*Id.* ¶ 73). Third, the ICDC Defendants were aware that Defendant DOJ had investigated Defendant Dr. Amin for similar unnecessary procedures from 2013–2015. (*Id.* ¶ 74).

Plaintiffs also allege that ICDC retaliated against Plaintiffs for complaining about Defendant Dr. Amin's improper medical treatment. (Doc. 210 ¶ 125). These retaliatory actions included, *inter alia*, placing Plaintiffs in solitary confinement, transferring them to other units, physically assaulting them, threatening to withhold food and water, delaying delivery of prescribed medications, limiting, or denying them phone access, and monitoring their phone calls and ending those calls abruptly when they discussed matters related to Defendant Dr. Amin's improper treatment or retaliation. (*Id.* ¶ 126).

### c.    Federal Defendants

The IGA required Irwin County to administer ICDC in accordance with ICE standards and allow ICE to inspect the facility to assess compliance with these standards. (Doc. 210 ¶¶ 603–05). While Irwin County was responsible for providing medical care to ICE detainees within ICDC, all outside non-emergency referrals required ICE approval, which included those made to Defendant Dr. Amin. (Doc. 210 ¶¶ 606–09).

Plaintiffs allege that the Federal Defendants, individually and/or in their official capacity, were aware of their complaints about Defendant Dr. Amin's medical care, and the 2013–2015 investigation into him. (Doc. 210 ¶¶ 70–94). Despite this, the Federal Defendants continued to allow ICDC to send patients to Defendant Dr. Amin. (*Id.* ¶¶ 72–73). Additionally, Dawn Wooten, a nurse at ICDC submitted a whistleblower complaint about Defendant Dr. Amin to Defendant Giles, the director of the ICE Atlanta field office at the time, on September 14, 2020. (*Id.* ¶ 82). Even after this complaint became public, some of the Plaintiffs were still sent to be treated by Defendant Dr. Amin. (*Id.* ¶ 83). Plaintiffs also allege that ICE employees engaged in retaliation against them alongside ICDC for their complaints about Defendant Dr. Amin, and that the Federal Defendants, individually and/or in their official capacity, generally conspired to expedite removal orders to prevent Plaintiffs from participating in lawsuits and investigations. (Doc. 210 ¶¶ 111–38).

## II.    OFFICIAL CAPACITY FEDERAL DEFENDANTS' MOTION TO DISMISS

### A.    Procedural History

On January 25, 2023, the Official Capacity Federal Defendants filed a Motion to Dismiss (Doc. 242). Plaintiffs filed their Consolidated Response brief on February 22, 2023. (Doc. 259).[7]  And on March 22, 2023, the Official Capacity Federal Defendants filed a Reply (Doc. 269). All of the Parties' respective briefs have been submitted and the Official Capacity Federal Defendants' Motion is ripe for ruling. The Official Capacity Federal Defendants move to dismiss all claims against them under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. (Doc. 242 at 7–16).

---

[7] Plaintiffs were granted leave to file a consolidated brief in response to Defendants' Motions to Dismiss. (Doc. 258).

In the SAC, Plaintiffs name two Federal Defendant entities: the United States of America; and Immigrations and Customs Enforcement ("ICE"). (Doc. 210 at 138). Plaintiffs also identify the following federal employees in their official capacities as defendants: Jarvis McMiller in his capacity as the Director of the ICE Atlanta Field Office, Tae Johnson in his capacity as Director of ICE, Alejandro Mayorkas in his capacity as Secretary of the Department of Homeland Security, Merrick Garland in his capacity as the Attorney General of the United States, Patrick Musante in his capacity as Assistant Field Office Director and Chief of Staff of the ICE Atlanta Field Office, Cesar Ciprian in his capacity as a Supervisory Detention and Deportation Officer at the ICE Atlanta Field Office, Defendant Ada Rivera in her capacity as the medical director of the ICE Health Service Corps, and "Unknown ICE Officials ##1-X."[8] (*Id.* ¶¶ 21–32). Hereinafter, the Court will refer to the federal entity and federal employee Defendants in their official capacity as the "Official Capacity Federal Defendants."

Plaintiffs allege the following six claims against the Official Capacity Federal Defendants:

> Count 1 alleging a First Amendment claim under *Bivens*, seeking declaratory and injunctive relief. (Doc. 210 ¶¶ 652–62);

> Count 4 alleging a Fifth Amendment claim for punitive conditions of confinement and a deliberate indifference claim, seeking declaratory and injunctive relief. (*Id.* ¶¶ 697–709);

> Count 7 alleging violations of the Administrative Procedure Act ("APA") and the Immigration and Nationality Act ("INA") for deporting witnesses in the midst of efforts to protect their civil rights, seeking declaratory relief. (*Id.* ¶¶ 748–59);

> Count 8 alleging a violation of the Administrative Procedure Act for failure to follow the Performance-Based National Detention Standards ("PBNDS"), seeking declaratory relief. (*Id.* ¶¶ 760–73);

> Count 9 alleging a violation of 42 U.S.C. § 1985(2), seeking declaratory and injunctive relief. (*Id.* ¶¶ 774–96); and

> Count 10 alleging a Fifth Amendment Due Process violation for deportation of essential witnesses, seeking declaratory and injunctive relief. (*Id.* ¶¶ 797–805).

Plaintiffs also allege the following four claims against the United States of America:

---

[8] Unknown ICE Officials ##1-X are an unknown number of ICE employees who are not identified in the SAC.

Count 18 alleging Negligence, Gross Negligence, and Recklessness claims under the Federal Tort Claims Act ("FTCA"), seeking damages. (Doc. 210 ¶¶ 885–901);

Count 19 alleging a Negligence *per se* claim under the FTCA, seeking damages. (*Id.* ¶¶ 902–13);

Count 20 alleging a Negligent Supervision claim under the FTCA, seeking damages. (*Id.* ¶¶ 914–24);

Count 21 alleging an Intentional Infliction of Emotional Distress claim under the FTCA, seeking damages. (*Id.* ¶¶ 925–33); and

Count 22 alleging a Negligent Infliction of Emotional Distress claim under the FTCA, seeking damages. (*Id.* ¶¶ 934–44).

### B. Standard of Review

Defendants move to dismiss Plaintiffs' claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which allows a party to move the Court to dismiss a claim because the Court lacks subject matter jurisdiction over that claim. A district court should grant a motion to dismiss for lack of subject matter jurisdiction "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Attacks on subject matter jurisdiction may be "facial" or "factual." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990). A facial attack is based solely on the allegations in the complaint, which are taken as true for the purposes of the motion to dismiss. *Id.* A factual attack challenges the existence of subject matter jurisdiction in fact, and a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* Here, the Official Capacity Federal Defendants rely on affidavits in support of their Motion to Dismiss and, therefore, make a factual attack under Rule 12(b)(1).

### C. FTCA Claims

The Official Capacity Federal Defendants move to dismiss Plaintiffs' FTCA claims for lack of subject matter jurisdiction, at Counts 18–22. (Doc. 242 at 12–16). Plaintiffs bring four FTCA claims: Negligence, Gross Negligence, and Recklessness; Negligence *per se*, Negligent Supervision, Intentional Infliction of Emotional Distress, and Negligent Infliction of Emotional Distress. (Doc. 210 ¶¶ 885–944). The gravamen of these claims is that the Official Capacity Federal Defendants breached a duty of care to Plaintiffs by allowing them to suffer

the medical abuses of Defendant Dr. Amin and either intentionally or recklessly caused them to continue to be sent to him after having knowledge of the abuses. (*Id.*)

Generally, the Federal Government and its agencies are immune from suit. *JBP Acquisitions, L.P. v. United States ex rel. F.D.I.C.*, 224 F.3d 1260, 1263 (11th Cir. 2000) (citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994)). The FTCA, however, provides a limited exception to this waiver in cases when "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). Where the FTCA applies, the United States may be liable for certain torts "in the same manner and to the same extent as a private individual under like circumstances . . . ." *JBP Acquisitions*, 224 F.3d at 1263.

### 1.    Independent Contractor Exception

The Official Capacity Federal Defendants contend that the FTCA waiver of subject matter jurisdiction does not apply because Defendant Dr. Amin was not a federal employee. (Doc. 242 at 12–14). Although the Court agrees that the FTCA does not waive sovereign immunity for actions committed by an independent contractor who was not a federal employee, *see e.g.*, *Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999), it would seriously misconstrue the SAC to suggest that Plaintiffs are pursuing FTCA liability against the United States based on Defendant Dr. Amin's status as a federal employee. Instead, Plaintiffs concede that Defendant Dr. Amin was not a federal employee, (Doc. 259 at 32), and therefore, pursue liability against the United States for the conduct of its employees, who allowed Plaintiffs to be subjected to the medical abuses of a federal contractor. (*See* Doc. 210 ¶¶ 885–944). The independent contractor exception does not bar FTCA liability when a government agency is negligent "in discharging a nondelegable duty imposed under state tort law," *Dickerson Inc. v. United States*, 875 F.2d 1577, 1582 (11th Cir. 1989), which Plaintiffs sufficiently allege that ICE did. (*See* Doc. 210 ¶¶ 885–994). As a result, the Court finds the Official Capacity Federal Defendants' contention that FTCA liability is barred because Defendant Dr. Amin was an independent contractor, unpersuasive.

