IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**DR. MAHENDRA AMIN, M.D.**,

Plaintiff,

v.                                                                  Civil Action No. 1:25-cv-01313

**TAYLOR & FRANCIS GROUP, LLC;**
**JESSICA TILLIPMAN; GOVERNMENT**
**ACCOUNTABILITY PROJECT, INC.;**
**TOM DEVINE; SAMANTHA FEINSTEIN;**
and **JOHN A. KOLAR**,

  Defendants.

_____

### GAP DEFENDANTS' REPLY IN SUPPORT OF
### MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

Defendants Government Accountability Project, Inc., Tom Devine, Samantha Feinstein, and John A. Kolar (the "GAP Defendants") respectfully submit this Reply to address the fundamental flaws in Plaintiff Dr. Mahendra Amin's (the "Plaintiff") Opposition to the Motion to Dismiss (MTD). The Opposition largely fails to address the core legal and factual defects identified in the MTD. Instead of plausibly alleging a single false statement of fact made by the Defendants, the Plaintiff resorts to generalized and implausible contentions that a jury would see the injustice that is just too illusive to plead with specificity. The plaintiff's plea is "trust me, these three GAP scholars are wolves in sheep's clothing who opine on judicial, Congressional and journalistic documents to harm me, but they know I am innocent and were obligated to say so!" of mischaracterization and attempts to shift the focus to an abstract "overall narrative" and a legally untenable "talebearer" theory.

1

I. **OVERVIEW: THE FOLLY OF THE OPPOSITION IN A SINGLE PARAGRAPH**

Defendants Motion to Dismiss argued that where a lawyer scholar writes a legal review about and citing a court case or congressional record or journalistic broadcast, there is no plausible allegation of falsity without an explicit claim that the scholars misrepresented the statements of the judges, congressmen or journalists. Claims of falsity by the scholars cannot meet the *Ashcroft* and *Twombly* standards by alleging that the judges, congressmen or journalists themselves were wrong about the plaintiff. Amin has not plausibly alleged that the GAP defendants themselves alleged anything other than what the judges, congressmen and journalists have stated, or that the GAP defendants did anything with those institutional statements other than subject them to analysis under federal whistleblower statutes like 41 U.S.C.§ 4712.

Under District of Columbia or Georgia law,[1] failing such a plausible allegation, the only possible way Amin's claim could survive Rule 12(b)(6) is to allege that the GAP scholars misrepresented the statements of the judges, congressmen or journalists. Such a legal requirement is at the heart of defamation by implication cases, and the Motion to Dismiss argues

---

[1] The Opposition effectively concedes there are no differences between D.C. and Georgia law, and thus the "outcome determinative" test of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, (1938) applies:

> "Under *Erie*, a court assesses the substantive/procedural dichotomy with the objective that 'the outcome of the litigation in the federal court [will] be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.' " *Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 302 (3d Cir. 2012) (quoting *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)). "This 'outcome determinative test' focuses on the 'twin aims' of discouraging forum shopping and avoiding 'the inequitable administration of the laws.' " *Id.* (quoting *Hanna v. Plumer*, 380 U.S. 460, 468, (1965)).

*Salaam v. Trump*, 350 F.R.D. 14, 17 (E.D. Pa. 2025).

that theory is neither pleaded nor subject to plausible pleading. Thus, the following paragraph of the Opposition clearly shows the folly of Amin's complaint:

> The GAP Defendants mischaracterize District of Columbia cases in arguing that a defamation action necessarily requires pleading facts showing a misrepresentation of a source of the information in the statements. District of Columbia law requires no such thing. *** Even if Georgia or District of Columbia law required pleading facts that a speaker "misquote[] or "misrepresent[]" its purported sources, Doc 27 at 17, which again they do not, Dr. Amin's complaint would still survive the GAP Defendants' motion, because he does allege that the GAP Defendants misrepresented the facts.

(Opposition pp. 1-2, emphasis added.). To survive Rule 12(b)(6) for a defamation case based on comment regarding judicial or journalistic events, Amin would need something like this commentary by candidate Trump:

> Mayor Koch has stated that hate and rancor should be removed from our hearts. I do not think so. I want to hate these muggers and murderers. They should be forced to suffer . . . I want to hate these murderers and I always will . . . I am not looking to psychoanalyze or understand them, I am looking to punish them . . . BRING BACK THE DEATH PENALTY AND BRING BACK OUR POLICE!

*See, Salaam v. Trump*, 350 F.R.D. 14, 16 (E.D. Pa. 2025), referring to Trump's full page ad (quoted in Salaam's opposition to dismissal, Case 2:24-cv-05560-WB Document 43 Filed 05/23/25 Page 6.[2]  The falsity must be in a misrepresentation of the sources of the commentary.

