**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DR. MAHENDRA AMIN, | |
| Plaintiff, | Civil Action No. 25-cv-1313 (BAH) |
| v. | Judge Beryl A. Howell |
| TAYLOR & FRANCIS GROUP, LLC, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Dr. Mahendra Amin was accused, in September 2020, in a letter released "to the media" by an organization called Project South, of performing hysterectomies, without consent, on immigrant women detained by the United States Immigration and Customs Enforcement ("ICE"). Compl. for Defamation & Demand for Jury Trial ("Compl.") ¶¶ 1, 88, ECF No. 1. Though these allegations were widely disseminated, with some news outlets identifying plaintiff by name, *id.* ¶ 105, plaintiff highlights that "multiple media outlets and investigations" reported that these "allegations of mass hysterectomies were not accurate," *id.* ¶ 6, including investigations conducted by a U.S. Senate subcommittee and the Georgia Medical Board, and "[n]o investigation corroborated Wooten's allegations of mass hysterectomies" or "resulted in any penalty against Dr. Amin," *id.* ¶¶ 124-25; *see id.* ¶¶ 126-27. Nonetheless, these allegations resurfaced, in April 2024, when recounted in two paragraphs written by defendants Tom Devine, Samantha Feinstein, and John A. Kolar—all of whom work for defendant Government Accountability Project, Inc. ("GAP")—which paragraphs appeared in Chapter 15 of *The Routledge Handbook of Public Procurement Corruption*. *Id.* ¶¶ 128-29.

1

In April 2025, plaintiff filed the instant defamation suit, which joins the series of suits he has filed against those who also allegedly disseminated the inflammatory allegations against him. *See, e.g.*, *Amin v. Spiegel & Grau LLC, et al.*, No. 25-cv-10582 (S.D.N.Y. Dec. 19, 2025); *Amin v. Sage Publ'ns, Inc.*, No. 25-cv-11489 (C.D. Cal. Dec. 2, 2025); *Amin v. O'Brien*, No. 24-cv-22 (S.D. Ga. Mar. 27, 2024); *Amin v. NBCUniversal Media, LLC*, No. 21-cv-56 (S.D Ga. Sept. 9, 2021).  For the reasons stated in more detail below, plaintiff has failed to state a claim upon which relief may be granted and, therefore, defendants' motion to dismiss is **GRANTED**.

## I.    BACKGROUND

The factual background and procedural history relevant to the pending motion are described below.

### A.    Factual Background

Plaintiff, until recently, "was the sole OB/GYN physician in Irwin County, Georgia," and "[a]t the present time," he "is one of only two OB/GYN physicians in Irwin County, Georgia." Compl. ¶ 58.  "Many of [his] patients fall below the poverty line and are on Medicaid."  *Id.* ¶ 59.  "He regularly treated patients in area jails because he knows that if he does not provide treatment, it is likely the patients will go without."  *Id.* ¶ 57.  Before the accusations about plaintiff performing hysterectomies, without consent, were made, plaintiff "provided gynecological medical services to patients detained at [the Irwin County Detention Center ("ICDC")]." *Id.* ¶ 61.

"On September 14, 2020, Project South, an organization that portrays its mission as 'eliminating poverty and genocide' and 'cultivating strong social movements,' sent a letter to the media which purported to be addressed to the Department of Homeland Security, the ICE Atlanta Field Office, and the ICDC."  *Id.* ¶ 88.  This "letter contained allegations regarding conditions at the ICDC, mostly relating to COVID-19," and "also contained allegations of high

rates of hysterectomies at ICDC," *id.* ¶ 92, with Dawn Wooten, "an ICDC nurse," *id.* ¶ 1, serving as "the letter's main source," *id.* at ¶ 89. "Although the letter did not identify Dr. Amin by name, as the only doctor providing gynecological treatment on ICDC patients outside of ICDC, his identity was discernable," so "[a] few outlets, including MSNBC and Prism, identified Dr. Amin by name and reported on the accusations in the letter," while "[m]any other outlets, however, noted that the allegations had not been corroborated." *Id.* ¶¶ 104-05. Following the letter's release "Wooten went on a media campaign as the face of the letter." *Id.* ¶ 89. "GAP actively assisted Wooten in this campaign," and "[f]or instance, a GAP employee appeared on camera with Wooten for an interview with MSNBC about the allegations." *Id.* ¶ 90. GAP also helped Wooten "solicit funds through GoFundMe campaigns which have generated over $100,000 in donations to date." *Id.* ¶ 91.