### 2.    Assault or Battery Exception

The Official Capacity Federal Defendants contend that the Court lacks subject matter jurisdiction over Plaintiffs' FTCA claims because they arise out of assault or battery. (Doc. 242

at 14–17). Congress carved out a number of exceptions to the FTCA's waiver of sovereign immunity, among those claims excepted, are those "arising out of assault [or] battery[.]" *Metz v. United States*, 788 F.2d 1528, 1532–33 (11th Cir. 1986) (citing 28 U.S.C. § 2680(h)). The phrase "arising out of" is construed broadly, to include "all injuries that are dependent upon one of the listed torts having been committed." *Zelaya v. United States*, 781 F.3d 1315, 1333 (11th Cir. 2015) (citing *United States v. Shearer*, 473 U.S. 52, 55 (1985)). In other words, the underlying governmental conduct which constitutes an excepted cause of action must be "essential" to a plaintiff's claims, meaning that there is no other governmental action upon which the claims could rest. *Metz*, 788 F.2d at 1535–6.[9]

Here, the Official Capacity Federal Defendants grossly oversimplify Plaintiffs' claims to shoehorn them into the Section 1346(b) exception. (*See* Doc. 242 at 15) ("each of Plaintiffs' FTCA claims is based in substance upon the non-consensual physical invasions they allegedly suffered"). Although Plaintiffs' FTCA claims against the United States depend on Defendant Dr. Amin's actions, the alleged misconduct encompasses a number of improper actions, only one of which Plaintiffs characterize as "Medical Battery."[10] Defendant Dr. Amin may have committed a battery on some or all of Plaintiffs, but Plaintiffs' FTCA claims in no way depend on such a finding. Instead, Plaintiffs may be able to establish their FTCA claims through a number of different avenues which tend to show that the United States breached a duty of care to Plaintiffs, or intentionally or recklessly sent them to see Defendant Dr. Amin with knowledge of his prior abuses. In short, although a finding that Defendant Dr. Amin committed battery might be probative, it is by no means essential. As a result, the Court finds that, because assault or battery is not essential to Plaintiffs' FTCA claims against the United States, the Section 1346(b) exception does not apply to those claims. For this reason, the Court finds the Official Capacity Federal Defendants' contention that it does, unpersuasive.

---

[9] Neither Plaintiffs nor the Official Capacity Federal Defendants attempt to grapple with the test set forth in *Metz*, instead sparring over the meanings of *Sheridan* and *Shearer*, when the proper test, that is binding on this Court, was announced in *Metz*. 788 F.2d at 1534.

[10] The substantive claims against Defendant Dr. Amin are for Gross Negligence, Medical Battery, Medical Malpractice, Intentional Infliction of Emotional Distress, and Negligent Infliction of Emotional Distress. (Doc. 210 ¶ 829–884).

### 3.    Conclusion: FTCA

In sum, the Court rejects both of Defendants' arguments that the FTCA waiver of sovereign immunity does not extend to Plaintiffs' claims against the United States. Accordingly, the Official Capacity Federal Defendants' Motion to Dismiss Plaintiffs' FTCA claims is **DENIED**.

### D.    Claims for Equitable Relief

The Official Capacity Federal Defendants move to dismiss Plaintiffs' claims for declaratory and injunctive relief. (Doc. 242 at 7–12). Plaintiffs ask only for declaratory and injunctive relief against the Official Capacity Federal Defendants for Counts 1, 4, 7, 8, 9 and 10. (*See* Doc. 210 ¶¶ 652–806). As such, if the Court lacks subject matter jurisdiction to grant the declaratory and injunctive relief sought in those claims, those claims should be dismissed in their entirety against the Official Capacity Federal Defendants.

### 1.    Types of Equitable Relief Sought

To appropriately respond to the Parties' arguments, it is helpful to break each of Plaintiffs' claims down into the types of relief sought, rather than organizing the analysis claim by claim.[11] Count 1 alleges that the Federal Defendants retaliated against Plaintiffs for engaging in First Amendment protected speech. (Doc. 210 ¶¶ 652–662). Plaintiffs allege the following specific acts of retaliation: deporting or attempting to deport Plaintiffs; and, at ICDC, use or threaten use of force, solitary confinement, and denial of privileges. (Doc. 210 ¶ 656). Count 1 asks the Court for declaratory and injunctive relief to find the enumerated acts of retaliation in violation of Plaintiffs' First Amendment rights and compelling all Defendants to cease their retaliatory conduct.

Count 4 alleges that the Official Capacity Federal Defendants subjected them, as civil immigration detainees, to punitive conditions of confinement and acted with deliberate indifference to their serious medical needs, in violation of the Due Process Clause of the Fifth Amendment. (Doc. 210 ¶¶ 697–709). Plaintiffs allege the Official Capacity Federal Defendants were aware of the serious risk of harm to Plaintiffs posed by Defendant Dr. Amin's medical abuses, and medical neglect, yet disregarded that risk. (*Id.* ¶¶ 702–03). And that the abuse at

---

[11] Neither the Official Capacity Federal Defendants' nor Plaintiffs' arguments distinguish between the types of relief sought, which has made deciphering their arguments challenging.

14

the hands of Defendant Dr. Amin was punitive and lacked any reasonable relationship to a legitimate government purpose. (*Id* ¶¶ 706–07). At Count 4, Plaintiffs do not, specifically, ask for any identified injunctive or declaratory relief, however, under the general prayer for relief caption, Plaintiffs ask the Court for a declaration that Defendants' conduct was in violation of the Fifth Amendment and an injunction prohibiting Defendants from "subjecting Plaintiffs to the unconstitutional and unlawful practices described in this Complaint." (*Id.* at 192). As a result, the Court construes Count 4 as asking it to declare that the conditions at ICDC violated the Fifth Amendment and to issue an injunction which prohibits the Official Capacity Federal Defendants from continuing to subject Plaintiffs to the unlawful conditions at ICDC.

Count 7 alleges that the Official Capacity Federal Defendants, by deporting Plaintiffs in the midst of legitimate efforts to protect their civil rights or civil liberties, violated the APA and INA. (Doc. 210 ¶¶ 748–59). Plaintiffs ask the Court to declare that the Official Capacity Federal Defendants' Conduct violated the APA and the INA, (*Id.* at 192), and ask the Court for a declaration that the Official Capacity Federal Defendants violated the APA and INA by deporting Plaintiffs who were making efforts to protect their civil rights or liberties. (*See id.* ¶ 759).

Count 8 alleges that the Official Capacity Federal Defendants violated the APA by failing to follow the PBNDS requirements which apply to all ICE civil detention centers. (Doc. 210 ¶¶ 760–773). Plaintiffs ask the Court for a declaration that the Official Capacity Federal Defendants violated the APA when they failed to follow the PBNDS mandates for providing medical care (*Id.* ¶¶ 760–73).

Count 9 alleges that the Official Capacity Federal Defendants took a number of actions or conspired with others to take actions, which were intended to deter Plaintiffs from engaging in congressional and federal investigations and from participating in the instant action; or to retaliate against them for the same, in violation of 42 U.S.C. § 1985(2). (Doc. 210 ¶¶ 778–94). Plaintiffs allege the following specific acts of retaliation or deterrence by the Official Capacity Federal Defendants: expediting deportations of Plaintiffs who attempted to participate in investigations (*Id.* ¶¶ 780–86); transferring Plaintiffs to different sections of ICDC when congressional investigators arrived (*Id.* ¶ 779); and monitoring and terminating phone conversations by Plaintiffs at ICDC (*Id.* ¶ 790). Plaintiffs ask the Court to declare that the acts

of deterrence and/or retaliation violated Section 1985(2) and to issue an injunction prohibiting the complained of acts of retaliation and deterrence. (*See id.* at 167, 192).

Count 10 alleges that the Official Capacity Federal Defendants violated the Due Process Clause of the Fifth Amendment by deporting or threatening to deport Plaintiffs who are material witnesses in court proceedings. (Doc. 210 ¶¶ 797–805). Plaintiffs ask the Court to declare that, by deporting or threating to deport them, the Official Capacity Federal Defendants violated the Fifth Amendment right to a fair hearing, and to issue an injunction prohibiting those deportations. (*See id.* at 169, 192).

Taken together, therefore, Plaintiffs ask for three types of equitable relief in Counts 1, 4, 7, 8, 9 and 10. First, Plaintiffs ask the Court to declare unlawful and enjoin the following deterring or retaliatory conduct, all of which occurred while Plaintiffs were detained at ICDC: use or threatened use of force, solitary confinement, denial of privileges, transferring Plaintiffs to different sections of the detention facility to prevent participation in investigations, and monitoring/terminating phone conversations at ICDC. Second, Plaintiffs ask the Court to declare unlawful and enjoin the Official Capacity Federal Defendants from continuing to subject Plaintiffs to unconstitutional conditions at ICDC. And third, Plaintiffs ask the Court to declare unlawful and enjoin retaliatory expedited deportations of Plaintiffs.[12] As the Court will discuss below, because it lacks jurisdiction to grant any of the equitable relief sought by Plaintiffs against the Official Capacity Federal Defendants, in Counts 1, 4, 7, 8, 9 and 10, those claims will be dismissed.

### a. Retaliation and Unconstitutional Conditions at ICDC

The Official Capacity Federal Defendants contend that Plaintiffs' claims for injunctive and equitable relief regarding conduct related to their confinement at ICDC are moot. (Doc. 242 at 10). The Court agrees. "A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1282 (11th Cir. 2004) (quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335–36 (11th Cir. 2001) (per curiam)). A federal court's determination of a moot

---

[12] Plaintiffs also make conclusory allegations of "threats, intimidation . . . which are sufficiently grave to constitute deterrence and retaliation under § 1985(2)." (Doc. 210 ¶ 793). The Court finds that these non-specific allegations are not pleaded with enough specificity for the Court to construe the SAC as making out a claim for relief based on them. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

controversy would be an impermissible advisory opinion. *Christian Coalition of Ala. v. Cole*, 355 F.3d 1288, 1291 (11th Cir. 2004). This requirement is imposed by the Article III limitation of federal court jurisdiction to "Cases" and "Controversies." *Troiano*, 382 F.3d at 1282 (quoting *Al Najjar*, 273 F.3d at 1335–36). Standing must continue throughout the pendency of the lawsuit. *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997).