---

[2] The comment that sparked this lawsuit was made by Defendant during his 2024 Presidential campaign when he faced off against then-Vice President and Democratic Nominee for President, Kamala Harris, in a televised debate (the "Debate"), hosted by the National Constitution Center in Philadelphia. *** Defendant said:

> This is the most divisive presidency in the history of our country. There's never been anything like it. They're destroying our country. And they come up with things like what she just said going back many, many years when a lot of people including Mayor Bloomberg agreed with me on the Central Park Five. *They admitted—they said, they pled guilty.* And I said, well, if they pled guilty they badly hurt a person, killed a person ultimately. And if they pled guilty—then they pled we're not guilty. But this is a person that has to stretch back years, 40, 50 years ago because there's nothing now.

Plaintiff's Opposition underscores, rather than cures, the core defects in his Complaint. He has not identified any provably false factual assertion made by the Government Accountability Project authors; he has not plausibly alleged defamatory meaning under District of Columbia law; and he has not overcome the multiple privileges that protect accurate, attributed discussion of allegations and proceedings arising from matters of profound public concern. Chapter 15 of the Routledge Handbook is a scholarly treatment of a whistleblower case study.

## II. AMIN FAILS TO PLEAD FALSITY

### A. **Public-Concern Speech Requires Plaintiff To Plead And Ultimately Prove Falsity**

The content of Chapter 15 places it squarely within the "public concern" category. It describes whistleblower allegations about medical treatment of women in federal immigration detention; ensuing litigation in *Oldaker v. Giles*;[3] and Congressional and GAO oversight. The Supreme Court and the D.C. Court of Appeals have repeatedly treated criticism of governmental operations, public litigation, and the conduct of those involved as paradigmatic public-concern

---

*Salaam v. Trump*, 350 F.R.D. 14, 16–17 (E.D. Pa. 2025) (emphasis added). The defamation claim against Trump survived because Trump misrepresented the judicial and journalistic record—the Central Park Five never pleaded guilty, they merely gave a coerced confession.

[3] See, O*ldaker v. Giles*, 724 F. Supp. 3d 1315 (M.D. Ga. 2024), where immigrant women who were detained at detention center while subject to removal proceedings or awaiting removal filed a consolidated class action complaint for declaratory and injunctive relief and for damages against a hospital, Dr. Amin, detention center officials, and federal officials affiliated with Immigration and Customs Enforcement (ICE), the Department of Homeland Security, and the Department of Justice, as well as state-law claims against Amin and the hospital, alleging detainees were subjected to medical and other abuse, including unnecessary gynecological procedures that were performed without their consent, and retaliated against for protected speech. Amin was dismissed under Bivens, and the district judge held the state law claims should be heard in the state courts, not under supplemental jurisdiction.

speech. See, e.g., *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 342–45 (1974) (speech about administration of justice and alleged police misconduct); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270–72 (1964).  In such cases, the First Amendment requires that the burden of proving falsity rest with the plaintiff. While that rule is stated most directly in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–78 (1986), the same allocation is reflected in the modern defamation framework applied in this very controversy in *Amin v. NBCUniversal Media, LLC*, 2024 WL 3188768, at *14–16 (S.D. Ga. June 26, 2024). Minor inaccuracies are immaterial so long as the *gist or sting* of the challenged report is accurate. Id. at *15 (citing *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 517 (1991)).

D.C. law follows the same approach: "[T]he plaintiff must prove the falsity of the allegedly defamatory statement." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594–97 (D.C. 2000) (treating falsity as an element and evaluating whether an Op-Ed column contained any provably false assertions of fact); White v. Fraternal Order of Police, 909 F.2d 512, 518–20 (D.C. Cir. 1990) (recognizing that materially true news reports are not actionable even if they permit a defamatory inference).  The Opposition fails to even make a credible effort to show that Amin has satisfied that threshold. His Opposition confirms that, after reproducing selective phrases from Chapter 15 (Compl. ¶ 138), he offers only a naked conclusion that "Those statements are false." Id. ¶ 139. That is exactly the kind of bare assertion courts reject. See *Wilson v. On the Rise Enters., LLC*, 305 F. Supp. 3d 5, 18–19 (D.D.C. 2018) (Howell, C.J.) (dismissing fraud claim where the complaint contained only "threadbare, conclusory allegations," without any detail as to "who made the statements, what was said, when or where these statements were made, and how or why the alleged statements were fraudulent"). Instead, Amin thinks that anyone who attempts to analyze or comment on the judicial, congressional and

5

journalistic record is not just a "tale bearer" but a "tale maker". That view of the law is ludicrous under Rule 12(b)(6).