Wooten subsequently filed a complaint alleging her employer retaliated against her "as a consequence for sharing concerns about the ICDC's failure to adhere to COVID-19 protocols and protections," but, notably, this complaint contained "zero allegations about hysterectomies and not a word about care from any gynecologist." *Id.* ¶¶ 96, 98. According to plaintiff, "[m]edical records show that Dr. Amin only performed two hysterectomies on women detained at ICDC," that "Wooten has never identified any women who she claimed received an unconsented-to hysterectomy," that "[t]here are no medical records showing a lack of consent for any hysterectomy performed by Dr. Amin on any woman detained at ICDC," and that "Wooten never accompanied any women detained at ICDC to medical appointments with Dr. Amin." *Id.* ¶¶ 99-103. Plaintiff further asserts that "[s]igned medical consent forms, for the hysterectomies as well as all of the procedures Dr. Amin performed on ICDC patients, confirm that all procedures were discussed and consented to by ICDC patients." *Id.* ¶ 115.

The ensuing media attention led to investigations of Wooten's claims, with the "Georgia Composite Medical Board clear[ing] Dr. Amin of wrongdoing and allow[ing] him to continue practicing medicine," and the U.S. Senate Permanent Subcommittee on Investigations "confirm[ing] that only two hysterectomies were performed, both approved by ICE as medically necessary." *Id.* ¶ 126-27.

*The Routledge Handbook of Public Procurement Corruption* was released on April 30, 2024, with Chapter 15, which was written by Devine, Feinstein and Kolar on behalf of GAP, and included a "Case Study" describing Wooten's "accusations of mass hysterectomies and sterilizations without consent or knowledge" and naming plaintiff. *Id.* ¶¶ 128-29. The two paragraphs of disputed statements regarding plaintiff reads as follows:

> Ms. Wooten's other disclosures concerned a doctor who allegedly performed hysterectomies and other gynecological procedures on immigrant women detained at the ICDC with dubious consent and necessity (Project South et al., 2020). On September 15, 2020, a *Prism* article by Tina Vásquez reported that the doctor responsible for the alleged abuse of these migrant women was identified by the press as Dr. Mahendra Amin (Vásquez, 2020). By December 21, 2020, 13 women previously detained at ICDC and allegedly victimized by Dr. Amin joined a class action lawsuit filed by attorneys from Dreyer Sterling LLC and eight immigration advocacy organizations (Dreyer et al., 2020). Although the class action lawsuit is ongoing as of December 11, 2022, the sheer size of the legal team representing the survivors of Dr. Amin's alleged malpractice signifies that the amount of public attention and outrage spurred by Ms. Wooten's whistleblower complaint is significant. There have been other positive developments as well. Within a week of Ms. Wooten's public disclosures, women stopped being referred to Dr. Amin, and by May 3, 2021, ICE confirmed that all women were transferred out of ICDC (Davis, 2021; Merchant, 2021). On May 20, 2021, although federal and Congressional investigations were still ongoing, DHS Secretary Mayorkas announced his plans to shut down ICDC as an immigrant detention facility based on the findings of ongoing investigations spurred by Ms. Wooten and the women survivors who came forward (Olivares and Washington, 2021). By October 7, 2021, ICE ended its contract with ICDC, but as of September 3, 2021, the facility already had stopped housing ICE detainees (Cuffari, 2022).
>
> There is a deeper problem across U.S. immigration detention centers. According to a U.S. Government Accountability Office (GAO) investigation, ICDC is merely one of several facilities where patients in ICE's custody lacked informed

4

consent. . . . Whistleblowers, therefore, continue to be essential for making the government aware of fraud and human rights abuses that occur.  But at what cost?