Here, as the Official Capacity Federal Defendants point out, according to the SAC, the federal government terminated its contract to hold detainees at ICDC in October 2021, (Doc. 210 ¶ 33),[13] and the SAC does not allege that ICDC, or any other detention center administered by the Official Capacity Federal Defendants, continues to be responsible for the detention of Plaintiffs. In fact, Plaintiffs concede that none of them remain in the Official Capacity Federal Defendants' custody. (Doc. 259 at 28). As a result, any declaration that the conduct which occurred at ICDC was unlawful would be merely advisory, and because no Plaintiffs remain detained, there is no identified conduct relating to their confinement which the Court can enjoin. Issuing such a declaration or injunction, therefore, would not provide meaningful relief. *See McKinnon v. Talladega Cnty.*, 745 F.2d 1360, 1363 (11th Cir. 1984) (citing *Holland v. Purdy*, 457 F.2d 802, 802 (5th Cir. 1972)) ("the general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief"); *Gayle v. Meade*, 614 F. Supp. 3d 1175, 1236 (S.D. Fla. 2020) (finding that the transfer of a civil immigration detainee to another facility mooted claim for declaratory and injunctive relief, absent evidence that ICE planned to use transfers to "evade the jurisdiction of the Court"). Accordingly, the Court finds that Plaintiffs' claims for declaratory and injunctive relief regarding conduct related to their confinement at ICDC, as pleaded, are moot.[14]

---

[13] Although the Official Capacity Federal Defendants provide extrinsic evidence in the form of affidavits about Plaintiffs' status, (Docs. 242-1 & 242-2), the Court need not rely upon them, because the SAC is facially deficient.

[14] To the extent that Plaintiffs' Response could be construed, which the Court finds it cannot, as arguing that the conduct relating to Plaintiffs' incarceration falls under the "capable of repetition but evading review" doctrine, (*see* Doc. 242 at 30–31), the Court finds that the generalized risk of future detention by ICE is insufficient to sustain a finding that there is a reasonable expectation that the wrong will be repeated. *See Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (holding that the risk of an inmate being transferred to a jail who allegedly violated his constitutional rights was not sufficient to sustain a finding that the challenged conduct had a reasonable chance of reoccurring).

### b.  Expedited Deportations

This leaves Plaintiffs' claim for the Court to declare unlawful and enjoin their deportations. The Official Capacity Federal Defendants contend that the Court lacks subject matter jurisdiction as to these claims because the Court cannot stay a final order of removal. (Doc. 242 at 7–9). Under 8 U.S.C. § 1252(g), "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to . . . execute removal orders against any alien." This provision bars a district court from reviewing certain exercises of discretion by the Attorney General, *Madu v. U.S. Atty. Gen.*, 470 F.3d 1362, 1368–69 (11th Cir. 2006), and is intended to prevent the "deconstruction, fragmentation, and hence prolongation of removal proceedings." *Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1272 (11th Cir. 2021) (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487 (1999)).

The SAC asks the Court to enjoin the Official Capacity Federal Defendants from expediting Plaintiffs' deportations, an exercise of discretion, and does not challenge the underlying bases for their final orders of removal. (*See* Doc. 210 ¶¶ 652–62, 748–59, 774–805). As a result, the relief sought is of exactly the type that Section 1252(g) precludes the Court from granting. Plaintiffs argue, however, that the Court should nonetheless exercise jurisdiction over their claims for three reasons. The Court will discuss each argument, but is not persuaded by any.

### i.  Outrageousness Exception

Plaintiffs argue that conduct that is sufficiently "outrageous" is subject to review notwithstanding the prohibitions of Section 1252(g). (Doc. 259 at 23–24). This argument is based on dicta in *Reno*, 525 U.S. at 491 where the Supreme Court commented that a rare case might present a constitutional violation that is so outrageous that the doctrine of constitutional doubt might be employed to overcome the jurisdictional prohibitions of Section 1252(g). Plaintiffs have found two out-of-circuit courts which have relied on this dicta to find that outrageous conduct may allow a court to bypass the jurisdictional limitations of Section 1252(g). *Ragbir v. Homan*, 923 F.3d 53, 69–73 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020); *Rueda Vidal v. U.S. Dep't of Homeland Sec.*, No. CV 18-9276 DMG (PLAx), 2019 WL 7899948, at *5 (C.D. Ca. Aug. 28, 2019), *rev'd and remanded sub*

*nom. Rueda Vidal v. Bolton*, 822 F. App'x 643, 644–65 (9th Cir. 2020). Both of these decisions, however, were vacated by higher courts, and the Court, therefore, is skeptical that it should treat these cases as even persuasive authority. In any case, the Court will not defy the plain language of Section 1252(g), which precludes judicial review of the discretionary authority to execute final deportation orders, without clear instruction to do so from binding authority, which the dicta in *American-Arab Anti-Discrimination Committee* falls well short of providing. As a result, the Court finds Plaintiffs' argument that outrageousness of the Official Capacity Federal Defendants' conduct provides an exception to Section 1252(g), unpersuasive.[15]

**ii.** *Accardi* **Doctrine**

Plaintiffs argue that the doctrine first announced in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–67 (1954), allows judicial review of Count 7, for violations of the APA and INA, notwithstanding Section 1252(g). Under the *Accardi* doctrine, when the Government has promulgated "[r]egulations with the force and effect of law," such regulations may "supplement the bare bones" of federal statutes. *Accardi*, 347 U.S. at 267. *Accardi* stands for the proposition that an agency must abide by its own regulations. *Walker v. Att'y Gen.*, 848 F. App'x 404, 404 n.1 (11th Cir. 2021) (citing *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1384 (5th Cir. 1979)); *Bourdon v. U.S. Dep't of Homeland Sec.*, 983 F.3d 473, 482 (11th Cir. 2020) (Martin, J., dissenting). And may provide an independent basis for jurisdiction. *See Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1041 (5th Cir. 1982) (citing *Accardi*, 347 U.S. at 267) ("agency deviation from its own regulations and procedures may justify judicial relief in a case otherwise properly before the Court"); *Jean v. Nelson*, 727 F.2d 957, 966, (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985). The Court declines to apply *Accardi* for two reasons.

First, the Eleventh Circuit in *Bourdon* clearly foreclosed judicial review of an agency discretionary decision under *Accardi* when a statute contains language which strips federal courts of jurisdiction to hear a claim. *Bourdon*, 940 F.3d at 549. ("Supreme Court cases reviewing the discretion of Executive Branch officials cannot guide us in cases, like this one,

---

[15] Plaintiffs' request to entirely enjoin deportation is overbroad. In effect, it is a request for immunity from deportation based on past alleged outrageous conduct without regard to any circumstances that may otherwise justify deportation. For a court to grant such a request would improperly interfere with the discretion of the Attorney General or his successor, the Secretary of Homeland Security. Nothing in this Order prevents Plaintiffs from seeking further relief where required or justified.

where we are told by Congress not to review that discretion in the first place"). This is, of course, consistent with *Accardi* which permits agency regulations to "supplement," not supplant "the bare bones" of federal statutes. *See Accardi*, 347 U.S. at 267. The language of Section 1252(g) provides an unambiguous direction from Congress that strips federal courts of the jurisdiction to review the execution of a removal order. *Accardi*, therefore, cannot guide the Court to ignore that direction.

Second, even to the extent that the application of *Accardi* here is not directly foreclosed by the Eleventh Circuit in *Bourdon*, the Court does not find that the ICE policy in question has the "force and effect of law." Plaintiffs direct the Court to ICE Policy 10076.1 which provides that it is "against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties." ICE Policy 10076.1, Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011). However, the policy also explains "these guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party." ICE Policy 100076.1 at 3.

The policy, therefore, can hardly be characterized as one which has the full force and effect of law. Instead, the policy provides guidelines and priorities for the exercise of prosecutorial discretion in the enforcement of immigration laws. Courts have been particularly reluctant to use *Accardi* to limit prosecutorial discretion based on internal regulations. *See United States v. Hayes*, 589 F.2d 811, 818 (5th Cir. 1979) (holding that a DOJ policy restricting federal prosecution of individuals already prosecuted under state law for the same act or acts did not create an enforceable right under *Accardi*); *United States v. Lee*, 274 F.3d 485, 492 (8th Cir. 2001) (holding that a DOJ manual which explained the protocol for exercising discretion with regard to withdrawing previously issued death penalty notices, did not create a right enforceable under *Accardi*, particularly because that manual stated that it did not create substantive or procedural rights); *see also Morales de Soto v. Lynch*, 824 F.3d 822, 828 (9th Cir. 2016) ("[T]he exercise of prosecutorial discretion is a type of government action uniquely shielded from and unsuited to judicial intervention. In the context of criminal prosecutions we have repeatedly held that we have little authority to review prosecutors' charging decisions. We see no reason

to act differently when the consequence of that discretion is removal rather than jail time." (citation omitted)).

The Court is persuaded by these decisions declining to extend the *Accardi* doctrine to failure to follow an internal policy guiding prosecutorial discretion, and the Court is skeptical that the policy limits the discretion of ICE at all, given that it specifies that it may not be relied upon to create a procedural right. As a result, the Court finds that ICE Policy 100076.1 did not have the force and effect of law, as required by *Accardi*.

For the foregoing two reasons, the Court finds Plaintiffs' argument that the *Accardi* doctrine provides an exception to Section 1252(g), unpersuasive.

### iii.    Inherent Authority of the Court to Protect its Own Jurisdiction

Lastly, Plaintiffs argue that the Court has the inherent authority to issue orders protecting its own jurisdiction and ensuring the fairness of proceedings before it, and therefore, the Court may stay Plaintiffs' removal proceedings. (Doc. 259 at 25). To the extent that the Court has the authority to issue stays to protect its own jurisdiction, the Court agrees with Plaintiffs. Such power, however, has no impact on the Court's ultimate ability to grant Plaintiffs relief from any final valid removal orders, something expressly precluded by Section 1252(g). As a result, the Court finds Plaintiffs' argument that its inherent power creates an exception to Section 1252(g), unpersuasive.[16]

### iv.    Conclusion: Expedited Deportations

The Court finds Plaintiffs' arguments that it has jurisdiction to grant them relief from the execution of their deportation orders notwithstanding the prohibition in 8 U.S.C. § 1252(g), unpersuasive. The Court, therefore, finds that 8 U.S.C. § 1252(g) denies the Court jurisdiction to preliminarily declare unlawful and enjoin all Plaintiffs' deportations.