### B. The Opposition Does Not Plausible Argue That GAP's Attributions Are False

The Opposition does not dispute that the only "facts" Chapter 15 asserts about Dr. Amin are that (1) federal detention-center whistleblowers and detainees made allegations concerning their medical care, (2) media outlets identified Dr. Amin as the physician they accused, (3) detainees represented by public-interest counsel filed the consolidated Oldaker habeas/damages complaint naming him, and (4) Congress and GAO thereafter investigated and reported on those events. Every one of those propositions is verified by the public record and by Plaintiff's own filings in this and other courts. See *Amin v. NBC*, 2024 WL 3188768, at *1–3, *10–12 (reciting Wooten's Project South complaint, media reports, the *Oldaker* action, and subsequent federal and Senate investigations). Chapter 15 did not recount the allegations of "mass hysterectomies" or "uterus collector" that was the heart of Amin's claims in *Amin v. NBC*.

The Opposition does not deny that Project South submitted the September 14, 2020 letter to DHS and circulated it to the media. It does not deny that Prism published an article about "uterus collector" who performed "mass hysterectomies." But nowhere in Chapter 15 are those two terms used—it is Amin and his complaint and the Opposition that imports such statements. Nor does the Opposition deny that detainees filed *Oldaker v. Giles*, describing their allegations against him in a detailed Second Amended Complaint. He does not deny that the Senate Subcommittee issued the 2022 report Medical Mistreatment of Women in ICE Detention, summarizing its eighteen-month investigation about the allegations against Amim.

Because the Complaint never alleges that GAP misstated or invented the existence or content of any of these sources, and because the public record shows they exist exactly as Chapter 15 describes, Plaintiff cannot satisfy his pleading burden to plead falsity. See Guilford,

6

760 A.2d at 594–97; White, 909 F.2d at 518–20; Amin v. NBC, 2024 WL 3188768, at *14–16. When it comes to repeating horrific statements about Dr. Amin, no one can compete with him in republishing them across the United States as he seeks to cash in with defamation lawsuits that he is careful to never bring to a trial.

C. **D.C. Law Protects Interpretive Commentary, Not Just "Hard News"**

The D.C. Court of Appeals has drawn a clear distinction between actionable defamation and protected interpretation or opinion on matters of public concern. In *Guilford*, the plaintiffs—railroad executives—sued over an Op-Ed column in the Journal of Commerce criticizing their labor relations and suggesting they had "a knack for grabbing headlines" and an "anti-labor" posture. 760 A.2d at 582–83. After full discovery, the trial court granted summary judgment to the columnist, and the Court of Appeals affirmed, emphasizing the First Amendment's role in protecting "vigorous public debate" and the special role of Op-Ed commentary. Id. at 582–83, 592–93. The Opposition thinks that only law articulated in a Rule 12(b)(6) order is relevant law, and that summary judgment law does not count.

The court held that general characterizations that Guilford was "antagonistic to labor" or hostile to unions were not "provably false" statements of fact, but rather assessments drawn from a disclosed history of strikes, litigation, and ICC proceedings. Id. at 590-91. The question, under D.C. law, is whether the challenged statements, viewed "in context," id. at 593, assert concrete, verifiable facts about the plaintiff—such as accusing him of having "violated the Railway Labor Act"—or instead "represent the writer's interpretation of the facts presented, because the reader is free to draw his or her own conclusions." Id. at 591.

The opposition deflects on the D.C. Circuit law applying similar reasoning in White, where a police captain claimed that a union's letters and media reports falsely implied he was a criminal and drug user. 909 F.2d at 516. The court suggested a line between (1) "materially true"

7

reporting of official investigations and arrest records, which cannot be re-cast as defamation by implication, and (2) new defamatory "implication[s]" supplied by the defendant's own rhetoric. Id. at 518. The union's letters crossed the line, because they juxtaposed true facts with explicit citations to bribery and tampering statutes that would allow a reasonable reader to infer the authors believed the plaintiff committed those crimes. But the media defendants' reports, which recounted what the FOP had accused and what the investigative record showed, remained non-actionable.