Defs.' Mot., Ex. 1, Tom Devine, Samantha Feinstein & Jack Kolar, Whistleblowers and Winning the Battle Against Government Contract Fraud, *in The Routledge Handbook of Public Procurement Corruption* 224-25 ("Devine, Whistleblowers and Winning") (Sope Williams & Jessica Tillipman eds., 2024), ECF No. 27-1.[1]

### B.     Procedural Background

Plaintiff filed this suit on April 29, 2025, *see* Compl., naming six defendants: Devine, Feinstein, Kolar and GAP, as well as Taylor & Francis Group, LLC, the publisher of *The Routledge Handbook*, and Jessica Tillipman, one of the book's editors.  Following plaintiff's voluntary dismissal, with prejudice, as to all claims against Tillipman and Taylor & Francis Group, LLC, *see* Pl.'s Rule 41(a)(1)(A)(i) Notice of Voluntary Dismissal with Prejudice of Def. Jessica Tillipman, ECF No. 23; Notice of Dismissal Pursuant to Rule 41(a)(1)(A)(i), ECF No. 31, the remaining defendants filed the pending motion to dismiss, *see* Defs.' Mot. to Dismiss ("Defs.' Mot."), ECF No. 27, which is now ripe for resolution, *see* Defs.' Reply, ECF No. 30.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff pleads

---

[1]     Defendants' request, with plaintiff's consent, to take judicial notice of the publication containing the allegedly defamatory statements is granted.  *See* Defs.' Mot. at 5-6; Pl.'s Resp. in Opp'n to GAP Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 19, ECF No. 29 ("Exhibit 1 is the publication at issue in this case.  To the extent the GAP Defendants attach it to show the entire publication thereof, Dr. Amin agrees that it is appropriate for judicial notice."); *see also Mason v. Am. Prospect, Inc.*, No. 23-cv-2238 (LLA), 2024 WL 4345855, at *4 (D.D.C. Sept. 30, 2024) ("[C]ourts routinely consider the publication containing an alleged defamatory statement when resolving a motion to dismiss.").

factual content that is more than "'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556-57). "[T]he Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## III.    DISCUSSION

The parties dispute, first, whether the libel law of the District of Columbia or Georgia governs, *compare* Defs.' Mot. at 17 (applying D.C. law), *with* Pl.'s Resp. in Opp'n to GAP Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 7, ECF No. 29 (arguing Georgia law applies), and second, whether defendants' statements were libelous. The choice-of-law inquiry is considered first and then liability for defendants' statements in the two contested paragraphs of Chapter 15 of *The Routledge Handbook of Public Procurement Corruption*.

### A.    Choice of Law

Subject matter jurisdiction for this suit rests on diversity jurisdiction, so the first inquiry is to determine which State's substantive laws controls its resolution. "When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006) (quoting *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997)). The District of Columbia "employs the governmental interest analysis test of the Restatement Second of Conflict of Laws." *Id.* (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001)). "Applying it to defamation actions, 'the weight of authority considers that the law to be applied is that of the place where the plaintiff suffered injury by

6

reason of his loss of reputation.'" *Id.* (paraphrasing *Dowd v. Calabrese*, 589 F. Supp. 1206, 1210 (D.D.C. 1984)).  Plaintiff correctly insists that Georgia law controls here since he maintains his medical practice in Georgia.   Pl.'s Opp'n at 7.   Defendants' confused invocation of "the 'outcome determinative' test of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)," Defs.' Reply at 2 n.1, does not persuade otherwise because that test concerns selection between federal and state procedural rules and not, as is relevant here, the choice of which substantive law between two States to apply.

##### B.    Application of Georgia Defamation Law

"In Georgia, a claim for defamation has four elements: '(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm.'"  *Oskouei v. Matthews*, 912 S.E.2d 651, 659 (Ga. 2025) (quoting *Am. C.L. Union, Inc. v. Zeh*, 864 S.E.2d 422, 427 (Ga. 2021)).  Defendants' motion to dismiss is predicated only on the first element, contending that "the Complaint fails to plausibly allege falsity."  Defs.' Mot. at 14.