### 2.    Conclusion: Claims for Equitable Relief

In sum, the Court finds that Plaintiffs' claims for declaratory relief and injunctive relief regarding conduct which occurred at ICDC are moot, and therefore, the Court lacks subject matter jurisdiction over those claims. Further, 8 U.S.C. § 1252(g) denies the Court subject

---

[16] As the Court explained when dismissing Plaintiffs' Motion for TRO without prejudice, any future misconduct by the Official Capacity Federal Defendants can easily be brought to this Court for review by motion. (Doc. 167 at 16). Plaintiffs are, therefore, entitled to renew their motion for TRO if they believe the Court's jurisdiction is threatened by an imminent deportation of a Plaintiff.

matter jurisdiction to preliminarily declare unlawful and enjoin the execution of Plaintiffs' deportation orders.[17] Taken together, these findings mean that the Court lacks subject matter jurisdiction to grant Plaintiffs any of the claims for relief they assert against the Official Capacity Federal Defendants, at Counts 1, 4, 7, 8, 9, and 10. Accordingly, the Official Capacity Federal Defendants' Motion to Dismiss those claims for lack of subject matter jurisdiction is **GRANTED** and those claims are **DISMISSED-WITH-PREJUDICE** as to the Official Capacity Federal Defendants.

### E. Conclusion

For the reasons discussed *supra* Section II, the Official Capacity Federal Defendants' Motion to Dismiss (Doc. 242) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Plaintiffs' claims at Counts 1, 4, 7, 8, 9, and 10 are **DISMISSED-WITH-PREJUDICE** for lack of federal subject matter jurisdiction. The only claims that remain against the Official Capacity Federal Defendants are Plaintiffs' FTCA claims against the United States at Counts 18–22.

## III. INDIVIDUAL CAPACITY FEDERAL DEFENDANTS' MOTION TO DISMISS

### A. Procedural History

On January 23, 2023, the Individual Capacity Federal Defendants (Thomas P. Giles, Cesar Ciprian, Ada Rivera, and Patrick Musante) filed a Motion to Dismiss (Doc. 234). Those Defendants filed their Reply (Doc. 270) to Plaintiffs' Consolidated Response (Doc. 259) on May 22, 2023. All the Parties' respective briefs have been submitted and the Individual Capacity Federal Defendants' Motion is ripe for ruling.

In the SAC, Plaintiffs name the following federal Defendants in their individual capacities, Thomas P. Giles, Patrick Musante, Cesar Ciprian, Ada Rivera, and Unknown ICE Officials ##1-X. (Doc. 210 ¶¶ 25, 29, 30, 31, & 32). Plaintiffs allege the following three claims against the Individual Capacity Federal Defendants:

> Count 1 alleging a First Amendment claim under *Bivens*, seeking damages. (Doc. 210 ¶¶ 652–62);

---

[17] Although the Official Capacity Federal Defendants argue that Plaintiffs' claim for relief from retaliatory deportations is moot, the Court need not reach this argument, because it has resolved the Motion on other grounds.

Count 4 alleging a Fifth Amendment punitive conditions of confinement and deliberate indifference claim, seeking damages. (*Id.* ¶¶ 697–709); and

Count 9 alleging a violation of 42 U.S.C. § 1985(2), seeking damages. (*Id.* ¶¶ 774–96).

The Individual Capacity Federal Defendants move to dismiss all claims against them under Rule 12(b)(6).

## B. Standard of Review: Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a party to assert by motion the defense of failure to state a claim upon which relief can be granted. A motion to dismiss a plaintiff's complaint under Rule 12(b)(6) should not be granted unless the plaintiff fails to plead enough facts to state a claim for relief that is plausible, and not merely just conceivable, on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Dismissal for failure to state a claim is proper if the factual allegations are not 'enough to raise a right to relief above the speculative level.'" *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (quoting *Rivell v. Priv. Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008)). "Stated differently, the factual allegations in the complaint must 'possess enough heft' to set forth 'a plausible entitlement to relief.'" *Edwards*, 602 F.3d at 1291 (quoting *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007)). The plausibility standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability. *Twombly*, 550 U.S. at 556. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[,]" rather, a complaint must make plausible, factual assertions that allow the Court to draw the required connections from the alleged harm and the requested relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

The Court must conduct its analysis "accepting the allegations in the complaint as true and construing them in the light most favorable to the [p]laintiff." *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). In evaluating the sufficiency of a plaintiff's pleadings the Court must "make reasonable inferences in [p]laintiff's favor, 'but [is] not required to draw plaintiff's inference.'" *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005)), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). The Supreme Court instructs that while on a motion to dismiss "a court must accept as true all of the allegations contained in a

complaint," this principle "is inapplicable to legal conclusions," which "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 555), for the proposition that courts "are not bound to accept as true a legal conclusion couched as a factual allegation" in a complaint).

### C. *Bivens* Claims

The Individual Capacity Federal Defendants move to Dismiss Plaintiffs' claims against them under *Bivens*, at Counts 1 and 4. (Doc. 233-1 at 7–14). A claim under *Bivens*,[18] allows a plaintiff whose federal constitutional rights have been violated by federal officers, acting under color of federal law, to bring a claim for damages against that officer. Unlike Section 1983, which is a congressionally authorized remedy for constitutional violations committed under color of state law, the authority to recognize *Bivens* actions against federal actors is anchored in the inherent power of federal courts to decide all cases "arising under the Constitution, laws, or treaties of the United States." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66–67 (2001) (quoting 28 U.S.C. § 1331). As a result, *Bivens* is far more limited in scope than Section 1983, authorizing recovery only in certain types of cases. *See Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017).

To determine whether to recognize a claim under *Bivens*, courts engage in a two-step inquiry. First, a court asks "whether the request involves a claim that arises in a 'new context'" *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. at 68); *see Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1206 (11th Cir. 2016). If so, a court then asks whether there are any "factors that counsel hesitation" about extending *Bivens* into the proposed new context." *Hernandez*, 140 S. Ct. at 743.[19]

### 1. First Amendment Claim

The Individual Capacity Federal Defendants contend that a *Bivens* damages remedy is unavailable in the First Amendment context and therefore Plaintiffs fail to state a claim for such a remedy at Count 1. (Doc. 234 at 8–9). Plaintiffs concede that, in light of the Supreme Court decision in *Egbert v. Boule*, 596 U.S. 482, 494 (2022), a *Bivens* damages remedy is

---

[18] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[19] The Court notes that since, *Abbasi*, the Eleventh Circuit has not examined *Bivens* authority in depth. As a result, the Court relies on Supreme Court authority for its analysis, as recent Supreme Court decisions have significantly changed the *Bivens* landscape.

unavailable for their First Amendment claims. (Doc. 259 at 29 n.21). The Court agrees with the Individual Capacity Federal Defendants and Plaintiffs—*Egbert* plainly forecloses Plaintiffs' First Amendment claim for damages under *Bivens*. *Egbert*, 596 U.S. at 498 ("we also conclude that there is no *Bivens* cause of action for [plaintiff's] First Amendment retaliation claim"). Accordingly, the Individual Capacity Federal Defendants' Motion to Dismiss Plaintiffs' First Amendment *Bivens* claim against them, at Count 1, is **GRANTED**. As a result, that claim is **DISMISSED-WITH-PREJUDICE**.

### 2. Fifth Amendment Due Process Claim

The Individual Capacity Federal Defendants contend that the Court should decline to recognize Plaintiffs' Fifth Amendment Due Process claim under *Bivens*. (Doc. 234-1 at 9–14). Plaintiffs counter that the Court should recognize their Fifth Amendment Due Process claim because it does not present a new *Bivens* context, or if the Court finds that it does present a new context, that Plaintiffs should nonetheless be allowed to pursue a *Bivens* remedy for their claim against the Individual Capacity Federal Defendants. (Doc. 259 at 40–48).

### a. New Context

The Court first inquires whether Plaintiffs' Fifth Amendment Due Process claim arises in a new *Bivens* context. A context is new if a case "is different in a meaningful way from previous *Bivens* [claims authorized by the Supreme Court.]" *Abassi*, 582 U.S. at 139. A case might differ in a meaningful way because of

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 139–40.

The Supreme Court has inferred a private cause of action against federal officers under *Bivens* in three contexts. First, in *Bivens* itself the Supreme Court recognized an implied private action for damages against federal officers who have violated a plaintiff's Fourth Amendment rights when acting in their official capacities. *Alvarez*, 818 F.3d 1194, 1205–06 (11th Cir. 2016) (citing *Bivens*, 403 U.S. at 388). Second, in *Davis v. Passman*, the Supreme Court recognized a

25

Fifth Amendment implied damages remedy for a congressional staffer who was dismissed on the basis of sex. *Hernandez*, 140 S. Ct. at 741 (citing *Davis*, 442 U.S. 228 (1979)). And third, in *Carlson v. Green*, the Supreme Court recognized a damages remedy for a federal prisoner's Eighth Amendment claim for failure to provide adequate medical treatment. *Hernandez*, 140 S. Ct. 735 at 741 (citing *Carlson*, 446 U.S. at 14).

Here, Plaintiffs allege that the Individual Capacity Federal Defendants violated their Fifth Amendment Due Process rights by being deliberately indifferent to their serious medical needs and imposing punitive conditions of confinement on them as civil detainees. (Doc. 210 ¶¶ 697–709). Plaintiffs contend that this does not present a new *Bivens* context because the Supreme Court has already recognized a claim for deliberate indifference in *Carlson*. (Doc. 259 at 55–57). Plaintiffs' argument goes something like this: because *Carlson* authorized an Eighth Amendment deliberate indifference claim, and some courts have suggested that a Fifth Amendment Deliberate Indifference claim employs the same standard as an Eighth Amendment Deliberate Indifference claim, Plaintiffs' current claim is not meaningfully different from *Carlson*. (*See* Doc. 359 at 41–43).