Chapter 15 falls clearly on the protected side of that line. It does not state that Dr. Amin performed "mass hysterectomies," that he "collected uteruses," or that any allegation is true. Instead, it tells the professional readers who bought the Handbook that (1) a former detention-center nurse, Dawn Wooten, filed a whistleblower complaint "alleging" large numbers of unnecessary gynecologic surgeries; (2) that complaint and detainee interviews were reported in the press; (3) that the press "identified" the physician in question as Dr. Amin; (4) that detainees represented by specific advocacy organizations filed suit in *Oldaker*; and (5) that the case became a focal point for advocacy about medical care in ICE detention. Those are not "hard news" findings by GAP; they are a synthesis of disclosed sources.

Under Guilford and White, readers of a law review–style handbook chapter understand that they are reading opinion, where scholars draw implications from the public record. The chapter thus fits comfortably within the category of "interpretive expression or subjective impression" that is not actionable because the audience "is free to draw his or her own conclusions." Id. at 591, 601; see *White*, 909 F.2d at 519–21 ("test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the  communication *to have been intended* in the defamatory sense".). Under the framework

articulated in *White* to transform a materially true report of what others said into defamation, a plaintiff must show that the defendant "did something beyond the mere reporting of true facts to suggest that the author or broadcaster intends or endorses the defamatory inference." 909 F.2d at 520 (emphasis added). Amin pleads no such "something beyond" here.

### III. CHAPTER 15 IS NOT REASONABLY CAPABLE OF A DEFAMATORY MEANING

#### A. D.C. Courts Police The Threshold Question As A Matter Of Law

Even apart from falsity, a defamation claim fails if the challenged words are not reasonably capable of a defamatory meaning. The D.C. Court of Appeals has long held that "[i]t is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule, as a matter of law, that it was not libelous*." Levy v. Am. Mut. Liab. Ins. Co*., 196 A.2d 475, 476 (D.C. 1964). But the inverse should also be equally true: a complaint should be dismissed if a publication is reasonably susceptible only to a non-defamatory interpretation of the statements being "fair comment on matters of public interest" . *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 82–83 (D.C. 1980). Opinion no matter how scathing is not actionable as a falsehood.

Reading Chapter 15 as a whole, in the sense its intended audience of legal and policy readers would understand it the only reasonable construction is that GAP is describing a whistleblower process and ensuing advocacy, not pronouncing Amin guilty of wrongdoing. The chapter's gist is that the Irwin County episode became a paradigmatic case study for how whistleblower law serves the public interest.

#### B. Amin Does Argue Defamation By Implication but Fails to Allege An Affirmative Endorsement by GAP

Amin's Opposition tacitly recognizes that neither Chapter 15 nor its authors ever say "Dr. Amin did X." Instead, while denying it, he relies on defamation-by-implication theories, arguing

9

that by recounting allegations and quoting evocative language from sources like Wooten's complaint and the Prism article, GAP supposedly invites readers to conclude the allegations are true. But D.C. law sets a demanding standard for such claims. The Opposition argues at page 18:

> The other cases the GAP Defendants cite in purported support of this position are also defamation by implication cases. Fells v. Serv. Emp. Int'l Union, 281 A.3d 572, 586 (D.C. 2022); Guilford Transp. Indus. v. Wilner, 760 A.2d 580, 596 (D.C. 2000). Here, in contrast, Dr. Amin alleges that the facts the GAP Defendants published are false, and therefore this is not a defamation by implication case. Again, though, even if it were or Dr. Amin were otherwise required to allege endorsement or intent, he has done so: for example, the GAP Defendants described the "sheer size" of attorneys taking the case against Dr. Amin as "signif[ying] that the amount of public attention and outrage spurred by Ms. Wooten's whistleblower complaint is significant," described as a "positive development[]" the fact that ICDC "women stopped being referred to Dr. Amin," and complained that government procedures as to off-site medical treatment "do not go far enough to prevent similar problems from occurring in the future." Doc. 27-1 at 5; Doc. 1 ¶¶ 12, 134, 138.

Amin is arguing by implication or he would have no case at all for falsity. In *White*, the D.C. Circuit explained that where a communication "merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference, the communication will be deemed capable of bearing that meaning." 909 F.2d at 520.

## IV. THE COMMON-LAW REPORTING PRIVILEGE APPLIES TO PLEADINGS, INVESTIGATIONS, AND OFFICIAL REPORTS, AND PRIVILEGED STATEMENTS CANNOT ESTABLISH THE FALSITY ELEMENT FOR DEFAMATION

Protected opinion cannot supply falsity. The District of Columbia recognizes a robust common-law privilege to publish fair and accurate reports of judicial and other official proceedings, including pleadings filed in court. See *Phillips*, 424 A.2d at 86–88; *Johnson v. Johnson Pub. Co.*, 271 A.2d 696, 698–99 (D.C. 1970). In Johnson, the Court of Appeals

expressly followed the view that privilege extends to reports of charges contained in pleadings filed in court, even before any judicial action, so long as "the publication, taken as a whole, was a fair and substantially correct repetition of these allegations." 271 A.2d at 698–99.