Georgia defines libel as the "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule."  Ga. Code Ann. § 51-5-1(a).  "A written defamatory statement is actionable as either libel per se or libel per quod."  *Zarach v. Atlanta Claims Ass'n*, 500 S.E.2d 1, 4-5 (Ga. Ct. App. 1998) (citing *Macon Tel. Publ'g Co. v. Elliott*, 302 S.E.2d 692, 696 (Ga. Ct. App. 1983)).  Plaintiff proceeds under both theories.  *See* Compl. ¶¶ 179-80.  "Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality."  *Barber v. Perdue*, 390 S.E.2d 234, 235 (Ga. Ct. App. 1989) (quoting *Grayson v. Savannah News-Press*, 139 S.E.2d 347, 351 (Ga. Ct. App. 1964)).  "Defamatory words which are actionable per se are

those which are recognized as injurious on their face—without the aid of extrinsic proof." *Macon*, 302 S.E.2d at 696. "When determining whether words are defamatory as a matter of law, courts may not hunt for strained constructions and must rely upon the words themselves in considering whether a statement was defamatory per se." *Zarach*, 500 S.E.2d at 5 (citing *Willis v. United Fam. Life Ins.*, 487 S.E.2d 376, 379 (Ga. Ct. App. 1997), and *Mathews v. Atlanta Newspapers*, 157 S.E.2d 300, 303 (Ga. Ct. App. 1967)); *see also Cent. of Ga. Ry. Co. v. Sheftall*, 45 S.E. 687, 688 (Ga. 1903) ("Words which are libelous per se do not need an innuendo."); *Bellemead, LLC v. Stoker*, 631 S.E.2d 693, 695 (Ga. 2006) ("[T]he negative inference a hearer might take from the words does not subject the speaker to liability for slander per se.").

In contrast, "if the defamatory character of the words do not appear on their face but only become defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod, and are said to require innuendo." *Macon*, 302 S.E.2d at 696. "The office of an innuendo is to explain that which is of doubtful or ambiguous meaning in the language of the publication, but cannot enlarge the meaning of words plainly expressed therein." *Park & Iverson v. Piedmont & Arlington Life Ins. Co.*, 51 Ga. 510, 510 (1874). Thus, "[i]nnuendo means only that where words are capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, which of the two meanings will be attributed to it by those to whom it is addressed or by whom it may be read." *Reece v. Grissom*, 267 S.E.2d 839, 841 (Ga. Ct. App. 1980) (citing *Grayson*, 139 S.E.2d at 351). Georgia law is clear that "[i]nnuendo is not a device whereby non-libelous words are made actionable," so "[u]nless the words of the alleged defamation are themselves susceptible of the libelous innuendo no cause of action is stated; any harmful innuendo which may result not from

8

the ambiguity of the words themselves but from the readers' subjective reaction to truthful words of an unambiguous and non-libelous nature is not an actionable defamation." *Id.*

The Supreme Court has identified "a 'chilling' effect [that] would be antithetical to the First Amendment's protection of true speech on matters of public concern," and has thus commanded that "a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant." *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986). In compliance with this binding judicial precedent, Georgia law holds that "[w]here a publication is substantially accurate, and if the article is published by the newspaper in good faith and the same is substantially accurate, the newspaper has a complete defense." *Lucas v. Cranshaw*, 659 S.E.2d 612, 615 (Ga. Ct. App. 2008) (alteration in original) (quoting *Blomberg v. Cox Enters., Inc.*, 491 S.E.2d 430, 432 (Ga. Ct. App. 1997)). Consequently, "[a]s long as facts are not misstated, distorted or arranged so as to convey a false and defamatory meaning, there is no liability for a somewhat less than complete report of the truth, even if the newspaper . . . conveys . . . its own editorial opinions." *Id.* (ellipses in original) (quoting *Mathews*, 157 S.E.2d at 303-04). Consistent with this reasoning, the Georgia Supreme Court has explained that "a defamation action will lie only for a statement of a fact . . . because a statement that reflects an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false." *Cottrell v. Smith*, 788 S.E.2d 772, 781 (Ga. 2016) (quoting *Gettner v. Fitzgerald*, 677 S.E.2d 149, 153 (Ga. Ct. App. 2009)). That being said, "[a]n opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false." *Gast v. Brittain*, 589 S.E.2d 63, 64 (Ga. 2003).