Plaintiffs' reliance on *Carlson*, however, is misplaced. In *Carlson*, the Supreme Court authorized a *Bivens* claim against federal officials when those officials failed to give a federal prisoner competent medical care in violation of his Eighth Amendment right against the infliction of cruel and unusual punishment. *Carlson*, 446 U.S. at 16 n.1. The Supreme Court, however, has already rejected the argument that the Eighth Amendment prisoner mistreatment claim authorized in *Carlson* amounts to the same context as a Fifth Amendment mistreatment of an immigration detainee claim. *See Abbasi*, 582 U.S. at 146–49. In *Abbasi*, immigration detainees brought a Fifth Amendment Due Process claim for deliberate indifference while detained on suspicion of terrorism. *Id.* Those detainees argued that their claim arose in the same context as *Carlson* because both claims involved conditions of confinement. *Id.* at 146–49. The Supreme Court rejected this argument, holding that "even a modest extension [of a previous *Bivens* context] is still an extension," because the detainees claim involved a different constitutional right, and the judicial guidance available to the warden at an immigration detention facility was less developed than a warden in the penal context. *Id.* at 148.

The Court, as a result, finds that Plaintiffs' Fifth Amendment Due Process claim against the Individual Capacity Federal Defendants is meaningfully different than previous *Bivens* contexts. The Court finds, at least, two relevant distinctions. First, Plaintiffs claim a violation of the Fifth Amendment, where the plaintiff in *Carlson* alleged a violation of his Eighth Amendment rights. Second, Plaintiffs are civil immigration detainees, rather than prisoners serving a penal sentence with the Bureau of Prisons. As a result, the Individual Capacity Federal Defendants were operating under a significantly different statutory and legal mandate, and there was far less judicial guidance on their constitutional duties to detainees. These distinctions, however modest, render Plaintiffs' claim meaningfully different than the *Bivens* claim authorized in *Carlson* as well as the contexts of *Bivens* and *Davis*. The Court, therefore, finds that Plaintiffs' Fifth Amendment *Bivens* claim arises in a new context from previously recognized *Bivens* claims, and therefore, turns to the question of whether to extend *Bivens* to Plaintiffs' new context.

   **b.      Extending *Bivens* to Plaintiffs' Claim**

Recognizing a new cause of action under *Bivens* is "a disfavored judicial activity." *Egbert*, 596 U.S. at 482 (citing *Abbasi*, 582 U.S. at 135). The Supreme Court has, therefore, refused to extend *Bivens* to any new context or new category for more than thirty years. *See Abbasi*, 582 U.S. at 135. As recent Supreme Court jurisprudence instructs, Courts should be reluctant to extend *Bivens* because the power to create causes of action is "a legislative endeavor," and Courts are ill-equipped to weigh the range of policy considerations that a legislature might rely on to create a new cause of action. *See Egbert*, 596 U.S. at 491; *Hernández*, 140 S. Ct. at 742–43; *Abbasi*, 582 U.S. at 135–36.

Nevertheless, Plaintiffs ask the Court to extend *Bivens* to recognize a novel action for deliberate indifference to their serious medical needs and imposing punitive conditions of confinement, all in violation of their Fifth Amendment Due Process Rights. (*See* Doc. 210 ¶¶ 730–47). The Court, however, will extend *Bivens* into a new context only if there are no "special factors counselling hesitation in the absence of affirmative action by Congress." *Abbasi*, 582 U.S. at 136–37. Although the Supreme Court has never defined the phrase "special factors counselling hesitation," that inquiry requires the Court to focus on "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and

benefits of allowing a damages action to proceed." *Id.* "Even a single sound reason to defer to Congress, is enough to require a court to refrain from creating such a remedy." *Egbert*, 596 U.S. at 491 (citing *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 634 (2021)) (internal quotations removed). Two considerations counsel hesitation here.

### i.     Congressional Amendments to the INA

First, the Court must give appropriate judicial deference to indications that congressional failure to provide an individual damages remedy "has not been inadvertent." *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988); *De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015). In 1952, Congress enacted the INA to provide a "comprehensive immigration scheme," which "set out the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Patel v. U.S. Att'y Gen.*, 971 F.3d 1258, 1266 (11th Cir. 2020). Congress has frequently amended the INA yet declined to authorize a damages remedy for civil immigration detainees against federal officers in their individual capacities. *See e.g.*, Immigration Reform and Control Act of 1986, Pub. L. No. 140–208, 110 Stat. 3009–54 (1996); Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990); Immigration Act of 1990, Pub. L. No. 101–649, 104 Stat. 4978 (1990); Illegal Immigration Reform and Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-54 (1996); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–208, 110 Stat. 3009–54 (1996); REAL ID Act of 2005, Pub. L. No. 109–13, 119 Stat. 302 (2005); Citizenship for Children of Military Members and Civil Servants Act, Pub. L. No. 116–133, 134 Stat. 274 (2020). When Congress has frequently amended a statutory scheme, yet has declined to create a certain remedy, this can demonstrate that "the Judiciary [should] stay its *Bivens* hand." *See Wilkie v. Robbins*, 551 U.S. 537, 554 (2007). For this reason, the Court finds that the frequent amendments to the INA, without any creation of a damages remedy for civil immigration detainees against federal officers in their individual capacities, counsels' hesitation before extending *Bivens* to Plaintiffs' Fifth Amendment claim.

### ii.     Alternative Means of Relief

Second, the availability of an alternative means of relief may alone counsel hesitation before extending a *Bivens* remedy. *See Ziglar*, 582 U.S. at 137. If Congress has created "any alternative, existing process for protecting the [injured party's] interest, that itself may amount

to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* (citing *Wilkie*, 551 U.S. at 550). Although earlier Supreme Court decisions were skeptical that the FTCA was the kind of alternative means of relief that would preclude extending a *Bivens* remedy, *see e.g., Carlson*, 446 U.S. at 21, in the wake of *Abbasi*, courts have found that the existence of an FTCA remedy is sufficient to counsel against extending a *Bivens* remedy. *See Olivia v. Nivar*, 973 F.3d 438, 444 (5th Cir. 2020) (finding that a potential FTCA claim counselled against extending a *Bivens* remedy to a plaintiff's use of force claim), *cert denied*, 141 S. Ct. 2669 (2021); *Huckaby v. Bradley*, No. 116CV4327NLHKMW, 2018 WL 2002790, at *5 (D.N.J. Apr. 30, 2018) (finding "the availability of a remedy against the United States on a claim of negligence under the FTCA, in light of [*Abbasi*], is a factor weighing against the Court recognizing a *Bivens* remedy here"); *Oliveras v. Basile*, 440 F. Supp. 3d 365, 373 (S.D.N.Y. 2020) (finding "that the existence of the FTCA as an alternative remedy qualifies as a specific factor that counsels hesitation in extending *Bivens* to cover Plaintiff's claims" relying on the contrast between *Abbasi* and *Carlson*). The Court is persuaded that, in the wake of *Abbasi*, the availability of an FTCA remedy is sufficient to counsel hesitation before extending a *Bivens* remedy.

Here, Plaintiffs have alleged a number of claims under the FTCA at Counts 18–22, which survive the Official Capacity Federal Defendants' Motion to Dismiss. Although not providing the same relief, against the same parties, as a *Bivens* damages remedy might, the FTCA is nonetheless an existing, alternative process which Congress has created. That process allows Plaintiffs to seek monetary damages for the alleged medical abuses of Defendant Dr. Amin which occurred while Plaintiffs were detained at ICDC. In the wake of *Abbasi*, this is sufficient to counsel hesitation before extending a *Bivens* remedy into a new context. As such, the Court finds that the availability of an alternative means of relief counsels against the extension of a *Bivens* remedy to Plaintiffs' Fifth Amendment claim.

Because the Court has identified two factors which counsel hesitation before extending Plaintiffs' proposed Fifth Amendment *Bivens* remedy to the deliberate indifference context, the Court declines to authorize such an extension. Accordingly, the Individual Capacity Federal Defendants' Motion to Dismiss Plaintiffs' Fifth Amendment *Bivens* claim against them, at Count 4, is **GRANTED**. That claim, therefore, is **DISMISSED-WITH-PREJUDICE**.

### D.    Section 1985(2) Claim

The Individual Capacity Federal Defendants move to Dismiss Plaintiffs' claim against them under 42 U.S.C. § 1985(2), at Count 9. (Doc. 232-1 at 14). Section 1985(2) "makes it unlawful for 'two or more persons' to conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein." *Chance v. Cook*, 50 F.4th 48, 51 (11th Cir. 2022) (quoting 42 U.S.C. § 1985(2)). Section 1985(2) authorizes claims for both deterring witnesses from testifying, *Chance*, 50 F.4th at 51, and for retaliating against witnesses who do. *Foster v. Pall Aeropower Corp.*, 111 F. Supp. 2d 1320, 1322 (M.D. Fla. 2000). Plaintiffs allege both types of claims against the Individual Capacity Federal Defendants. (Doc. 210 ¶¶ 774–96).

However, as the text of the statute requires, and prior authority confirms, Section 1985(2) "refer[s] to conspiracies that are designed to obstruct the course of justice in any court of the United States," and, therefore, plaintiffs seeking to recover under that clause must show a nexus between the alleged conspiracy and a proceeding in federal court. *Bradt v. Smith*, 634 F.2d 796, 801 (5th Cir. Jan. 9, 1981).[20] Nevertheless, Plaintiffs attempt to sustain their claim by asking the Court to accept that the potential of a federal lawsuit is sufficient to establish the required nexus to a proceeding in federal court, which would allow the Court to consider allegations of a conspiracy which occurred earlier than the filing of the instant action. (Doc. 259 at 65–66). The best support Plaintiffs can find for this approach is a case from the Northen District of Georgia, citing a Tenth Circuit case entertaining the idea, in dicta, that a conspiracy to deter a plaintiff from bringing a lawsuit in federal court might give rise to a Section 1985(2) claim. *See Aque v. Home Depot U.S.A., Inc.*, 629 F. Supp. 2d 1136, 1345–46 (N.D. Ga. 2009) (citing *Shoultz v. Monfort of Colorado, Inc.*, 754 F.2d 318, 322 (10th Cir. 1985)). This is a far cry from the type of authority that would compel this Court to adopt Plaintiffs' expansive view of Section 1985(2), particularly when a case that is binding on this Court requires a nexus between an alleged conspiracy and a federal court proceeding. *See Bradt*, 634 F.2d at 801. The Court, therefore, finds that the potential of a future federal lawsuit as alleged is an insufficient nexus to a proceeding in federal court to sustain Section 1985(2) liability. As a result, the only

---

[20] Decisions of the former Fifth Circuit rendered before its partition on October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

allegations that are relevant to Plaintiffs' Section 1985(2) claim are those which occurred while the instant action, filed on November 9, 2020, was pending.