Chapter 15 fits that model exactly. It describes (with footnote citations) (1) the Project South whistleblower filing made to DHS and the Office of Inspector General; (2) the Oldaker consolidated habeas/damages complaint filed in the Middle District of Georgia; (3) the Senate Subcommittee's 2022 Medical Mistreatment report; and (4) a GAO report addressing ICE medical-care oversight. Amin never alleges that any of those proceedings did not occur, nor that the chapter misstates who filed them, what they alleged, or what conclusions the official reports reached. Under Johnson and Phillips, such a "fair and substantially accurate repetition" is conditionally privileged. 271 A.2d at 698–99.

Plaintiff invokes the maxim that "tale bearers are as bad as tale makers," *Davis v. Macon Tel. Pub. Co.,* 92 S.E.2d 619, 624 (Ga. Ct. App. 1956). But as Judge Boasberg has explained in his historical survey of modern defamation doctrines, that absolute rule has long since been moderated by both the fair report privilege and, in some jurisdictions, neutral reportage. James E. Boasberg, "With Malice Toward None: A New Look at Defamatory Republication and Neutral Reportage", 13 Hastings Comm/Ent L.J. 455, 456–63 (1991). The D.C. Court of Appeals' decisions in *Johnson*, Phillips, White, and Guilford, best reflect that evolution: a reporter who fairly and accurately relays what a court filing, administrative body, or congressional committee has said is not treated as the "tale maker" of those allegations.

The Opposition would accord no room for the First Amendment. The Supreme Court has recognized that public-interest litigation and the public discussion of that litigation are themselves forms of political expression entitled to the highest First Amendment protection. See

11

*NAACP v. Button*, 371 U.S. 415, 429–31 (1963) (treating civil-rights impact litigation and related client-solicitation as a form of political expression and association at the core of the First Amendment"). See, *Guilford*, 760 A.2d at 592–93 (emphasizing the need to avoid chilling Op-Ed debate about railroad operations and Amtrak privatization).

Chapter 15 is, by design, an academic commentary on how whistleblowers, detainee plaintiffs, public-interest lawyers, and congressional oversight bodies interact. It describes the Oldaker action as an example of how advocacy organizations use litigation to surface and test allegations about detention conditions. GAP's authors do not purport to resolve factual disputes that the Senate itself found only partially substantiated; they describe those governmental findings and use them to illuminate systemic whistleblower and oversight dynamics. In that role, Chapter 15 is even further removed from defamation liability than the newspaper Op-Ed in Guilford.

To allow a defamation claim to proceed against opinion as falsity in such a chapter would be to chill the full and free exercise of First Amendment rights with respect to the conduct of government and doctors being paid by the government in an immigrant detention facility. Indeed Amin expressly demands a right to punish not just discourage scholars and advocates from writing about litigation and oversight.

V. **CONCLUSION**

Chapter 15 does not purport to adjudicate Dr. Amin's clinical practice. It describes, with careful attribution, what a whistleblower alleged, what detained women claimed, what the Oldaker plaintiffs filed in federal court, how Congress and GAO responded, and how that episode illustrates broader whistleblower and oversight dynamics in immigration detention. Under D.C. law and the First Amendment, such academic commentary on public records and proceedings is not actionable defamation.

The Complaint fails to plead falsity; it fails to identify any provably false factual assertion by GAP; it fails to allege a defamatory meaning cognizable under District of Columbia precedent; and it ignores the robust reporting and fair-comment privileges that protect GAP's work. For all of these independent reasons, and to avoid the chilling effect that protracted litigation would have on public-interest speech like Chapter 15, the Court should grant the GAP Defendants' Motion to Dismiss with prejudice.

Respectfully submitted,

*/s/ F. Douglas Hartnett*

_____
F. Douglas Hartnett (DC Bar 466851)
Elitok & Hartnett at Law, PLLC
1101 - 30th Street, NW #500
Washington, DC 20007
(202) 965-0529/dhartnett@elitokandhartnett.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2025, a true and correct copy of the foregoing Government Accountability Project Defendants' Reply re Motion to Dismiss Complaint for Failure to State a Claim for Relief was electronically filed and served through this Court's electronic filing system (ECF) upon all counsel of record.

*/s/ F. Douglas Hartnett*
_____
Counsel for Government
Accountability Project Defendants