9

Applying these legal principles to the two paragraphs challenged as defamatory makes plain the shortfalls in plaintiff's claim. Starting with the first of Chapter 15's paragraphs at issue, plaintiff does not identify a specific statement as being false nor explain how any statement is demonstrably false, but instead simply contends that "[t]he statements are false." Compl. ¶ 135. He then points out, more generally, that he "only conducted two hysterectomies, both of which were necessary and done with the patient's knowledge and consent, as were all of the procedures Dr. Amin performed on ICDC patients." *Id.* These facts do not alter that the challenged paragraph reports on "disclosures" made by Wooten that "concerned a doctor who allegedly performed hysterectomies and other gynecological procedures on immigrant women detained at the ICDC with dubious consent and necessity." *Id.* ¶ 134. Such a summary of Wooten's allegations is, in fact, precisely what plaintiff's own complaint provides. *See id.* ¶ 89 ("Wooten was the letter's main source."); *id.* ¶ 92 ("The letter also contained allegations of high rates of hysterectomies at ICDC."); *id.* ¶ 61 ("Wooten first made false allegations that he was conducting mass hysterectomies and sterilizations without consent . . . ."). Quite simply, recounting the fact that allegations were made does not amount to falsity.

Plaintiff next focuses on missing contextual information to rebut purported falsehoods within the first disputed paragraph summarizing the sequence of events between Wooten's September 2020 disclosure and ICE ending its contract with ICDC in October 2021. For example, with respect to the statement that "[o]n September 15, 2020, a *Prism* article by Tina Vásquez reported that the doctor responsible for the alleged abuse of these migrant women was identified by the press as Dr. Mahendra Amin," plaintiff contends that "Prism had published reasons to doubt the veracity of Wooten's claims on September 17, 2020." *Id.* ¶ 134-35. A subsequent expression of "doubt," however, does not contradict the fact that Prism reported the

allegation or that Prism identified plaintiff, as accurately stated in the disputed paragraph.  Next, Chapter 15 goes on to state that "[b]y December 21, 2020, 13 women previously detained at ICDC and allegedly victimized by Dr. Amin joined a class action lawsuit filed by attorneys from Dreyer Sterling LLC and eight immigration advocacy organizations" and that "the class action lawsuit is ongoing as of December 11, 2022."  *Id.* ¶ 134.  Plaintiff emphasizes that he "was dismissed as a defendant from the class action lawsuit," *id.* ¶ 135, but that omitted fact does not negate the stated facts that the suit was filed or that the suit was ongoing in December 2022.  Moreover, plaintiff was not dismissed from the class action until March 2024, well after the stated date of "as of December 11, 2022," rendering this statement accurate, even though plaintiff's dismissal occurred shortly before publication of the book.  *See Oldaker v. Giles*, 724 F. Supp. 3d 1315, 1354 (M.D. Ga. 2024) (dismissing plaintiff from the suit); *see also* Pl.'s Opp'n at 20 (noting that plaintiff had been dismissed as a defendant in the class action "the month before the publication of those statements").  Finally, plaintiff appears to take issue with defendants' statement that "federal and Congressional investigations were still ongoing" in May 2021, noting that "the United States Senate Permanent Subcommittee on Investigations had definitively stated that only two hysterectomies had been performed by Dr. Amin on ICDC patients and that ICE had approved both as medically necessary."  *Id.* ¶ 134-35.  The completion of subsequent factfinding does not render false the fact that an investigation was underway at the time indicated in the writing.