To successfully plead a claim under Section 1985(2), under either theory Plaintiffs assert, a plaintiff must allege the existence of a conspiracy. *See* 42 U.S.C. § 1985(2). In conspiracy cases, a pleading must inform a defendant of the "nature of the conspiracy which is alleged." *Grappell v. Carvalho*, 847 F. App'x 698, 702 (11th Cir. 2021) (quoting *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984)). "It is not enough to simply aver in the complaint that a conspiracy existed[,]" a plaintiff must include specific allegations in the complaint of a joint agreement between Defendants. *Fullman*, 739 F.2d at 557.

Here, Plaintiffs plead a number of conclusory allegations that a conspiracy existed between Defendants. (*See e.g.,* Doc. 210 ¶ 780) ("on information and belief and based on ample circumstantial evidence, Defendants . . . conspired to deter and prevent Plaintiffs from testifying or participating in a pending federal proceeding by expediting the deportation of witnesses who attempted to participate in federal investigations into ICDC"). The Plaintiffs assert a handful of specific allegations about acts which might have been in furtherance of a conspiracy, for example:

> On November 25, 2020, Plaintiff Walker . . . informed government attorneys that she had information relevant to federal investigations and judicial proceedings related to medical abuse at ICDC. Approximately one week later, an ICE official at ICDC took Ms. Walker's fingerprints and informed her that issuance of her travel documents was being expedited, which meant she would soon be deported

(*e.g.,* Doc. 210 ¶ 781). The SAC, however, fails to include specific factual allegations that a joint agreement existed between any Defendant and an Individual Capacity Federal Defendant or among any Individual Capacity Federal Defendant. Nor have Plaintiffs alleged that any specific Individual Capacity Federal Defendant knew of an alleged conspiratorial agreement. Without these specific allegations, the Individual Capacity Federal Defendants, and the Court, are left in the dark about the factual nature and make-up of the alleged conspiracy. For this reason, Plaintiffs fail to sufficiently allege the existence of a conspiracy, as required to state a claim under Section 1985(2).

Plaintiffs argue that their pleading is sufficient because a conspiracy may be proven by circumstantial evidence. (Doc. 259 at 64–65). To the extent that this is true in the criminal

cases Plaintiffs cite, *see e.g., United States v. Morales*, 868 F.2d 1562, 1574 (11th Cir. 1989), and might be true at the summary judgment stage of a civil case, *see e.g., Williamson v. Ala. Dep't of Mental Health & Mental Retardation*, No. 7:19-cv-00669-LSC, 2021 WL 3603456 (N.D. Ala. Aug. 13, 2021), the Court agrees. At the pleading stage of a civil case, however, the authority is clear that specific allegations of a joint agreement are necessary, which is more than "a chronology of events" which loosely suggest the existence of such a joint agreement.[21] The Court, therefore, finds Plaintiffs' argument that their pleading is sufficient because it establishes conspiracy by circumstantial evidence, unpersuasive.

In sum, the Court finds the SAC fails to sufficiently allege the existence of a conspiracy, and except for one isolated allegation, a connection to a court action. As a result, Plaintiffs have failed to state a claim under Section 1985(2) against the Individual Capacity Federal Defendants. Those Defendants' Motion to Dismiss Plaintiffs' Section 1985(2) claim, at Count 9 is, therefore, **GRANTED**. As a result, that claim is **DISMISSED-WITH-PREJUDICE**.

### E. Conclusion

For the reasons discussed above, in Section III, the Individual Capacity Federal Defendants' Motion to Dismiss (Doc. 234) is **GRANTED**. Plaintiffs' claims against those Defendants, at Counts 1, 4, and 9 are **DISMISSED-WITH-PREJUDICE**. Therefore, no claims remain in the above-captioned action against the Individual Capacity Federal Defendants. As a result, Defendants Thomas P. Giles, Cesar Ciprian, Ada Rivera, and Patrick Musante, in their individual capacities, are **DISMISSED** as Parties from this action.

Because all moving Individual Capacity Federal Defendants have been dismissed from the action, this leaves "Unknown ICE Officials ##1-X." To date, Plaintiffs have not perfected service on these Defendants. Under Federal Rule of Civil Procedure 4(m), "if a defendant is

---

[21] Plaintiffs also rely heavily on *Aque v. Home Depot U.S.A. Inc.*, 629 F. Supp. 2d 1336, 1345–46 (N.D. Ga. 2009), to support their contention that their pleading is sufficient. The *Aque* Court found that a specific "chronology of events" was sufficient to inform Defendants of the nature of the conspiracy. While the pleading in *Aque* did not specifically allege the entire nature of the defendants' agreement, it alleged a plausible and compelling narrative, with specific allegations regarding a number of Defendants, entwined with procedural events in the litigation, from which the existence of an agreement could be inferred reasonably. The SAC, on the other hand, contains mostly conclusory allegations, with only one specific allegation against any of the Individual Capacity Federal Defendants which occurred during the pendency of the instant action. (*See* Doc. 210 ¶ 404) ("[O]n November 17, 2020, Ms. Klinke was informed by Defendant Musante that Ms. Adan [Cajigal] was scheduled to be deported"). The Court, therefore, finds *Aque* distinguishable, and, for this reason, finds Plaintiffs' reliance on it misplaced.

not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." The original Habeas Petition was filed on November 9, 2020. Now, approaching three years after the action was filed, Plaintiffs have failed to perfect service on these unknown or unidentified Defendants. The Court put Plaintiffs on notice that unserved Defendants may be subject to dismissal in an Order (Doc. 225) entered on January 3, 2023. Accordingly, Unknown ICE Officials ##1-X are **DISMISSED-WITHOUT-PREJUDICE**.

IV.    DEFENDANTS MINES AND RABIOU'S MOTION TO DISMISS

       A.    **Procedural History**

       On August 17, 2023, Defendants Mines and Rabiou filed a Motion to Dismiss (Doc. 323). Plaintiffs filed a separate Response (Doc. 324) on September 7, 2023. Defendants Mines and Rabiou filed their Reply (Doc. 328) on September 2, 2023. All the Parties' respective briefs have been submitted and the Motion is ripe for ruling.

       Defendants Mines and Rabiou were incorrectly identified in the SAC as ICDC employees when, in fact, they were employed by ICE as deportation officers. (Doc. 244 ¶ 13 ("Plaintiffs have since learned that Walkiria Mines and Djibril 'William' Rabiou were [ICE] employees detailed to ICDC from July 2020 through August 2020."). As the Plaintiffs and Defendants Mines and Rabiou agreed that the claims asserted against them as ICDC officers were not viable, Defendants Mines and Rabiou, in their individual capacities, filed a Consent Motion to dismiss the claims asserted against them at Counts 2, 3, 5, 6, and 11–17 (Doc. 308). Plaintiffs, Defendant Mines, and Defendant Rabiou, also agreed to construe Count 9 to apply to them, not as ICDC employees, but as federal employees.[22] The Court granted Defendants Mines and Rabiou's Motion, and, therefore, dismissed Counts 2, 3, 5, 6, and 11–17 against them. (Doc. 312 at 1–2). The following three claims remain pending against Defendants Mines and Rabiou:

---

[22] *See* Docs. 309 and 311 (Order and Plaintiffs' response thereto confirming their agreement with respect to statements contained in the consent motion).

Count 4 alleging a Fifth Amendment punitive conditions of confinement and deliberate indifference claim, seeking damages. (*Id.* ¶¶ 697–709).

Count 9 alleging a violation of 42 U.S.C. § 1985(2), seeking damages. (*Id.* ¶¶ 774–96); and

Count 23 alleging a claim for attorneys' fees. (Id. ¶¶ 774–96).

Defendants Mines and Rabiou move to dismiss Plaintiffs' claims at Count 4 and Count 9 against them.

### B.    Standard of Review

For the sake of brevity, the Court incorporates by reference the standard of review set forth above. *See* discussion *supra* Section III.B.

### C.    *Bivens* Claim

Defendants Mines and Rabiou move to dismiss Plaintiffs' remaining claim against them under *Bivens*, at Count 4. (Doc. 323 ¶ 3). As the Court has discussed with respect to the Individual Capacity Federal Defendants, *supra* Section III.C, it will not extend *Bivens* to recognize Plaintiffs' Fifth Amendment claim against any federal defendant. The factors counselling hesitation to extend *Bivens* liability to the Individual Capacity Federal Defendants are equally applicable to Defendants Mines and Rabiou, and therefore, Plaintiffs have failed to state a claim against Defendants Mines and Rabiou under *Bivens*. Accordingly, Defendants Mines and Rabiou's Motion to Dismiss Plaintiffs' *Bivens* claim against them, at Count 4, is **GRANTED**. As a result, that claim is **DISMISSED-WITH-PREJUDICE**.

### D.    Section 1985(2) Claim

Defendants Mines and Rabiou move to dismiss Plaintiffs' claim against them under 42 U.S.C. § 1985(2) at Count 9.[23] As the Court has discussed with respect to the Individual Capacity Federal Defendants, *supra* Section III.D, Plaintiffs fail to sufficiently allege the existence of a conspiracy or to sufficiently allege a nexus to an actual court proceeding, as required to state a claim under Section 1985(2). *See Grappell*, 847 F. App'x at 702 (quoting

---

[23] Defendants Mines and Rabiou present their arguments that Plaintiffs fail to state a claim under Section 1985(2) in the context of a qualified immunity analysis. (*See* Doc. 323 at 15–17). As an affirmative defense, qualified immunity is typically addressed at the summary judgment stage. *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). However, because Defendants Mines and Rabiou argue in their qualified immunity analysis that there was no underlying violation of Section 1985(2), the Court construes Defendants Mines and Rabiou's Motion as moving to dismiss Plaintiffs' Section 1985(2) claim for failing to sufficiently allege a claim.