Plaintiff highlights two statements in the first paragraph to show that defendants went beyond merely reporting the allegations to endorsing their veracity.  *See* Pl.'s Opp'n at 12-13.  Specifically, defendants wrote that "[a]lthough the class action lawsuit is ongoing as of December 11, 2022, the sheer size of the legal team representing the survivors of Dr. Amin's

alleged malpractice signifies that the amount of public attention and outrage spurred by Ms. Wooten's whistleblower complaint is significant." Compl. ¶ 134. Plaintiff's interpretation of this sentence as endorsing the veracity of Wooten's allegations is a stretch since the clear focus is on the public attention garnered by the "whistleblower complaint" and this opinion about the effectiveness of such complaints to draw such attention cannot be understood as defamatory. Indeed, the Complaint itself makes similar statements about "widespread media coverage" *Id.* ¶ 148; *see also id.* ¶ 123 ("Following Wooten's jaw-dropping allegations and the ensuing media coverage, multiple government bodies investigated."). Plaintiff also focuses on defendants' writing that "[t]here have been other positive developments as well," followed by reporting that, after the allegations were made public, women detainees stopped being referred to plaintiff and that the entire ICDC facility was eventually shut down. Devine, Whistleblowers and Winning at 224. Whether the development was positive or negative is an opinion that "cannot be proved false" and thus cannot form the basis for recovery under Georgia law. *Cottrell*, 788 S.E.2d at 781. To whatever degree this statement implies facts later disproven, the "substantially accurate" nature of the reporting protects the authors' "own editorial opinions." *Lucas*, 659 S.E.2d at 615.

Turning to the second contested paragraph, in which defendants identified "a deeper problem across U.S. immigration detention centers" that "ICDC is merely one of several facilities where patients in ICE's custody lacked informed consent," Compl. ¶ 134, plaintiff objects that "using Wooten's accusations to support its argument that whistleblowers are 'essential for making the government aware of fraud and human rights abuses'" only "emphasized the false and defamatory nature of the accusations," *id.* ¶ 133. To show falsity, plaintiff points to the Senate Report, which he represents, "contrary to Ms. Wooten's allegations,

found that Dr. Amin only performed two hysterectomies, both of which were medically necessary." Pl.'s Opp'n at 13. The thrust of the challenged second paragraph, however, was more general: that "patients in ICE's custody lacked informed consent" and that "[w]histleblowers, therefore, continue to be essential for making the government aware of fraud and human rights abuses that occur." Compl. ¶ 134. Moreover, plaintiff's cherry-picked excerpt from the Subcommittee report's conclusions ignores other conclusions that actually lend support to this published paragraph. While the Subcommittee found the allegation of mass hysterectomies "to be false," the Subcommittee also concluded that "under Dr. Amin's care, female detainees appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures" and that "Dr. Amin was a clear outlier in both the number and types of procedures he performed compared to other OB-GYNs that treated ICE detainees," such that "he performed nearly one-third of *certain* OB-GYN *procedures* on ICE detainees across the country between 2017 and 2020 and more than 90% of some key procedures." Staff of Permanent S. Subcomm. on Investigations, 117th Cong., *Medical Mistreatment of Women in ICE Detention* 4-5, 21 (2022) (emphases in original). More to the point, the Subcommittee found that "[t]here appears to have been repeated failures to secure informed consent for offsite medical procedures performed on ICDC detainees." *Id.* at 3. The report elaborates that "[a]ccording to medical experts who reviewed the records of Dr. Amin's ICDC patients, there was a lack of informed consent in many instances," *id.* at 12, and one expert "flagged that Dr. Amin 'does not appear to be board certified' and 'likely does no or limited continuing education to stay current' on up-to-date medical practices in these areas," *id.* at 69.[2] Far from undercutting defendants'

---

[2]    Plaintiff reportedly rejected repeated efforts by the Subcommittee "to obtain [his] voluntary testimony" and then, after the Subcommittee served him "with a subpoena for deposition," plaintiff "submitted an affidavit to the Subcommittee stating that he was innocent of the allegations and that he declined to provide testimony pursuant to his Fifth Amendment privilege against self-incrimination." *Id.* at 70.

statements in the second paragraph, the Senate Report supports the paragraph's expressed opinion that whistleblowers helped to uncover surgeries completed without informed consent in ICE detention facilities.

## IV.  CONCLUSION AND ORDER

For the foregoing reasons, plaintiff has failed to state a claim upon which relief can be granted.  Accordingly, it is hereby

**ORDERED** that defendants' Motion to Dismiss, ECF No. 27, is **GRANTED**; and further

**ORDERED** that this case be **DISMISSED**.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Date:  April 10, 2026

_____
**BERYL A. HOWELL**
United States District Judge