*Fullman*, 739 F.2d at 557). This is particularly true with respect to Defendants Mines and Rabiou because the SAC mentions no specific allegations of their involvement with a conspiracy at all. (*See* Doc. 210 at ¶¶ 774–96). Accordingly, Defendants Mines and Rabiou's Motion to Dismiss Plaintiffs' Section 1985(2) claim, against them, at Count 9 is **GRANTED**. As a result, that claim against them is **DISMISSED-WITH-PREJUDICE**.

### E.    Claim for Attorneys' Fees and Costs

When Plaintiffs and Defendant Mines and Rabiou jointly moved to dismiss Counts 2, 3, 5, 6, and 11–17 against them, they represented this as leaving "only two individual-capacity damages claims" remaining with respect to Defendants' Mines and Rabiou. (Doc. 308 at 4, 6). However, the SAC alleges another claim against Defendants Mines and Rabiou, Plaintiffs' claim for Attorneys' Fees and Costs, at Count 23. When the Court granted the Joint Motion to Dismiss (Doc. 308), therefore, three claims remained in the action against Defendants Mines and Rabiou, not the two represented in their Motion. (*See* Doc. 312)

To correct the Parties' oversight, the Court will construe their stipulation that "Plaintiffs, Mines, and Rabiou further [agree] to bear their own costs and attorney's fees with respect to the dismissal of these claims as to these two Defendants," as requesting the Court to dismiss Count 23 against them as well, at least with respect to those claims. And because the Court has dismissed Counts 4 and 9 against Defendants Mines and Rabiou, Plaintiffs are, of course, not entitled to collect attorneys' fees with respect to Counts 4 and 9. As a result, Plaintiffs' claim for attorneys' fees from Defendants Mines and Rabiou, at Count 23, is **DISMISSED-AS-MOOT**.

### F.    Conclusion

For the reasons discussed above in Section IV, Defendants Mines and Rabiou's Motion to Dismiss (Doc. 323) is **GRANTED**. Plaintiffs' claims against those Defendants, at Counts 4 and 9 are **DISMISSED-WITH-PREJUDICE** and Count 23 is **DISMISSED-AS-MOOT**. Therefore, no claims remain in the above-captioned action against Defendants Mines

and Rabiou. As a result, Defendants Walkiria Mines and Djibril "William" Rabiou, in their individual capacities, are **DISMISSED** as Parties from the action.[24]

## V.  DEFENDANT DR. AMIN'S MOTION TO DISMISS

### A.  Procedural History

Defendant Dr. Mahendra Amin ("Defendant Dr. Amin") filed a Motion to Dismiss (Doc. 235) on January 23, 2023. And he filed his Reply (Doc. 274) to Plaintiffs' Consolidated Response (Doc. 259) on March 22, 2023. All the Parties' respective briefs have been submitted and Defendant Dr. Amin's Motion is ripe for ruling. Defendant Dr. Amin moves to dismiss Plaintiffs' class action allegations, Plaintiffs' *Bivens* claim against him, at Count 6, and all of Plaintiffs' state law claims against him, at Counts 13, 14, 15, 16, 17, and 23.

### B.  Standard of Review

For the sake of brevity, the Court incorporates by reference the standard of review set forth above. *See* discussion *supra* Section III.B.

### C.  Class Action Allegations

Defendant Dr. Amin moves to dismiss the class action allegations against him because they "are not fit for class litigation." (Doc. 235 at 3). Under Rule 23, a Defendant may move for a determination of class certification at any time, even as early as the pleading stage. *Lawson v. Life of the S. Ins. Co.*, 286 F.R.D. 689, 694 (M.D. Ga. 2012) (citing *Lumpkin v. E.I. Du Pont de Nemours & Co.*, 161 F.R.D. 480, 481 (M.D. Ga. 1995). However, dismissal of class allegations before discovery is an "extreme remedy," and is warranted only when a defendant can show, "from the face of the complaint, that it will be impossible to certify the classes alleged by the plaintiff regardless of the facts the plaintiff may be able to prove[.]" *Lawson,* 286 F.R.D. at 694; *accord Foxx v. Ocwen Loan Servicing, LLC,* No. 8:11-CV-1776-T-17EAK, 2012 WL 2048252, at *9–10 (M.D. Fla. June 6, 2012). This is the case because "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the

---

[24] Because the Court has resolved Defendants Mines and Rabiou's Motion on other grounds, the Court need not reach the merits of their arguments that Plaintiffs' claims are barred by qualified immunity, or that the statute of limitations bars Plaintiffs' claims.

plaintiff's cause of action.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978)).

Here, the Court does not find that the class allegations in the SAC are facially deficient, and, as a result, Defendant Dr. Amin's Motion to Dismiss those allegations is premature. As the Court noted before, in response to Defendants making similar arguments in opposition to class certification at an even earlier stage of the litigation, "the Court finds that the adequacy of the class definitions will be determined upon the filing of the appropriate motion and responses by the Parties and upon a full review of those issues on the merits." (Doc. 209 at 4). To the extent the Court was unclear, if any, this note was not an invitation for any Defendant to renew its objection to Plaintiffs' classes at this stage, once again, before discovery. Then, as now, the Court declines to address the adequacy of Plaintiffs' class definitions before discovery has begun, because such discovery may yield facts which are critical to that issue, preventing a full review of the class certification issues on the merits at this stage. Here, Defendant Dr. Amin does not seek early determination by way of a motion to do so on the merits, but by motion to dismiss. Accordingly, Defendant Dr. Amin's Motion to Dismiss Plaintiffs' class allegations against him is **DENIED-WITHOUT-PREJUDICE**.

### D.    *Bivens* Claims

Defendant Dr. Amin moves to dismiss Plaintiffs' claims against him under *Bivens*, at Counts 1 and 4. (Doc. 235 at 7–11). With respect to Defendant Dr. Amin's Motion to Dismiss Plaintiffs' First Amendment claim against him, the Court finds that Plaintiffs do not allege such a claim against Defendant Dr. Amin, because Count 1 is alleged against the Official and Individual Capacity Federal Defendants. As a result, Defendant Dr. Amin's Motion to Dismiss Plaintiffs' First Amendment *Bivens* claim against him is **DENIED-AS-MOOT**.

With respect to Defendant Dr. Amin's Motion to Dismiss Plaintiffs' Fifth Amendment *Bivens* claim against him, for the reasons discussed with respect to the Individual Capacity Federal Defendants (*supra* Section III.C.2.a.), the Court finds that Plaintiffs' Fifth Amendment *Bivens* claim presents a new context. However, at the next stage of the analysis, the Court makes different findings about the factors counselling hesitation before extending a *Bivens* remedy to Plaintiffs' Fifth Amendment claim, although the ultimate conclusion is the same.

First, the purpose of a *Bivens* remedy is to deter federal officials from committing constitutional violations, and that consideration is less acute when a private actor violates the constitution. *Malesko*, 534 U.S. at 71 (citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 474 (1994)). The *Malesko* Court found cause for hesitation in similar circumstances. *Malesko* examined the issue of whether to extend a *Bivens* remedy for deliberate indifference to medical needs against a private prison corporation, acting pursuant to a contract with the Federal Bureau of Prisons. *Malesko*, 534 U.S. at 66–74. In *Malesko*, the Supreme Court declined to extend *Bivens* liability to a private prison corporation because, among other factors, judgments against those corporations would have little deterrent effect on federal officials. *Id.* at 70.

Here, Defendant Dr. Amin was a private physician affiliated with Irwin County Hospital who was referred patients, including Plaintiffs, by ICDC. (Doc. 210 ¶¶ 50, 633). A judgment against Defendant Dr. Amin, therefore, would have little deterrent effect on federal officials, officials who appear only to have approved the referrals to Defendant Dr. Amin after they had been made by ICDC staff. (*See e.g.,* Doc. 210 ¶ 144) ("Unknown ICDC Officers sought approval from ICE Health Service Corp to refer Ms. Oldaker to Defendant Amin"); (*Id.* ¶ 208) ("ICDC employee Mattie Davis approved a referral to Defendant Dr. Amin"); (*Id.* ¶ 227) ("Unknown ICDC Officers sought approval from [ICE] to refer Ms. Terrazas Silas to Defendant Amin on several occasions. Unknown ICE Officials approved the request."); (*Id.* ¶ 606) ("the IGA requires Irwin County to provide 'all medical treatment provided to federal detainees within the facility' but Irwin County must seek approval from ICE for all requests for treatment to be provided outside the facility"). A private physician, referred requests by officials at a privately run detention facility, which were approved by federal officials only after they were made, is several steps further removed from federal officials than the Defendant in *Malesko*. A *Bivens* remedy against Defendant Dr. Amin, therefore, would be even less likely to have a deterrent effect on the conduct of federal officials contemplated by *Bivens* and its progeny. This diminished deterrent effect of a judgment against Defendant Dr. Amin, therefore, counsels hesitation before extending *Bivens* to Plaintiffs' Fifth Amendment claim against him.

Second, as noted, the availability of an alternative means of relief may alone counsel hesitation before extending a *Bivens* remedy. *See Abbasi*, 582 U.S. at 137. This can be the case

either if Congress has fashioned a remedy, *Bush v. Lucas*, 462 U.S. 367, 379 (1983), or state law provides relief for a plaintiff's injury. *Minneci v. Pollard*, 565 U.S. 118, 120–21 (2012). Defendant Dr. Amin contends that the availability of alternative state law remedies counsels hesitation here. The Court agrees. There are alternative state law remedies which Plaintiffs could use to pursue relief for the alleged unconstitutional conduct by Defendant Dr. Amin, as evidenced by the many state law claims Plaintiffs assert against Defendant Dr. Amin, Irwin County Hospital, and the ICDC Defendants. (*See* Doc. 210 ¶¶ 12–17). As a result, the Court finds that the availability of alternative means of relief counsels hesitation before extending a *Bivens* remedy to Plaintiffs' Fifth Amendment claim.

Because the Court has identified two factors which counsel hesitation before extending Plaintiffs' proposed Fifth Amendment *Bivens* remedy to the deliberate indifference and punitive conditions of confinement context, the Court declines to authorize such an extension.[25] Accordingly, Defendant Dr. Amin's Motion to Dismiss Plaintiffs' Fifth Amendment *Bivens* claim against him, at Count 9, is **GRANTED**. Therefore, that claim is **DISMISSED-WITH-PREJUDICE**.[26]

### E.    State Law Claims

Defendant Dr. Amin moves to dismiss Plaintiffs' state law claims against him at Counts 13, 14, 15, 16, 17 and 23. (*See* Doc. 235 at 13–20). Although Defendant Dr. Amin argues that Plaintiffs fail to state a claim for each of their state law claims, the Court need not reach that issue, because it declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

District courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. As a result, the Court has original jurisdiction over Plaintiffs' federal claims. District courts may exercise supplemental jurisdiction over state-law claims, that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]" 28

---

[25] The Court notes that it cannot allow the seriousness of Plaintiffs' allegations against Defendant Dr. Amin, which are grave indeed, to distract it, in the Court's view, from the clear instruction of the Supreme Court that it would be inappropriate to extend *Bivens* to Plaintiff's claim against Defendant Dr. Amin.

[26] Because the Court has found that it will not authorize a *Bivens* remedy for Plaintiffs' claim against Defendant Dr. Amin, it need not address his argument that he was not acting under color of federal law.

U.S.C. § 1367(a). The Court, therefore, may exercise supplemental jurisdiction over Plaintiffs' state-law claims.

A district court, however, may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). When deciding whether to exercise supplemental jurisdiction over a state-law claim, the Court should consider "judicial economy, fairness, and comity[.]" *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002) (citing *Baggett v. First Nat'l Bank of Gainesville*, 177 F.3d 1342, 1352–53 (11th Cir. 1997)). Both comity and judicial economy are served when state courts are given the opportunity to resolve issues of state law. *Rowe*, 279 F.3d at 1288. And this argument to decline jurisdiction is particularly strong when federal law claims have been dismissed prior to trial. *Id.*

Here, the Court has granted Defendant Dr. Amin's Motion to Dismiss all federal claims against him. Considering judicial economy, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims against Defendant Dr. Amin. As such, the Court makes no determination as to the merits of those state law claims. Accordingly, Plaintiffs' state-law claims, at Counts 13, 14, 15, 16, 17, & 23 against Defendant Dr. Amin are **DISMISSED-WITHOUT-PREJUDICE**. Defendant Dr. Amin's Motion to Dismiss Plaintiffs' state law claims on the merits is, therefore, **DENIED**, on the grounds asserted, as moot.

### F. Conclusion

For the reasons discussed above in Section V, Defendant Dr. Amin's Motion to Dismiss (Doc. 235) is **GRANTED-IN-PART**, **DENIED-IN-PART,** and **DENIED-AS-MOOT-IN-PART**. Plaintiffs' federal claim against Defendant Dr. Amin at Count 4, is **DISMISSED-WITH-PREJUDICE**. Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims against Defendant Dr. Amin, at Counts 13, 14, 15, 16, 17, and 23, those claims are **DISMISSED-WITHOUT-PREJUDICE**. Therefore, no claims remain in the above captioned action against Defendant Dr. Amin. As a result, Mahendra Amin, in both his individual and official capacities, is **DISMISSED** as a party from the action.

## VI.  HOSPITAL AUTHORITY OF IRWIN COUNTY'S MOTION TO DISMISS

### A.  Procedural History

On September 17, 2021, Defendant Irwin County Hospital filed a Motion to Dismiss (Doc. 165) Plaintiffs' Amended Petition for Writ of Habeus Corpus (Doc. 54). However, the filing of the SAC (Doc. 210) replaced Plaintiffs' Amended Petition for Writ of Habeus Corpus (Doc. 54). *See e.g., S. Pilot Ins. Co. v. CECS, Inc.*, 15 F. Supp. 3d 1284, 1287 (N.D. Ga. 2013). The Court authorized Defendant Irwin County Hospital to file an amendment or supplement to their already filed Motion to Dismiss, rather than filing a new motion. (Doc. 209 at 7). Defendant Irwin County Hospital filed an Amended Brief (Doc. 231) on January 23, 2023, asserting a number of grounds for dismissal of Plaintiffs' claims against them. Most relevant to this Order, is Defendant Irwin County Hospital's Motion for the Court to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims against them, at Counts 12, 13, 14, 15, 16, 17 and 23.

### B.  Supplemental Jurisdiction

As previously discussed in depth, *see* discussion *supra* Section V.E, the Court may decline to exercise supplemental jurisdiction, and should consider "judicial economy, fairness, and comity" when considering whether to do so. *See Rowe*, 279 F.3d at 1288. Plaintiffs have alleged no federal claims against Defendant Irwin County Hospital, nearly all federal claims in the lawsuit alleged against other Defendants have been dismissed, and the Court has declined to exercise supplemental jurisdiction over any other state law claim alleged in the SAC. The Court finds that under these circumstances, judicial economy, fairness, and comity will be served by declining to exercise supplemental jurisdiction over Plaintiffs' state law claims against Defendant Irwin County Hospital. As a result, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims against Defendant Irwin County Hospital. Accordingly, its Motion (Doc. 165) for the Court to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims against it is **GRANTED**. Plaintiffs' state law claims against Defendant Irwin County Hospital, at Counts 12, 13, 14, 15, 16, 17, and 23 are **DISMISSED-WITHOUT-PREJUDICE**. As a result, Defendant Irwin County Hospital's Motion to Dismiss Plaintiffs' state law claims on other grounds on the merits is **DENIED**, as moot. Therefore, no claims remain in the above-captioned action against Defendant Irwin

County Hospital. As a result, Hospital Authority of Irwin County is hereby **DISMISSED** as a party to the action.

## VII.   CONCLUSION

For the reasons discussed above, the instant Motions to Dismiss (Docs. 242, 234, 323, 235 & 165) are **GRANTED-IN-PART**, **DENIED-IN-PART**, and **DENIED-AS-MOOT-IN-PART**. The dispositions of the Motions are as follows:

1. The Official Capacity Federal Defendants' Motion to Dismiss (Doc. 242) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Plaintiffs' claims against them at Counts 1, 4, 7, 8, 9, and 10 are **DISMISSED-WITH-PREJUDICE**. The only claim that remains in the action against the Official Capacity Federal Defendants is Plaintiffs' FTCA claim against the United States of America. As a result, Defendants Immigration and Customs Enforcement, Jarvis McMiller in his capacity as the Director of the ICE Atlanta Field Office, Tae Johnson in his capacity as Director of ICE, Alejandro Mayorkas in his capacity as Secretary of the Department of Homeland Security, Merrick Garland in his capacity as the Attorney General of the United States, Patrick Musante in his capacity as Assistant Field Office Director and Chief of Staff of the ICE Atlanta Field Office, Cesar Ciprian in his capacity as a Supervisory Detention and Deportation Officer at the ICE Atlanta Field Office, Defendant Ada Rivera in her capacity as the medical director of the ICE Health Service Corps, and "Unknown ICE Officials ##1-X, in their official capacity, are **DISMISSED** as Parties from the action.

2. The Individual Capacity Federal Defendants' Motion to Dismiss (Doc. 234) is **GRANTED**. Plaintiffs' claims against those Defendants, at Counts 1, 4, and 9 are **DISMISSED-WITH-PREJUDICE**. Therefore, no claims remain in the above-captioned action against the Individual Capacity Federal Defendants. As a result, Defendants Thomas P. Giles, Cesar Ciprian, Ada Rivera, and Patrick Musante in their individual capacities are **DISMISSED** as Parties from the action.

3. Defendants Mines and Rabiou's Motion to Dismiss (Doc. 323) is **GRANTED**. Plaintiffs' claims against those Defendants, at Counts 4 and 9 are **DISMISSED-WITH-PREJUDICE**, and Plaintiff's claim against them at Count 23 is **DISMISSED-AS-MOOT**.

Therefore, no claims remain in the above-captioned action against Defendants Mines and Rabiou. As a result, Defendants Walkiria Mines and Djibril "William" Rabiou, in their individual capacities, are **DISMISSED** as Parties from the action.

4. Defendant Dr. Amin's Motion to Dismiss (Doc. 235) is **GRANTED-IN-PART**, **DENIED-IN-PART,** and **DENIED-AS-MOOT-IN-PART**. Plaintiffs' federal claim against Defendant Dr. Amin at Count 4, is **DISMISSED-WITH-PREJUDICE**. Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims against Defendant Dr. Amin, at Counts 13, 14, 15, 16, 17, and 23, those claims are **DISMISSED-WITHOUT-PREJUDICE**. Therefore, no claims remain in the above captioned action against Defendant Dr. Amin. As a result, Mahendra Amin, in both his individual and official capacities, is **DISMISSED** as a party from the action.

5. Defendant Irwin County Hospital's Motion to Dismiss (Doc. 165) is **GRANTED-IN-PART** and **DENIED-AS-MOOT-IN-PART**. Plaintiffs' claims against Defendant Irwin County Hospital, at Counts 12, 13, 14, 15, 16, 17, and 23 are **DISMISSED-WITHOUT-PREJUDICE**, because the Court declines to exercise supplemental jurisdiction over those claims. Therefore, no claims remain in the above-captioned action against Defendant Irwin County Hospital. As a result, Defendant Hospital Authority of Irwin County is hereby **DISMISSED** as a party from the action.

Lastly, all claims against Unknown ICE Officials ##1-X are **DISMISSED-WITHOUT-PREJUDICE** for failure to perfect service.

In sum, the only claims that remain in the action are Plaintiffs' FTCA claims against the United States of America.

**SO ORDERED**, this 22nd day of March 2024.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**